**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **EDWIN F. LEGARD, JR., ELIZABETH** | ) | |
| **ANNE COX TRUST, by and through its** | ) | |
| **Trustee, Elizabeth Anne Cox; and EMILY P.** | ) | |
| **BAKER GENERATION SKIPPING TRUST,** | ) | |
| **by and through its Trustee, William G. Baker,** | ) | |
| **on behalf of themselves and all others** | ) | **Case No. 1:10-cv-00041** |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **EQT PRODUCTION COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

## I.    INTRODUCTION

Plaintiffs allege that EQT engages in a variety of improper practices, each of which improperly reduces the gas royalty payments that EQT is obligated to make to Plaintiffs and the Class Members.  One of these practices involves EQT's sale of gas at below-market prices.  As Plaintiffs allege in their Complaint:  EQT "improperly used gas prices that were less than fair market value prices.  EQT's use of such improper prices resulted from, among other things, the sale of Gas by EQT to affiliates . . . on a non-arm's length basis."  (Complaint, ¶15).

An additional improper practice in which Plaintiffs allege that EQT engages is that it deducts various post-wellhead costs when calculating the royalties it pays Plaintiffs and Class

Members.  EQT "has improperly taken deductions from Plaintiffs' and Class Members' Royalties for various post-wellhead costs.  Such costs include fees, expenses, and charges for gathering, compression, dehydration, treating, separation, processing and/or transportation to the point of sale."  (Complaint, ¶17).  EQT also fails to disclose many of those post-wellhead deductions on the check stubs it mails to Plaintiffs and Class Members with each royalty payment:  "The check stubs EQT prepared and sent to Plaintiffs and the Class Members did not disclose all of the deductions or adjustments that EQT had made to Plaintiffs' and the Class Members' Royalty payments."  (Complaint, ¶19).

At this stage of the litigation, the Court must assume that these allegations -- as well as all other factual allegations in the Complaint -- are true.

The Court should deny EQT's motion to dismiss.  First, EQT in its motion virtually ignores Plaintiffs' allegations that relate to its below market value gas sales.  Those allegations independently form a factual basis for Plaintiffs' royalty underpayment claims, and because EQT fails to address those allegations in its motion, Plaintiffs' claims should not be dismissed.

The second reason why the Court should deny EQT's motion is that the legal arguments it makes concerning its post-wellhead deduction practices are incorrect.  Under the plain language of Plaintiffs' leases, EQT is not permitted to deduct the subject costs.  Even if the lease language were ambiguous – which it is not – the lease language would have to be construed against EQT, the drafter/lessee.  *See* Section II.D.2, pp. 8-11 *infra*.  Moreover, because the Court must assume as true all of Plaintiff's factual allegations, EQT cannot rely upon the fact-filled Declaration of Rick Crites, which is attached to EQT's motion to dismiss.  The Court should strike the declaration.  *See* Section II.B., p. 5 *infra*.

- 2 -

EQT claims that it is entitled to take post-wellhead deductions as a matter of law. Incorrect.  While Virginia courts have not yet decided this issue, the majority view of courts around the country is that unless a lease expressly permits an operator like EQT to deduct them, the operator must solely bear all post-wellhead costs that have been incurred to make gas marketable.  Notably, West Virginia courts support Plaintiffs' position.  If -- as EQT wants -- this Court were to take a view contrary to that of the West Virginia courts, gas rights holders in the two neighboring states -- who draw gas from the same gas pools that underlie both states -- would be put in the untenable position of being entitled to significantly higher or lower royalties on the gas drawn from the same pools, depending only on the side of the border on which they live.  That would make no sense, and it would be contrary to Virginia's interest in protecting the citizens of some of the poorest counties in the state. *See* Section II.D.3, pp. 11-15 *infra*.

EQT's statute of limitations arguments are equally unavailing.  Controlling Virginia Supreme Court authority holds that a breach of a continuing mineral rights lease does not accrue until the contract expires.  Moreover, when a party by contract owes a continuing duty to another party, no cause of action for breach accrues until the relationship ends – which here it has not. *See* Section III.E, pp. 17-20 *infra*.  Alternatively, under clear and recent Virginia law, in cases like this in which the complained-of misconduct occurred in intervals, causing new damages, each wrong gives rise to a new and independent cause of action.  Therefore, at the very least, all claims based on conduct within the past five years are actionable.

EQT argues that Plaintiffs' claims for conversion, breach of implied duties, and breach of fiduciary duties are not recognized under Virginia law.  EQT is incorrect.  EQT fails to cite a single oil or gas case to support its arguments – perhaps because those cases support Plaintiffs'

claims.  Further, the cases EQT does cite do not support dismissal.  *See* Section III, F-H, pp. 27-35, *infra*.

Plaintiffs respectfully request that the Court deny EQT's motion in its entirety.

## II.   ARGUMENT

### A.   Standard Of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).  The court must determine whether there is a "reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544. 558 (2007).  "Plausibility" means the "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556.

When ruling on a motion to dismiss, the court must take the allegations in the complaint as true.  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Witthohn v. Fed. Ins. Co.*, 164 Fed. Appx. 395, 396 (4th Cir. 2006).  The court may not consider materials outside of the complaint without converting the motion to one for summary judgment.  *Id*., *see also* Fed. R. Civ. P. 12(d) ("If on a motion under Rule 12(b)(6) ... matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").  If a court were to consider materials outside of the complaint and thereby convert a motion to dismiss to one for summary judgment, the court must give all parties "reasonable opportunity to present all material made pertinent to such motion by Rule 56."  Fed. R. Civ. P. 12(b); *see also Plante v. Shivar*, 540 F.2d 1233, 1235 (4th Cir. 1976).  This "reasonable opportunity" includes some indication by the court to all parties that it is treating the 12(b)(6)

motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits or to pursue reasonable discovery." *Plante*, 540 F.2d at 1235.

**B.**   **The Court Should Strike The Declaration Of Rick Crites, Which Contains Factual Claims Contradicting The Facts Alleged In The Complaint.**

In the face of black letter law that a court must take the allegations in the complaint as true when ruling on a motion to dismiss, EQT has attached as Exhibit 5 to its motion to dismiss the "Declaration of Rick Crites."  Mr. Crites' statements regarding EQT's purported practice of paying royalty checks that disclose (some of) its deductions are factual statements that contradict the statements in the Complaint.  The allegations in the Complaint must be taken as true at this stage and materials outside of the complaint may not be considered.  *Ashcroft*, 129 S.Ct. at 1949; *Witthohn*, 164 Fed. Appx. at 396.  Therefore, the Court may not rely upon Mr. Crites' statements when it considers EQT's motion to dismiss.  For that reason, the Court should strike Mr. Crites' declaration.[1]

**C.**   **The Court Should Deny EQT's Motion To Dismiss Because EQT Fails To Address Plaintiffs' Claims That EQT Underpaid Royalties By Selling Gas At Below Fair Market Value Prices.**

In addition to Plaintiffs' allegations that EQT unlawfully deducted costs when calculating its royalty payments, each of Plaintiffs' claims is also premised on the fact that EQT has failed to meet its obligation to Plaintiffs as "a reasonably prudent operator . . .to market and sell its Gas production at the highest price obtainable." (Complaint at ¶ 15).  Instead, EQT sold the gas from Plaintiffs' wells at rates that were less than the "highest price obtainable" and at rates that

---

[1] If the Court is inclined to consider the Declaration and convert EQT's motion to dismiss into a motion for summary judgment – which would be highly unusual and inappropriate at this pre-discovery stage of the litigation –Plaintiffs are entitled to conduct discovery to test any facts EQT raises before the Court rules.

"were less than fair market value prices, including sales to affiliates on a non-arm's length basis."  (*Id.*)

EQT barely recognizes the existence of this basis for Plaintiffs' claims in its motion, and none of the brushing comments it makes about these allegations are sufficient to sustain a motion to dismiss.

> **D.    The Court Should Reject EQT's Assertions That Its Deductions Are Proper as a Matter of Law.**
>
> > **1.    The Plain Terms of Plaintiffs' Leases Prohibit EQT From Deducting Its Costs From Plaintiffs' Royalties.**

Four of the subject oil and gas leases at issue permit EQT to produce gas from Plaintiffs' properties in Virginia in exchange for a royalty payment on gas "saved and marketed from the leased premises at the rate of one-eighth (1/8) of the proceeds received by the Lessee at the well."  (*See* Exs. 1-4 to EQT's Brief)).

Under Virginia law, when determining whether a contractual term is ambiguous, the court considers how words are used in their ordinary meaning.  *Pocahontas Mining Ltd. Liab. v. CNX Gas Co., LLC*, 276 Va. 346, 353, 666 S.E.2d 527, 531 (Va. 2008).  The phrase "of the proceeds" is a plain, unambiguous term; it requires EQT to pay royalties based on the full amount of the proceeds, rather than based on a partial amount of the proceeds.  In reviewing similar lease language in *Hanna Oil Gas Co. v. Taylor*, 297 Ark. 80, 759 S.W.2d 563 (Ark. 1988), the Supreme Court of Arkansas found that these words required the lessee to calculate its royalty payment based on the full amount of the "proceeds," and that the lessee could, therefore, not deduct post-wellhead (compression) costs in calculating royalties. In reaching its conclusion, the court noted that "Webster's New World Dictionary's first definition of 'proceeds' provides: 'what is produced or derived from something (as a sale, investment, levy, business) by way of

- 6 -

total revenue: the total amount brought in: yield, returns.'" *Id.,* 297 Ark. 80, 81, 759 S.W.2d 563, 565.  The court stated "we find it unnecessary to go beyond the clear language of the agreement of the parties to hold that [the lessee] is not entitled to deduct compression costs." *Id*. This Court should reach the same conclusion, and hold that the plain terms of the four "proceeds" leases at issue require EQT to market the gas and pay royalties from its full proceeds, without any costs deductions.[2]

EQT's brief notes that there are five leases between the parties, notes that four of the five leases provide for royalty of one-eighth of the "proceeds received by Lessee at the well," attaches the four "proceeds" leases to its brief (Exs. 1 - 4), and frames its arguments around the four proceeds leases.  EQT never discusses the fifth lease and did not attach the fifth lease to its brief.  For good reason.  The fifth lease is attached hereto as Exhibit 1.  This lease was originally entered between the Plaintiffs' predecessors-in-interest, as lessors, and EQT's predecessor-in-interest (Edwards & Harding Petroleum Company), as lessee.  The lease provides, in Paragraph 3(b), that gas royalties are to be paid by the lessee based on "the market value at the wells" of one-eighth of the gas sold or used.  The printed form of the lease contained language that would have specifically allowed the lessee (now EQT) to deduct charges for gathering, compressing and making the gas "merchantable," but such printed language was specifically removed from

---

[2]  The leases also expressly require the lessee to "market[]" the gas extracted from Plaintiffs' land. In the gas industry, the duty to market is commonly understood to include the duty to bear the costs to prepare the gas for market.  *See* discussions at pp. 12-15, *infra*.  As stated by the late Professor Maurice Merrill, when discussing the *implied* duty to market, "If it is the lessee's obligation to market the product, it seems necessarily to follow that his is the task also to prepare it for market, if it is unmerchantable in its natural form.  No part of the costs of marketing or of preparation for sale is chargeable to the lessor." Maurice Merrill, *Covenants Implied in Oil and Gas Leases* (2d ed.) § 85, at 214-15.  Given that it is the lessee's duty to bear the costs to market when the duty is *implied*, the same duty necessarily applies when the duty to market is expressly included in the lease, as it is here.

the lease via interlineation.  It is, therefore, clear from the express language of the "fifth" lease, that EQT is required to pay royalties to Plaintiffs on a "market value at the well" basis, without any costs deductions.

> **2.      The Leases Should Be Construed To Prohibit EQT from Deducting Its Costs.**

If the Court were to find -- contrary to the express language of the leases -- that the royalty payment clauses are ambiguous, or that the leases are silent regarding who must bear post wellhead costs, the leases must be construed against EQT, and in favor of the Plaintiffs.  This approach is required by Virginia law, and is consistent with the general law of construction of oil and gas leases.

When contracts are unclear, they must be construed against the drafter.  *Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 182, 519 S.E.2d 133, 140 (Va. 1999).  This rule has been specifically applied to oil and gas leases, which are strictly construed against the lessee and in favor of the lessor.  *See Tawney v. Columbia Nat'l Resources, L.L.C.,* 219 W.Va. 266, 273-74 633 S.E.2d 22, 29-30 (W.Va. 2006) ("if the drafter of the leases below originally intended the lessor to bear a portion of the transportation and processing costs of oil and gas, he or she could have written into the lease specific language which clearly informed the lessors exactly how their royalties were to be calculated and what deductions were to be taken from the royalty amounts for post production expenses") ; *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 391 388 P.2d 602, 605 (Kan. 1964) ("Construction of oil and gas leases containing ambiguities shall be in favor of the lessor against the lessee") (citing 2 *Summers on Oil and Gas*, perm. ed., § 372, p. 485); *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 898 (Colo. 2001) (a royalty clause in an oil and gas lease should be construed against the drafter); *Hanna Oil and Gas Co.*, 297 Ark. at 82, 759

S.W.2d at 565 (holding that a lease similar to Plaintiffs' leases here should be construed against the lessee, which was required to bear the post-wellhead costs).

The rationale behind the strict construction of an oil and gas lease against the lessee is that the lessee "usually provides the lease form or dictates the terms thereof, and if such lessee is desirous of a more complete coverage of the marketing of oil and gas . . . the lessee has the opportunity to protect itself by the manner in which it draws the lease." *Gilmore*, 192 Kan. at 391, 388 P.2d at 605. This is consistent with Virginia law of contract interpretation. *Forest, D.D.S., P.A. v. Kentucky-Ohio Gas Acquisition Corp.*, No. 167807, 1999 WL 33117234, at *2, (Cir. VA. Nov. 23, 1999) ("a document must be construed against its drafter"); *Donnelly*, 258 Va. at 183, 519 S.E.2d at 140 (same).

EQT argues that the "at the well" provision in the lease allows it to deduct any costs it may incur downstream of the well, including costs to put the gas in marketable condition. This argument is unpersuasive and unavailing. The Supreme Court of West Virginia addressed whether similar "at the well" language requires reconsideration of the "generally recognized rule that the lessee must bear all costs of marketing and transporting the product to the point of sale." *Tawney*, 219 W.Va. at 272, 633 S.E.2d at 28. The court held that "at the well" language "lacks definiteness" and is "imprecise," and therefore that leases that contain such language must be construed against the lessee, which is required to pay for all costs incurred to make the gas marketable. *Id.*; s*ee also Wellman v. Energy Resources, Inc,* 210 W.Va. 200, 210, 557 S.E.2d 254, 264 (W.Va. 2001) ("proceeds at the well" lease is silent as to the distribution of costs between lessor and lessee).

Significantly, the highest courts of at least four other states have ruled, explicitly or

- 9 -

implicitly, that "at the well" language is silent as to the allocation of costs against the royalty interest and cannot serve as the basis (as EQT asserts) of imposing on royalty owners post-wellhead costs that were incurred to make gas marketable. *See, e.g., Rogers* (Colorado), *supra,* 29 P.3d at 897 ("market value at the well" language "is silent with respect to all deductions"); *Sternberger* (Kansas), *infra,* 894 P.2d at 794 ("market price at the well" is silent "on the issue of post-production deductions"); *Hanna* (Arkansas), *supra,* 759 S.W.2d at 564-65 ("proceeds at the well" lease presents "clear language" that lessee is not entitled to deduct compression costs); and *Wood* (Oklahoma), *infra,* 854 P.2d at 882-83 ("market price at the well" lease does not entitle lessee to deduct compression costs).

In interpreting the leases in *Tawney,* the West Virginia Supreme Court noted the absence of terms that expressly permit post-wellhead costs to be deducted, and the absence of terms that define "*how* or *by what method* the royalty is to be calculated or the gas is to be valued." *Tawney,* 633 S.E.2d at 28.[3]   The court held: "Simply put, if the drafter of the leases below originally intended the lessors to bear a portion of the transportation and processing costs of oil and gas, he or she could have written into the leases specific language which clearly informed the lessors exactly how their royalties were to be calculated and what deductions were to be taken from the royalty amounts." *Id*. at 29-30.  *See also Rogers*, 29 P.3d at 897 (the lease should "indicate whether the calculation of market value at the well includes or excludes costs," and

---

[3] In reaching this conclusion, the court noted that traditionally, "the landowner has received a royalty based on the sale price of the gas receive by the lessee." *Tawney,* 633 S.E.2d at 27. Notably, the court cited Robert Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia,* § 104 (1951), which states, "'From the very beginning of the oil and gas industry it has been the practice to compensate the landowner by selling the oil by running it to a common carrier and paying to him [the landowner] one-eighth of the sale price received.'" *Id*.

should "describe how those costs should be allocated, if at all, between the parties").  This Court should adopt the same approach as the West Virginia Supreme Court.

One professor in the field has posited that gas producing companies intentionally omit such explicit language from their leases so that they can avoid alerting landowners of their intention to deduct production costs.  Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically?* Part 2, 37 NAT. RESOURCES J. 611, 633-35 (Summer 1997).[4]  Professor Anderson suggests that gas companies could have stated that "the lessor 'shall bear a proportionate share of post-wellhead expenses incurred in marketing the gas,'" but that such language was avoided by gas companies "because the lessors would be too easily alerted to the objective and could then amend the clause by inserting the word 'not' between the words 'shall bear.'"  *Id.*  Professor Anderson is exactly right, as confirmed by the "striking out" of such language in the "fifth" lease between Plaintiffs and EQT. (*See* p. 7-8, *supra*).

For these reasons, the Court should reject EQT's argument and find that the "at the well" language  is "not effective to permit the lessee to deduct from the lessor's 1/8 royalty any portion of the costs incurred between the wellhead and the point of sale."  *Tawney,* 633 S.E.2d at 28.  *See also Rogers*, 29 P.3d at 897.

        **3.**    **The Implied Duty To Market Requires The Post-Wellhead Expense To Be Paid By EQT If Those Expenses Were Incurred To Make The Gas Marketable.**

Among the courts that have considered the issue, there are two views on whether a gas producing company like EQT ("lessee") is permitted to charge royalty owners for the costs the

---

[4] Professor Anderson is the Eugene Kuntz Professor of Oil, Gas, & Natural Resources, at the University of Oklahoma College of Law.  37 Nat. Resources J. 611, n.a1.

lessee incurs to make gas marketable.  The more sound view, and the one most widely

recognized (including by neighboring West Virginia), is that it is improper for a lessee to deduct

"marketability" costs, and that the lessee instead must bear all costs incurred to obtain a

marketable product.  This view is referred to as the "marketable product" rule.

  While some courts or commentators believe the marketable product rule may be imposed

based on express lease language, it is generally recognized that the marketable product rule flows

from the "implied duty to market" which the law imposes on lessees.  Implied covenants in oil

and gas leases obligating the lessee have been recognized for many decades.  One commentator

(who is in-house counsel for a major oil company (Exxon)) has observed the following with

regard to implied covenants in oil and gas leases:

> The implied covenants cover many aspects of a lessee's operations
> under an oil and gas lease.  While numerous systems of classifying
> the covenants [have] been suggested over the years, the following
> list of implied covenants, proposed by Professor Richard
> Hemingway, is the most generally accepted:
>
> 1.   The implied covenant to develop the lease ...;
>
> 2.   The implied covenant to protect the lease …; and
>
> 3.   The implied covenant to manage or administer the lease which includes the covenants to: (a) produce, and market production, and (b) operate the lease with reasonable care . . . .
>
> Until recently, the implied covenant to market received less
> attention than most of the other implied covenants.  The covenant,
> however, has always been recognized.

S. Lansdown, *The Implied Marketing Covenant in Oil and Gas Leases: The Producer's*

- 12 -

*Perspective*, 31 ST. MARY'S L.J. 297, 302-04 (2000) (footnotes omitted).

It is the implied covenant to market production which is significant for the purposes of the present analysis.  It would seem to be a simple contract-law proposition that it is the lessee's obligation to absorb the costs of performing its implied-covenant duties under the lease. *See Wellman*, 557 S.E.2d at 265. The late Professor Maurice Merrill wrote as follows with regard to the implied covenant to market:

> If it is the lessee's obligation to market the product, it seems necessarily to follow that his is the task also to prepare it for market, if it is unmerchantable in its natural form.  No part of the costs of marketing or of preparation for sale is chargeable to the lessor.

Maurice Merrill, *Covenants Implied in Oil & Gas Leases* (2d ed.), Section 85, at 214-15.

This concept has become known as the "marketable-product rule," in that it postulates a lessee cannot charge any of its costs to a lessor until a marketable product has been achieved, and the rule has been generally accepted since the early twentieth century.  *See* Merrill, *Covenants Implied in Oil and Gas Leases* (2nd ed.); R. Hemingway, *The Law of Oil and Gas,* §7.4 (3d ed 1991)(the "better approach" is that the lessee must bear all costs within its obligation to market the products from the lease.); Victor H. Kulp, *Oil and Gas Rights,* 10.71 (1954)("Sometimes the product must be treated before it is marketable.  No part of the expense of doing so is chargeable to the lessor in absence of a special provision in the lease…"); L. Mills and J.C. Willingham, *The Law of Oil and Gas*, §§ 126, 129 (1926)(recognizing a duty to market free of expense to the lessor); Robert Sullivan*, Handbook of Oil and Gas Law*, §§ 70 and 92 (1955)("The lessee is subject to the implied obligation to market the oil and gas that is produced from the leased premises in order that the lessor may receive his royalty thereon.  If the oil is not merchantable,

the lessee must prepare it for market, and the lessor is not liable for his proportionate share of the costs in absence of an appropriate provision in the lease.")

Although Virginia courts have not yet had the opportunity to address the issue, the "marketable product" rule is well-supported by cases from other jurisdictions. While the parameters of the rule vary from state to state, courts in Arkansas, Colorado, Kansas, Kentucky, Oklahoma, and West Virginia[5] have all adopted the marketable product rule and recognize that the lessee has a duty to produce a marketable product and a duty to pay royalties on a marketable product, and that the lessee alone bears the expense of making the product marketable.  Three other states, Michigan, Nevada, and Wyoming, have adopted statutory versions of the rule, which disallow deductions for costs required to place the gas in a marketable condition. M.C.L.A. § 440.9102; Wyo. Stat. § 30-5-304(vi) (1994 Supp.); Nev. Rev. Stat. Ann. § 522.1151(b).  Also, consistent with the prevailing rule, the United States requires that the lessees of federal gas rights to "place gas in a marketable condition at no cost to the Federal Government." 30 C.F.R. § 206.153(i)(1993). [6]

---

[5] *See, e.g., Hanna Oil and Gas Co v. Taylor.*, 297 Ark. 80, 759 S.W.2d 563 (Ark. 1988)**;** *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 901 (Colo. 2001) (expanding on the marketable-product rule articulated in *Garman v. Conoco*, *Inc.*, 886 P.2d 652, 656-62 (Colo. 1994)); *Sternberger v. Marathon Oil Co*., 894 P.2d 788, 795-800 (Kan. 1995); *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P.2d 602 (Kan. 1964); *Warfield Natural Gas Co. v. Allen*, 88 S.W.2d 989, 991 (Ky., 1935); *Mittelstaedt v. Santa Fe Minerals, Inc*., 954 P.2d 1203, 1205-10 (Okla. 1998); *Clark v. Slick Oil Co.*, 88 Okla. 55, 211 P. 496 (Ok. 1922); *Tawney v. Columbia Nat. Resources, LLC,* 219 W.Va. 266, 633 S.E.2d 22, 29 (W.Va. 2006); *Wellman v. Energy Resources, Inc*., 557 S.E.2d 254, 263-65 (W.Va. 2001).

[6] The reasons for assigning the costs of creating a marketable product to the lessor have been well explained:

> We interpret the lessee's duty to market to include the cost of preparing the gas for market. The lessor, who generally owns the minerals, grants an oil and gas lease, retaining a smaller interest, in exchange for the risk-

For these reasons and the reasons set forth below, this Court should reject EQT's arguments and adopt the "marketable product" rule, which apart from its purely legal applicability, is the rule that best protects the rights of the citizens of some of the most economically disadvantaged counties in the Commonwealth of Virginia.

### 4.   The Attorney General and Tax Commissioner Opinions Are Neither Persuasive Nor Controlling.

EQT says that the Court should consider the opinions of the State Attorney General and the Tax Commissioner.  Each has rendered an opinion that, with respect to pooling agreements (*i.e.*, when no lease exists), the operator may deduct post-wellhead costs in determining the value of the gas extracted by it from a well.  (Brief at 11-12).  As EQT admits, however, neither of these opinions "involve royalties payable under a lease."  *Id*. at 12.  Accordingly, neither applies in this case. *See Washington County Board of Equalization v. Petron Development Co*., 109 P.3d

> bearing working interest receiving the larger share of proceeds for developing the minerals and bearing the costs thereof. Part of the mineral owner's decision whether to lease or to become a working interest owner is based upon the costs involved. We consider also that working interest owners who share costs under an operating agreement have input into the cost bearing decisions. The royalty owners have no such input after they have leased. In effect, royalty owners would be sharing the burdens of working interest ownership without the attendant rights. If a lessee wants royalty owners to share in compression [a preparation-for-market function] costs, that can be spelled-out in the oil and gas lease. Then, a royalty owner can make an informed economic decision whether to enter into the oil and gas lease or whether to participate as a working interest owner.

*Wood* v. *TXO Production Corp.,* 854 P.2d 880, 882-83 (Okla. 1992). In reaching this same conclusion, the Supreme Court of Colorado reasoned that it would be unfair to force royalty owners to bear these costs, because they have no right to provide input regarding the expenditures or to disagree with the costs, thereby checking the gas producer's "unbridled ability to incur costs without full consideration of their economic effect."  *Garman*, 886 P.2d at 660. The same is true here.  Plaintiffs should not be required to bear EQT's "unbridled" costs.

146, 145 (Colo. 2005) (distinguishing between analyses of gas valuation for tax purposes and valuation for royalty payment purposes; "The analogy between *Rogers* and this [tax] case is misplaced. Our decision in *Rogers* addresses royalty obligations under private gas leases.") Additionally, opinions of the Attorney General are not binding on Virginia courts. *Stroud v. Stroud*, 49 Va.App. 359, 377, 641 S.E.2d 142, 151 (Va. 2007); *Beck v. Shelton*, 267 Va. 482, 492, 593 S.E.2d 195, 200 (Va. 2004).[7]

### 5.      Disputed Fact Questions Exist Precluding Dismissal

The propriety of EQT's costs deductions turns on disputed questions of fact. For example, under the "marketable product" rule, the determination of "marketability" is a question of fact. *See, e.g., Rogers*, 29 P.3d at 907, 913; *Savage v. Williams Prod. RMT Co.,* 140 P.3d 67, 71 (Colo. App. 2005). As the court in *Rogers* recognized:

> Once a determination is made that gas is marketable, costs can be allocated accordingly. Costs incurred to make the gas marketable are to be borne solely by the lessees. Alternatively, costs incurred subsequent to the gas being marketable are to be shared proportionately between the lessees and the lessors.

*Id.* at 912-13. Thus, under the marketable product rule, the propriety of the costs EQT imposed on Plaintiffs can only be decided after the jury has identified the point at which the subject Gas was "marketable."[8]

---

[7] Plaintiffs suggest it would be more instructive to consider the fact that EQT recently paid in excess of $25,000,000 to settle a class action in which its West Virginia royalty owners asserted claims of the same type asserted by these Plaintiffs. *See The Kay Co. v. Equitable Production Co*., No. CIV 2:07-cv-0062, 2010 U.S. Dist. LEXIS 41892, at *35 (S.D. W.Va. April 28, 2010).

[8] Plaintiffs believe, for example, that the Gas produced by EQT is not marketable in its raw form, and that the Gas is not marketable until after it has been treated, dehydrated, and processed and otherwise placed in a condition acceptable for entry into the interstate pipelines that move gas to gas markets, e.g., to industries, local gas distribution companies, marketers, and other gas buyers and traders.

As noted above in subsection II(D)(1), Plaintiffs contend that this Court could rule that under the plain language of the five leases, EQT may not take the subject deductions when calculating Plaintiffs' Royalties.  Factual issues have been raised, however, through EQT's assertion that it incurred the subject costs in order to generate "enhanced prices."  The factual disputes in this case would, therefore, include, *inter alia*, the issue of whether EQT's marketing practices resulted in an enhanced Royalty valuation -- as EQT asserts -- or whether EQT's marketing practices resulted in an improper  "undervaluation" due to EQT's sales of Gas at below market prices and/or its imposition of improper (including excessive) costs -- as Plaintiffs assert.  In any event, at this stage of the proceedings, the allegations of Plaintiffs' complaint must be taken as true and there is no justifiable basis for EQT's assertion that Plaintiffs' claims fail as a matter of law.

### E.    The Statute Of Limitations Does Not Bar Plaintiffs' Claims.

EQT admits that it has been deducting "certain" post-wellhead costs from Plaintiffs' royalty payments for "over 20 years."  (Brief at 6). It contends that the five-year Virginia statute of limitations for claims of breach of contract, found at Virginia Code § 8.01-246(2),[9] bars Plaintiffs' claims because they accrued when EQT first began its wrongful deductions. Controlling Virginia Supreme Court precedent confirms that EQT is wrong.

First, the Virginia Supreme Court has held that the statute of limitations for a lessor's breach of a mineral rights lease does not begin to run until expiration of the lease.  *Heirs of Roberts v. Coal Processing Corp.*, 235 Va. 556, 369 S.E.2d 188 (Va. 1988).  The court reasoned

---

[9] Va. Code § 8.01-230 provides that an action for breach of contract must be brought within five years of the time the cause of action accrues, and that the right of action is "deemed to accrue and the prescribed limitation period shall begin to run from the date . . . when the breach of contract occurs."

that the lease did not require payment at any particular time, and in that way it differed from a contract that required payments due at specified times and it was, therefore, an "indivisible" or "entire" contract. *Id.*, 235 Va. at 561, 369 S.E.2d at 189. Under these circumstances, the party seeking to recover has the option to pursue "his remedy when the breach occurs, or of awaiting the time fixed by the contract for full and final performance." *Id.* If the party elects to wait, then "the statute of limitations does not begin to run against his right of action until the time for final performance fixed by the contract has passed." *Id.* (citations omitted). The *Heirs of Roberts* court concluded that the plaintiffs' claim would not be dismissed because, "under the provisions of the contract in question here, which fix no particular time for full and final performance, the rights of action of the lessors did not arise, and the statute of limitations did not begin to run against them, until the end of the contract's 99-year term." *Id.* The court went on to say that "this holding results from the general rule that, ordinarily, the statute of limitations does not begin to run on a claim for breach of an entire contract, which is continuing, executory, or capable of being enforced, until its termination." *Id.* Likewise, because the leases at issue here are continuing, executory leases, the statute of limitations has not yet accrued, and EQT's motion should be denied.[10]

Virginia also applies the "continuing service" or "continuing duty" rule to determine the accrual of the statute of limitations. Under that rule, where one party, like EQT as operator, takes on a service or an obligation to another and injures or causes damage to the other party in conjunction with performance of the continuing service or duty, the statute of limitations on a

---

[10] The leases at issue do not terminate until production operations have ceased for a certain period of time, an event which has not yet occurred with respect to Plaintiffs' leases.

- 18 -

resulting right of action does not begin to run until termination of the undertaking or relationship. *Rowlett v. Pearsall*, 3 Va. Cir. 372, 376 (Cir. Va. June 18, 1985), *reversed on other gnds, sub nom Wilson v. Rowlett*, 369 S.E.2d 194 (Va. 1988) (Supreme Court confirmed Virginia's adherence to the "continuing services" rule citing its decisions in *Farley*, *Keller* and *McCormick, infra*).

The application of this rule is particularly appropriate in the instant matter where there exists as between Plaintiffs and EQT a continuing relationship of confidence and trust.  EQT, as operator of the leased premises and producing units, exclusively controls and maintains all operational and accounting data and information pertaining to Plaintiffs' interests.  As non-operating Royalty owners, Plaintiffs are wholly dependent upon EQT to truthfully and completely report and account to Plaintiffs about their royalty interests on a continuing basis. Virginia law has repeatedly recognized and applied the "continuous services" rule where, as here, there is an inherent trust relationship and the services provided are continuing in nature and ongoing. *Rowlett*, 369 S.E.2d at 196 (*citing Farley v. Goode*, 219 Va. 969, 979-80, 252 S.E.2d 594, 599-600 (1979) (doctor-patient continuing services); *Keller v. Denny*, 232 Va. 512, 517-18, 352 S.E.2d 327, 329-30 (1987) (lawyer-client continuing services); *McCormick v. Romans & Gunn*, 214 Va. 144, 148-49, 198 S.E.2d 651, 654-55 (1973) (same)). *See also Wilson v. Miller*, 104 Va. 446, 448, 51 S.E. 837, 838 (1905); *Beale v. Moore*, 183 Va. 519, 525-26, 32 S.E.2d 696, 698-99 (1945). Likewise, the Virginia Supreme Court has applied the rule to hold that the statute of limitations in a negligence action for damages against an accountant did not begin to run until the particular undertakings of the accountants that formed the basis of the action had terminated; only then did the statute begin to run. *Boone v. C. Arthur Weaver Co., Inc.*, 365 S.E.2d 764,

766-67 (Va. 1988).

The rule has also been applied by the Supreme Court of Virginia to the relationship between joint venturers. *Roark v. Hicks*, 234 Va. 470, 362 S.E.2d 711 (Va. 1987). The relationship between a producer and a property owner has been interpreted as one between joint venturers. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1229 (7th Cir. 1996) (the producer and the property owner were "joint venturers who owe a fiduciary duty to each other.") The *Roark* court found that the statute of limitations does not begin to run for causes of action between joint venturers until the "completion of winding up the affairs of the dissolved enterprise." *Roark*, 234 Va. at 475, 362 S.E.2d at 476. Because the relationship between EQT and Plaintiffs can be construed as one between joint venturers, and their enterprise has not been dissolved, the statute of limitations has not accrued. *Id*.

The continuing or recurring nature of the highly technical, specialized operational and accounting services provided by EQT for the lessors is undisputed. Application of the "continuing services" rule is especially appropriate here, where the lessors are required, by virtue of the nature of the relationship, to trust that EQT will fairly pay all royalties due under the lease and report and account to Plaintiffs/lessors honestly and completely. Based on this relationship, the Court should find that the statute of limitations has not even begun to run, as the relationship has not ended and there has been no "termination of the undertaking." *Rowlett*, 369 S.E.2d at 647 (and cases cited therein); *Boone*, 365 S.E.2d at 766-67.

In the alternative, the Court should, at a minimum, find that a new cause of action arises each time EQT calculates and remits a new royalty payment. Thus, Plaintiffs' claims for royalty underpayments made within five years of the filing of the complaint cannot be barred, and the

Court should deny the motion to dismiss with respect to those claims.

This is consistent with the decision in 2006 by the Supreme Court of Virginia in *American Physical Therapy Association v. Federation of State Boards of Physical Therapy ("APTA"),* 271 Va. 481, 484, 628 S.E.2d 928, 929 (Va. 2006). In *APTA*, the court held that, where "wrongful acts are not continuous and 'occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action.'" *Id*. (*quoting Norfolk & W.R. Co. v. Allen*, 118 Va. 428, 435, 87 S.E. 558, 560 (1916), *aff'g on rehearing*, 87 S.E. 558 (1915)). This decision controls here, and eviscerates EQT's statute of limitations argument.

In *APTA*, the Federation of State Boards of Physical Therapy ("Federation") imposed fee increases on plaintiffs in 1995 and 2000 that were alleged to be in violation of their contract. In 2005, plaintiffs filed their complaint. The Federation argued that the breach of contract occurred more than five years prior to filing the complaint, in 1995 when the first increase occurred, and that the subsequent fees only increased the plaintiffs' damages. *Id*., 628 S.E.2d at 929. The Supreme Court reasoned that the first injury that was inflicted on the plaintiff "did not inflict 'all the damage which can ever result;' . . . rather, each time the Federation imposed a new fee, a new injury occurred and a separate cause of action accrued." *Id*. (quoting *Hampton Roads Sanitation Dist. v. McDonnell,* 234 Va. 235, 360 S.E.2d. 841 (1987)). The court held that "the Federation's actions constituted distinct, separate breaches of the Agreement, and the APTA is entitled to bring its claims for those breaches of contract that occurred in the five years preceding its filing of this suit." *Id.*

In reaching the conclusion in *APTA,* the Virginia Supreme Court distinguished *Westminster Investing Corp. v. Lamps Unlimited, Inc.,* 237 Va. 543, 379 S.E.2d 316 (1989), the

case relied upon by EQT here.  The *APTA* court noted that *Westminster* involved a lease that the landlord breached from the beginning of the term, more than five years before the suit was filed. It noted that in cases such as *Westminster*, the cause of action accrued because the wrongful act was "of a permanent nature" and produced "'all the damage that could ever result from it.'" *APT*, 271 Va. 481,  628 S.E.2d at 929.  The *APTA* court found the facts before it to be more akin to that in *Hampton Roads*, where a series of discharges of sewage onto the plaintiff's property caused damages over and over again, and each discharge gave rise to a new cause of action.

*Hunter v. Custom Business Graphics*, 635 F.Supp.2d 420 (E.D. Va. 2009), cited by EQT, is also inapposite.  In that case, an employer breached an employment contract by reducing the employee's commission rate and eliminating a monthly allowance more than five years before the case was filed.  The district court in *Hunter* distinguished *APTA* because it noted that in *APTA*, as here, "each imposition of a new fee resulted in a new injury and a separate cause of action."  *Hunter*, 635 F. Supp. 2d at 432.  The continuing action in *Hunter* was not a new breach that reoccurred, but was "always the same," and "merely a continuation of the original breach." *Id*. at 433.  That cannot be said here, where EQT calculated and made new royalty payments in intervals (e.g., monthly), with each payment being based on new gas production and with each payment varying month-to-month due to changes in production volumes, sales, prices, and other factors.  As in *Hampton Roads* and *APTA*, the wrongful acts here -- the underpayment of royalties on a monthly basis -- occurred periodically and in intervals, and new and distinct damages accrued with each underpayment.  Therefore, a new and separate cause of action arose out of each payment.  *Id*.

Multiple other courts have reached the conclusion that each royalty underpayment gives

rise to a new cause of action. Indeed, this conclusion was reached by the United States Court of Appeals for the Sixth Circuit interpreting Virginia law. *Temple v. Millers Cove Energy Co., Inc.*, No. 98-6279, 2000 U.S. App. LEXIS 10924, at *11-12 (6th Cir. May 9, 2000). Specifically, the *Temple* court held that, under Virginia law, where there was an obligation to make royalty payments pursuant to a lease on a monthly basis, a separate cause of action accrued each time the defendant failed to do so. *Id*. at *11-12. It stated "A cause of action did not accrue until [the royalty owner] was injured- that is, until the next monthly royalty payment came due and [the defendant] paid a reduced amount. Thereafter, because the leases required [the defendant] to make a new payment of per ton royalties every month, a distinct injury occurred -- and a separate cause of action accrued -- with every reduced or missing payment." *Id*. at *11. Many other courts, applying the laws of various jurisdictions, have reached this conclusion as well. *See Hondo Oil & Gas Co. v. Texas Crude Operators*, 970 F.2d 1433 (5th Cir. 1992) (reaching the same conclusion in applying Texas law to an oil and gas lease, stating "Where a contract provides for monthly payments and not a present sale of gas, a cause of action accrues when the monthly payment is due. Only those payments due more than four years before the suit was filed are barred."); *Rupe v. Triton Oil & Gas Corp.*, 806 F.Supp. 1495 (D.Kan. 1992)(same applying Kansas law); *Armstrong Petroleum v. Tri-Valley Oil and Gas*, 116 Cal. App. 4th 1375 (2004)(same under California law); *Beeson, Inc. v. Coca-Cola Co., et al.*, 2009 U.S. App. LEXIS 15409 (3rd 2009)(applying the same rule to a beverage royalty case).

Based on these cases, if the Court does not conclude that Plaintiffs' causes of action have not yet accrued because there has not yet been a termination of the leases or of EQT's continuing services, the Court should, at a minimum, hold that a new and separate breach of contract

occurred, and the statute of limitations accrued, each time EQT underpaid a periodic (e.g., monthly) royalty payment.  Therefore, the Court should find that every breach (royalty underpayment) within the last five years is actionable and not barred by the statute of limitations.

Plaintiffs also maintain that the statute of limitations was tolled by EQT's concealment of the full extent of the deductions it made from the royalties. (Complaint at ¶ 19).  EQT argues that the statute cannot be tolled, asserting that its check stubs "disclosed both revenues and deductions" and asserting that "Plaintiffs' allegation of concealment is simply untrue."  (Brief at 2). [11]  EQT has (a) misread or ignored the allegations of Plaintiffs' complaint, and (b)  overstated the extent and significance of its so-called "disclosures."

First, Plaintiffs have alleged that EQT's check stubs "did not disclose all of the deductions or adjustments that EQT had made to Plaintiffs' and the Class Members' Royalty payments." (Complaint at ¶19 (emphasis added)).  EQT asserts that its check stubs disclose "deductions for gathering charges." (Crites Affidavit at ¶6).  Plaintiffs have alleged, however, that, EQT also deducted compression, dehydration, treating, separation, processing and/or transportation fees and expenses when calculating Plaintiffs' Royalties (Complaint ¶17) -- and those types of cost deductions were not disclosed by EQT, a fact that is undoubtedly true and must be taken as true at this stage of the proceedings.[12]  Plaintiff also notes that, while EQT's

---

[11] In support of this argument, EQT relies on the Affidavit of Rick Crites, attached as Exhibit 5 to EQT's Memorandum in Support, and the attached check stubs.  As explained above in subsection II(B), the Court should not consider Mr. Crites' statement, which contradicts the facts alleged in the complaint. *Witthohn*, 164 F. App'x at 396-97; Fed.R.Civ.P. 12(d).  However, if the Court does rely on Mr. Crites' affidavit, and the attached check stubs, Mr. Crite's statements actually support Plaintiffs' position that EQT failed to disclose, and concealed, the full extent of its deductions.

[12] EQT's failure to disclose is confirmed by Mr. Crites' affidavit.  Mr. Crites states that EQT's Royalty calculation is based on sales prices that have been adjusted "for gathering charges and pipeline

check stubs disclose monetary deductions (for gathering charges), the check stubs fail to disclose the <u>volumetric</u> deductions that were imposed on Plaintiffs and the Class Members as alleged in Paragraph 17 of Plaintiffs' Complaint: "EQT has improperly taken deductions . . . for various post-wellhead costs.  Such costs include <u>fees</u>, <u>expenses</u>, and <u>charges</u> for gathering, compression, dehydration, treating, separation, processing and/or transportation to the point of sale.  Such costs <u>also</u> include those <u>volumes</u> of Gas that were used (as fuel) to operate post-wellhead facilities or that were lost or otherwise unaccounted for by the providers of post-wellhead facilities and services." (Emphasis added).  EQT's check stubs simply do <u>not</u> disclose that volumes of Gas were used, lost, or consumed for post-wellhead activities, e.g., the check stubs do not disclose the difference between (a) the volume of Gas produced at the well, and (b) the volume of Gas that was sold.

Second, EQT's argument fails to acknowledge that the reporting of a deduction does not, in and of itself, reveal that the deduction has been taken improperly.  The deduction may -- or may not -- be improper, depending upon the overall Royalty valuation and payment.  For example, under the four leases attached to EQT's brief, EQT is obligated to pay Royalties based on the "proceeds at the well."  EQT asserts that "[u]nder the attached leases, the well is the location for determining the proceeds on which Royalties are paid," but EQT says it moved the Gas away from the well via a gathering system and sold the Gas at a downstream location for "an enhanced price." (Brief at 11).  That is a disputed fact question, of course (*see* Complaint at ¶¶ 15 & 17), but if EQT decided, as a reasonably prudent operator, that it could enhance the value

capacity charges," (Crites Aff.. at ¶8), yet EQT's check stubs, according to Mr. Crites, show only "deductions for gathering charges." (Crites Aff.. at ¶7). This confirms that <u>pipeline</u> <u>capacity</u> <u>charges</u> were deducted by EQT in calculating Plaintiffs' and the Class Members' Royalties but were <u>not</u> <u>disclosed</u> by EQT.

of the Gas by gathering it and selling it at a downstream sales point, and if EQT's marketing strategy resulted in a Royalty valuation that was greater than the Royalty valuation it could have achieved by selling the Gas (in a marketable condition) at the well, then Plaintiffs would arguably be obligated to bear a proportionate share of the gathering charges that were incurred to achieve the enhanced value. *See, e.g., Garman v. Conoco*, 886 P.2d 652, 660 (Colo. 1994) ("To the extent that certain [post-wellhead] costs enhance the value of an already marketable product, the burden should be placed upon the lessee [EQT] to show such costs are reasonable, and that actual royalty revenues increase in proportion with the costs assessed against the non-working interests.").  If, on the other hand, EQT's downstream sales marketing strategy resulted in a Royalty valuation that was less than the Royalty valuation that would have resulted from EQT selling all of the Gas (in a marketable condition) at the well based on fair market value prices, then EQT's Royalty calculation, including its deductions of gathering charges, would be improper.

    In any event, the propriety of EQT's Royalty valuation is a complex, accounting-intensive fact issue which is not answered by the mere disclosure of gathering charges on a check stub, especially given that the check stubs did not disclose EQT's volumetric losses or its sales of gas at below market prices.  Instead, the issue can only be determined through an accounting and investigation of EQT's books, records, and practices. (Complaint at ¶ 20).  EQT is in possession of all of the necessary information, including detailed accounting and other data and records disclosing the volumes of Gas produced, the volumes of Gas lost, the volumes of Gas sold, available market prices at the well, available downstream market prices, gathering and other post-wellhead costs (which may be excessive/unreasonable), etc.  Plaintiffs do not possess such

information but must rely upon EQT to market the Gas as a reasonably prudent operator.  They were entitled to rely upon EQT's calculation of Royalties as being one which resulted in the highest Royalty valuation possible, and EQT's assertion that it fully disclosed its breaches to the Plaintiffs simply has no merit.  Plaintiffs' claims should be tolled due to EQT's concealments.

In addition to their breach of contract claims, Plaintiffs allege that EQT violated the implied duty to market; that it breached its fiduciary duties; and that its acts constitute conversion of Plaintiffs' Royalties and Royalty payments.  (Complaint at ¶¶ 35-45). EQT argues – with no support – that its statute of limitations argument applies equally to these other claims.  (Brief at 9).  EQT's bare statement is not a sufficient basis for a motion to dismiss.  But even if it were, under *APTA*'s controlling mandate, the periodic and repeated injuries that Plaintiffs incurred as a result of EQT's periodic and repeated royalty underpayments condemn EQT's argument.

Plaintiffs' claims are not time-barred, and the Court should deny EQT's motion to dismiss.

### F.    Plaintiffs State a Valid Claim for Conversion.

Plaintiffs have properly pleaded a conversion claim.  Conversion is "any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*, 261 Va. 561, 582, 544 S.E.2d 666, 679 (Va. 2001).

EQT contends that the tort of conversion cannot apply here because the "gist of Plaintiffs' claims is that the lessee failed to pay all the royalties due under the lease."  (Brief at 15.)  While it is true that Plaintiffs' claims are that EQT failed to pay certain royalties, this failure is in part due to a breach of the lease, but also in part due to its breach of implied duties

and its breach of fiduciary duties.  Through its self-dealing and other wrongful practices, EQT retained monies that rightfully belong to Plaintiffs and thereby engaged in actionable conversion.

Other courts have recognized conversion in this context.  For example, in *Clark v. Slick Oil Co.*, 88 Okla. 55, 211 P. 496 (Okla. 1922), the plaintiff brought a claim for breach of an oil and gas lease and a claim for conversion.  The court recognized the claim, noting that conversion is  "'Any distinct act of dominion wrongfully exerted over another's . . . property in denial or inconsistent with his rights therein.'"  *Id.*, 211 P. at 502 (citations omitted).

Plaintiffs have alleged sufficient facts in the Complaint to support the claim for conversion of Plaintiffs' royalties.  EQT's motion to dismiss this claim should be denied.

### G.   Plaintiffs State A Valid Claim For Breach Of Implied Duties.

EQT argues that Count II should be dismissed because Virginia courts do not recognize a cause of action for "breach of good faith."  (Brief at 13).  Plaintiffs' claim for "Breach of Implied Duties" does not solely include a claim for "breach of good faith and fair dealing," but also alleges that "Defendants owed Plaintiffs and the Class Members certain obligations resulting from implied covenants and duties, including the duty to market, [and] the duty to act as a reasonably prudent operator."  (Complaint at ¶ 36).  Defendants do not focus on these alleged breaches, and with good reason.  As set forth above (*see* pp. 11-15), the implied duties of an operator under an oil and gas lease are well-established, and EQT could not reasonably argue that these implied duties do not exist or that they are not bound by them.  *See Garman*, 886 P.2d at 659 (recognizing the implied duty to market); *Gilmore*, 192 Kan. at 392, 388 P.2d at 606 (where reasonable diligence to market "is not expressed in the lease, it is generally implied").

One of the implied duties is the duty to "operate diligently and prudently."  *Garman*, 886

P.2d at 659. "'Embodied in the duty to operate diligently and prudently is the implied covenant to market.'" *Id*. (*quoting Davis v. Cramer,* 808 P.2d 358 (Colo. 1991)). The standard of care in which lessors are expected to carry out these duties is "that of a reasonably prudent operator under the same or similar facts and circumstances." *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567-68 (Tx. 1981) (citations omitted); *see also Smith v. Amoco Prod. Co.*, 272 Ks. 58, 31 P.3d 255, 270, 272 (Kan. 2001) (noting that "Under the reasonably prudent operator standard, Amoco must not only consider its own economic interest but also take into account the interest of [the lessor]"); *Southwest Gas Producing Co. v. Seale*, 191 So.2d 115, 119-20 (Miss. 1966) (recognizing that "the great majority of jurisdictions . . . apply the 'prudent operator' standard" and describing the standard as "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interest of both lessor and lessee, in what is required.").

Notably, none of the cases upon which EQT relies to support its argument against a cause of action for breach of implied duties in Virginia are oil or gas lease cases. *See Bill Greever Corp. v. Tazewell Nat. Bank*, 41 Va. Cir. 298, (Va. Cir. 1997) (involving dishonored checks); *Frank Brunckhorst CO., LLC v. Coastal Atlantic, Inc.*, 542 F. Supp. 2d 452, 465 (E.D. Va. 2008) (involving distribution agreement); *Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.*, 251 Va. 28, 33, 466 S.E.2d 382, 385 (1996) (involving commercial banking transaction); *Johnson v. D&D Home Loans Corp.*, 2007 U.S. Dist. LEXIS 90140, *8 (E.D. Va. Dec. 6, 2007)(involving a mortgage). Thus, while there may not be a separate claim for breach of good faith in a general breach of contract case in Virginia, there is no authority, and none is cited, holding that implied duties do not exist with respect to oil and gas leases. Implied duties *are*

consistently recognized as arising out of such leases in virtually all jurisdictions, and, for the reasons set forth above, those duties should be recognized and enforced here.

### H.   Plaintiffs State a Valid Claim for Breach of Fiduciary Duty

EQT says that Plaintiffs' claim for breach of fiduciary duty must be dismissed because there is no fiduciary duty imposed by the terms of the lease, and the duty cannot be implied.[13] This is wrong.

As it must, EQT concedes that a fiduciary relationship exists where "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *H-B Ltd. P'ship v. Wimmer*, 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979) (finding that a real estate agent has a fiduciary duty to his principal by virtue of their special relationship that required the agent to hold title of property in trust for principal where the principal instructed the agent to purchase it on his behalf); *see also Restatement (Second) of Torts* § 874 (1979)  ("A fiduciary relation exists between two persons when one of them is under a duty to act for . . . the benefit of another upon matters within the scope of the relationship.")

The relationship between a lessee and lessor fits perfectly within Virginia's description of

---

[13] The issue of whether there is a fiduciary relationship is a question of fact. *Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 611 S.E.2d 600 (Va. 2005); *see also  Cafritz v. Corporation Audit Co.,* No. 23005, 1945 U.S.Dist. LEXIS 2251, at **10-11 (D.D.C. May 14, 1945), *aff'd in part, rev'd in part on other grounds,* 156 F.2d 839 (D.C.Cir. 1946) (citing  Pomery, *Equity Jurisprudence*, Sec. 956. "Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new instances might be excluded.  It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other.  The relation and the duties involved may be moral, social, domestic, or merely personal.").  This issue should be decided by the trier of fact, and not on a motion to dismiss.  At the very least, Plaintiffs should be given the opportunity to conduct discovery as to this issue.

a fiduciary relationship.  Indeed, courts have specifically recognized that there is a fiduciary relationship between a gas producer and a royalty owner.  *Roberts Ranch Co. v. Exxon Corp.*, 43 F.Supp.2d 1252, at 1261 (W.D. Okla. 1997); *J.C. Hill v. Marathon Oil Co.*, No. Civ-08-37-R, 2010 WL 2365477 (W.D. Okla. June 9, 2010)(certifying a class action on behalf of lessors on a claim of breach of fiduciary duty against lessee for failing to properly calculate royalties); *Atlantic Richfield v. Farm Credit Bank*, 226 F.3d 1138, 1163 (10th Cir. 2000)(holding that, under Colorado law, the district court erred in granting summary judgment for gas producer and dismissing royalty owner's claim for breach of fiduciary duty); *Seeco v. Hales,* 341 Ark. 673, 698 (2000)("a producer occupies a fiduciary relationship with respect to its royalty owners."); *La Barte v. Seneca Resources Corp.*, 285 A.D.2d 974, 976, 728 N.Y.S.2d 619, 622 (N.Y. App. 2001).

Here, EQT has undertaken a duty to operate the well, produce the gas, determine the amount of gas produced, market and sell the gas, properly calculate royalties to be paid to Plaintiffs, and render an accounting of same to Plaintiffs through its royalty payment statements (check stubs).  The continuing operating and accounting services EQT has undertaken to perform for the benefit of Plaintiffs are completely and exclusively within the control of the EQT.  There is no question that Plaintiffs have reposed their confidence in EQT that EQT will carry out the operating and accounting duties it agreed to undertake in "good faith and with due regard for their interests."  *H-B Ltd. P'ship*, 220 Va. at 179, 257 S.E.2d at 773.  Given EQT's position of superior knowledge and power, the Court should find that a fiduciary relationship exists between EQT and the Plaintiffs.

In *Gurley v. Lindsley,* 459 F.2d 268 (5th Cir. 1972), the United States Court of Appeals

- 31 -

for the Fifth Circuit found that where a property owner was obligated, by virtue of a judgment against him, to pay a debt from royalties he received from an oil and gas lease, the property owner had a fiduciary duty to account for and pay the royalties to satisfy the debt. *Id*. at 275. The court agreed with the district court's conclusion that, by receiving the income from the land from which they were to pay the royalties, the landowner became a fiduciary to its debtor, with the "'duty and obligation to account to and promptly pay any amounts due and owing to Plaintiffs.'" *Id*.  EQT has an essentially identical fiduciary obligation to Plaintiffs, where EQT is obligated to account for and pay royalties to Plaintiffs.

Other courts have specifically found that where one party takes on an accounting duty for another, and is entrusted to hold and account for money or property, then a fiduciary relationship exists between the parties.  In *Cafritz v. Corporation Audit Co.,* No. 23005, 1945 U.S.Dist. LEXIS 2251 (D.D.C. May 14, 1945), the plaintiff employed an audit and accounting company to keep and maintain his books and those of his business.  The plaintiff brought a claim for conversion against the audit company for improperly paying itself and its manager from the plaintiff's account. The court found that, "It is well established that when the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the plaintiff, because of money or property intrusted [sic] the burden is upon him to show that he has performed his trust and the manner of its performance.  He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed." *Id.* at **12.  Likewise here, EQT has duty to account to Plaintiffs for the production proceeds entrusted to it as part of a confidential relationship.  Only EQT knows whether it has accurately performed, and thus EQT's duty to account to Plaintiffs is a fiduciary duty. *Id*.

Virginia has also specifically recognized the existence of a fiduciary relationship between joint venturers. *Roark,* 234 Va. at 475, 362 S.E.2d at 714; *Burruss v. Green Auction and Realty Co., Inc.*, 288 Va. 6, 319 S.E.2d 725, 727 (Va. 1984) (each joint venturer "has a high degree of fiduciary duty toward the others arising out of the confidential relationship between them."). This Court should conclude that EQT and Plaintiffs are in such a relationship. In *Finley v. Marathon Oil Co.*, 75 F.3d at 1229, Judge Richard Posner, writing for the United States Court of Appeals for the Seventh Circuit, found that the producer and the property owner were "joint venturers who owe a fiduciary duty to each other." *Id.*

The Oklahoma Supreme Court, in *Young v. West Edmond Hunton Lime Unit*, 275 P.2d 304, 308-09 (Okla. 1954), reached the same conclusion, but analogized the relationship in terms of a trust relationship rather than a joint venture. It held that, the "operator stands in a position similar to that of a trustee for all who are interested in the oil production either as lessees or royalty owners." *Young*, 275 P.2d at 308 (Okla. 1954). Further, the court stated, the trustee has an obligation for "'the faithful discharge of the duty which is owing in a fiduciary capacity.'" *Id.* (quoting *Magruder v. Drury*, 235 U.S. 106 (1914)). Based on this duty, the *Young* court specifically found that a well operator had a fiduciary duty "to account to all the owners of oil rights" and to find "the highest market price available at the time of such production under the circumstances." *Id.* at 310.

EQT's argument that no fiduciary duty exists mischaracterizes the relationship between it and Plaintiffs as one of a "general business relationship." (Brief at 14). However, the relationships between the parties in the unreported cases cited by EQT do not relate at all to oil and gas rights and the special relationship of trust between a landowner and a gas producing

company.  *See Allaun v. Scott,* No. L01-3109, 2002 WL 31990277 (Va. Cir. Ct. Sept. 19, 2002)

(investment agreement did not create fiduciary duty); *Landis v. O'Connor*, No. 14528, 1994 WL

1031066 (Va. Cir. Ct. Feb. 28,  1994) (dwelling lease did not create fiduciary duty); *Rossman v.*

*Lazarus,* 2009 U.S. Dist. LEXIS 1741, **23-27 (E.D.Va. Jan. 9, 2009) (home loan contract did

not create fiduciary duty).

EQT's argument that there can be no breach of fiduciary duty here because the exclusive

remedy available to Plaintiffs is breach of contract is unavailing as well.  "It is well established

that the same conduct constituting the breach of a contractual obligation may also constitute a

breach of a duty arising out of the relationship created by the contract but independent of the

contract itself."  *La Barte*, 285 A.D. 2d at 976, 728 N.Y.S. 2d at 622.  In *La Barte*, where

plaintiff royalty owners brought a claim for breach of fiduciary duty against a producer for

failing to market, the court found that the plaintiffs there had stated a cognizable claim for breach

of fiduciary duty, noting that other courts had recognized a fiduciary duty of operators to market

oil at the highest price available.  *Id*. (citing *Coosewood v. Meridian Oil Co.*, 25 F.3d 920, 931

(10th Cir. 1994)).[14]

In support of its argument that the breach of fiduciary duty claim cannot co-exist with the

breach of contract claim, EQT cites *Augusta Mutual Insurance Company v. Mason*, 645 S.E.2d

290 (Va. 2007).  This case is one between a building contractor and his principal, and does not

relate to oil and gas leases.  As set forth above, when considering this exact same argument as it

related to an oil and gas lease, the defendants' argument did not prevail.  *Le Barte,* 285 A.D. 2d

---

[14] In denying the motion to dismiss on this issue, the *La Barte* court recognized that the issue "'is necessarily fact-specific to the particular case.'"  *Id.* (citing *Wiener v. Lazard Freres & Co*., 241 A.D.2d 114, 122, 672 N.Y.S.2d 8).  It is not appropriate to rule on this issue at this stage of the litigation.

at 976, 728 N.Y.S. 2d at 622.  Furthermore, the lack of any specific provision in a lease stating

that the lessee has no "fiduciary duty" to the lessor should be construed in the lessor's favor

based on the well-established rule that "the lessee has the opportunity to protect itself by the

manner in which it draws the lease."  *Gilmore*, 192 Kan. at 391, 388 P.2d at 605; *Rogers*, 29 P.3d

at 898 ("a royalty clause should be interpreted against the party who offered it, and in light of the

fact that the royalty clause is the means by which the lessor receives the primary consideration

for a productive lease.") This is also consistent with Virginia law of contract interpretation.

*Forest*, 1999 WL 3311724, at *2 (contracts are to be construed against the drafter).

　　　For these reasons, Plaintiffs' claim for breach of fiduciary duty is well-supported by the

allegations in the Complaint, and the Court should deny ET's motion to dismiss the claim.

## I.     Plaintiffs' Requests For Punitive Damages And Attorneys' Fees Should Not Be Dismissed.

　　　Plaintiffs have alleged that EQT's conduct was willful and wanton (Complaint at ¶21),

and therefore punitive damages are recoverable.  EQT admits that when a defendant's conduct in

committing a tort is willful, punitive damages can be awarded.  *Kamlar Corp. v. Haley*, 224 Va.

699, 707, 299 S.E.2d 514, 518 (1983).  In light of the fact that the Court must take their

allegations as true, Plaintiffs should be entitled to pursue these claims, and EQT's motion should

be denied. *Iqbal*, 129 S.Ct. at 1949.

　　　As to the issue of attorneys' fees, Plaintiffs have alleged that EQT engaged in intentional

acts of self-dealing (e.g., Complaint ¶15), made intentional omissions from its check stubs

(Complaint ¶19), and intentionally failed to accurately report and disclose to Plaintiffs all

material information relating to its calculation of Royalty payments (Complaint ¶40).  Such facts

are sufficient to conclude that EQT's conduct constitutes actual or constructive fraud, and are

sufficient to enable the Court, in its discretion, to award attorneys' fees to Plaintiffs. *See*

*Prospect Development Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291, 301 (1999) ("in a fraud

suit, a chancellor, in the exercise of his discretion, may award attorneys' fees to a defrauded

party"; "defendants engaged in callous, deliberate, deceitful acts that the Chancellor described as

a pattern of misconduct, which misled the [plaintiffs]").

> **J.**     **Plaintiffs Do Not Oppose Dismissal of EQT Corporation.**

Defendants argue that EQT Corporation should be dismissed.  Plaintiffs do not oppose a

dismissal of EQT Corporation from this case, without prejudice, and are filing a notice of

dismissal of EQT Corporation pursuant to Fed. R. Civ. P. Rule 41(a)(1)(A)(i).

## III.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny EQT's

motion to dismiss in its entirety.

Dated:  August 20, 2010                    Respectfully submitted,

                                           EDWIN F. LEGARD, JR.; ELIZABETH ANNE
                                           COX TRUST,  by and through its Trustee,
                                           Elizabeth Anne Cox; and EMILY P. BAKER
                                           GENERATION SKIPPING TRUST, by and
                                           through its Trustee, William G. Baker, Jr.

                        By:       s/ Larry D. Moffett_____.
                                  Larry D. Moffett
                                  DANIEL COKER HORTON &
                                  BELL, P.A.
                                  265 North Lamar Boulevard, Suite R
                                  P.O. Box 1396
                                  Oxford, MS  38655-1396
                                  Tel:  662-232-8979
                                  Fax:  662-232-8940
                                  lmoffett@danielcoker.com

Peter G. Glubiak, Esq. (VSB 31271)
GLUBIAK LAW OFFICE
P. O. Box 144
11165 W. River Rd.
Aylett, VA 23009
Tel:  (804) 769-1616
Fax:  (804) 769-1897
glubiaklaw@aol.com

Don Barrett
Brian Herrington
Katherine B. Riley
David M. McMullan, Jr.
BARRETT LAW GROUP, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS  39095
Tel:  662-834-2488
Fax:  662-834-2628
dbarrett@barrettlawoffice.com
bherrington@barrettlawgroup.com
kbriley@barrettlawoffice.com
dmcmullan@barrettlawoffice.com

Richard Barrett
LAW OFFICES OF RICHARD R.
BARRETT, PLLC
P.O. Box 339
Lexington, MS  39095
Tel:  662-834-4960
Fax:  662-430-5459
rrb@rrblawfirm.net

David S. Stellings
Jennifer Gross
Steven E. Fineman
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel:  212-355-9500
Fax:  212-355-9592
dstellings@lchb.com
jgross@lchb.com
sfineman@lchb.com

Elizabeth A. Alexander
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue N., Suite 1650
Nashville, TN  37219
Tel:  615-313-9000
Fax:  615-313-9965
ealexander@lchb.com

Charles Barrett
Attorney at Law
6518 Highway 100, Suite 210
Nashville, TN  37205
Tel:  615-525-3393
Fax:  615-515-3395
charles@cfbfirm.com

*Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel does hereby certify that he has this day served a true and correct copy of the above and foregoing upon all counsel of record via ECF notification and/or by e-mail.

Wade W. Massie
Penn Stuart & Eskridge
P. O. Box 2288
Abingdon, VA 24212
wmassie@pennstuart.com

W. Thomas McGough, Jr.
Reed Smith, LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
wmcgough@reedsmith.com

This the 20th day of August, 2010.

*/s/ Larry D. Moffett*
Larry D. Moffett