# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **EDWIN F. LEGARD, et al.,** | ) | |
|     **Plaintiffs** | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| **v.** | ) | **Case No.  1:10cv00041** |
| | ) | |
| **EQT PRODUCTION COMPANY,** | ) | |
|     **Defendant** | ) | |

This case comes before the court on defendant's Motion To Dismiss, (Docket Item No. 21) ("Motion"). The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

## I. Facts and Procedural History

The plaintiffs sue EQT Production Company, ("EQT"), on behalf of themselves and others similarly situated. The Complaint alleges that the plaintiffs own certain lands and gas interests in Dickenson County, Virginia, and are entitled to payments from EQT as lessors under certain gas leases on their properties. The court's jurisdiction is based on diversity of citizenship. See 28 U.S.C.A. § 1332(d)(2)(A) (West 2006).  Plaintiffs allege that, under the gas leases,  EQT is responsible for the proper determination, calculation, distribution and payment of royalties due and owing to them on gas produced from their properties.  The plaintiffs allege that EQT has

underpaid royalties under the leases by selling gas at below-market prices to affiliated companies, by underreporting the amount of gas produced, by selling gas in an unmarketable condition and by improperly deducting certain post-production costs from royalties. The plaintiffs further allege that EQT has purposefully concealed these improper deductions by intentionally omitting these deductions from the statements that accompany royalty payments. The plaintiffs seek compensatory and punitive damages from EQT for breach of contract, breach of implied duties to market, failure to act as a reasonably prudent operator, breach of good faith and fair dealing, breach of fiduciary duties and conversion. The plaintiffs also seek an accounting from EQT. Neither the leases at issue nor any of the statements or "check stubs" that accompany royalty payments were attached as exhibits to the Complaint.

EQT moves for the court to dismiss plaintiffs' claims for failing to state a claim under Federal Rule of Civil Procedure 12(b)(6).  EQT has filed with the court four of the five leases it claims are at issue. (Docket Item No. 22, Att. Nos. 1-4.) Three of these leases contain the following language:

> As a royalty, Lessee agrees to deliver to the credit of Lessor(s), heirs or assigns, free of cost, into the tanks or pipelines to which it may connect its well or wells, the equal one-eighth (⅛) part of all oil produced and saved from the leased premises; and the Lessee agrees to pay a royalty for all gas except stored gas and gas produced from the storage horizon or horizon produced, saved and marketed from the leased premises at the rate or one-eighth (⅛) of the proceeds received by the Lessee at the well.  Royalty payments shall constitute the entire consideration to Lessor(s) for such gas including the gasoline and other content thereof.  Lessor(s) shall pay a proportionate part of all excise, depletion, privilege and production taxes now or hereafter levied, assessed or charged on oil or gas produced from said premises. It is

agreed, however, that gas produced from any well or wells may be taken
by Lessee for fuel in its operation on said premises.

The fourth lease filed by EQT contains substantially similar language. All four of
these leases state that they give the lessees "the exclusive right of operating for,
producing and marketing oil and gas" from the leased properties.

EQT also has provided the court with the Declaration of Rick Crites, Director
of Revenue Accounting for EQT. (Docket Item No. 22, Att. 5, ("Crites's
Declaration.")) According to Crites, EQT pays all royalties owed by monthly checks.
Crites states that these checks are accompanied by remittance statements or check
stubs that provide information to the lessors concerning the revenues earned and
deductions taken for the particular well.  Crites states that these royalty checks are
issued by a third-party vendor and that EQT does not routinely keep copies of these
checks.  According to Crites, EQT does have copies of some of the check stubs or
statements issued. Copies of these checks are attached to Crites's Declaration.
According to Crites, these check stubs have shown deductions for gathering charges
for the past 20 years.

One of the checks provided by Crites is accompanied by a "Check Attachment"
dated September 22, 1996. This Check Attachment shows deductions taken for
transportation and compression. A number of "Remittance Statements" also are
attached to Crites's Declaration. The Remittance Statements show the total deductions
taken on each well under a category entitled "Gross Deducts," but there is no
information stating what types of expenses have been deducted.

Crites admits that for more than the past five years, EQT has sold the gas gathered from these lessors to an affiliated company, EQT Energy, LLC. Crites states, however, that the royalties during this time were paid based upon the sale price received by EQT Energy, LLC, or based on an index.

In response, the plaintiffs have provided the court with the fifth lease pertaining to these properties. (Docket Item No. 31, Att. No. 1.)  This lease states:

> The royalties reserved by Lessor, and which shall be paid by Lessee or by the vendee of oil or gas produced and sold hereunder, are ... on gas (including casinghead gas and all other gaseous or vaporous substances) produced from said land and sold or used off the leased premises in the manufacture of gasoline or any other product, the market value at the wells of one-eighth (⅛) of the gas sold or used.

The same paragraph of this lease originally contained language allowing for deductions from royalties for the expenses of gathering, compressing and making the gas merchantable.  This language, however, was physically stricken from the lease by the parties. On a later page of this lease it states: "Lessee may make a reasonable charge for compressing and making merchantable coal bed methane." (Docket Item No. 31, Att. No. 1 at 5.)

## II.  Analysis

The Motion seeks dismissal of the Complaint for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).  Specifically, EQT argues that plaintiffs' claims are barred by Virginia's five-year statute of limitations on actions

based on a written contract. EQT also argues that the leases at issue allow the deduction of post-production costs from royalties. EQT also argues that a number of claims raised by the plaintiffs are not recognized by Virginia law; these include the claims for breach of a duty of "good faith," breach of fiduciary duties, conversion, punitive damages and attorneys' fees.

The Supreme Court recently revisited the proper standard of review for a motion to dismiss and stated that the long-used "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), has "earned its retirement" and "is best forgotten" because it is an "incomplete, negative gloss on an accepted pleading standard." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007). In *Twombly*, the Supreme Court stated that "a plaintiff's obligation to provide the 'grounds' of ... 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). Additionally, the Court established a "plausibility standard" in which the pleadings must allege enough to make it clear that relief is not merely conceivable but plausible. *See Twombly*, 550 U.S. at 555-63.

The Court further explained the *Twombly* standard in *Ashcroft v. Iqbal*,129 S. Ct. 1937, 1949-50 (2009):

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare  recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice. ... Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. ...

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

(Internal citations omitted.)

Generally, a court may not consider matters outside of the pleadings on a motion to dismiss without converting it to a motion for summary judgment. *See* FED. R. CIV. P. 12(d); *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985). The court may, however, consider documents that are attached to or referenced in the complaint. *See Moore v. Flagstar Bank*, 6 F. Supp. 2d 496 (E.D.Va. 1997) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (1990)). Since the leases at issue are referenced in the Complaint, this court will consider the leases as if their terms were contained in the Complaint. The court will not consider Crites's Declaration at this stage because, as explained below, the declaration, at best, establishes a dispute in fact.

Since this court's jurisdiction is based upon diversity, the court must apply the substantive law of the forum state, including the forum state's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496-97 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). This court sits in Virginia. Virginia adheres to the use of traditional rules applicable to conflict of laws. "Under such rules, questions of

-6-

substantive law are governed by the law of the place of the transaction or the place where the right is acquired (lex loci)."  *Frye v. Commonwealth*, 345 S.E.2d 267, 272 (Va. 1986). Under Virginia law, issues regarding real estate are governed by the law of the state where the property is located. *See Mort v. Jones*, 51 S.E. 220, 221 (Va. 1905).  Furthermore, under Virginia law, claims for personal injury, whether they be for property damage or conversion, are governed by the law of the state where the injury occurred. *See Ryder Truck Rental, Inc. v. UTF Carriers, Inc*., 790 F. Supp. 637 (W.D. Va. 1992). "Generally, where a cause of action arises in tort, Virginia applies the law of the state where the tortious conduct or injury occurred." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (citing *Jones v. R. S. Jones & Assocs*., 431 S.E.2d 33, 34 (Va. 1993)).

The Complaint alleges that the leases at issue were to be performed in Virginia. The Complaint also alleges that the leases granted EQT  the right to extract gas from real property located in Virginia.  Furthermore, insofar as it is alleged that EQT violated its obligations or exceeded its rights under the leases or the law, these actions appear to have occurred with regard to the production of and accounting for gas gathered in Virginia.  Therefore, under Virginia conflict of law rules, Virginia substantive law, including Virginia's statutes or periods of limitation, would control. *See Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945) ("the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of litigation, as it would be if tried in a State court"); *Atkins v. Schmutz Mfg. Co.*, 401 F.2d 731, 734 (4th Cir. 1968).

EQT argues that the plaintiffs' breach of contract claims are barred by the

statute of limitations. Under Virginia law, an action based upon a written contract must be filed within five years of accrual. *See* VA. CODE ANN. § 8.01-246(2) (2007 Repl. Vol.). Furthermore, Virginia law states that a right of action accrues on "the date the injury is sustained in the case of injury to the person or damage to property, when the breach of contract occurs in actions ex contractu and not when the resulting damage is discovered...." VA. CODE ANN. § 8.01-230 (2007 Repl. Vol.). Each of the plaintiffs' claims in this case revolve around the allegation that EQT has not paid the amounts owed the plaintiffs under their respective leases. EQT argues that it has deducted post-production expenses from the royalties paid on these leaseholds for more than 20 years.  If deducting post-production expenses from these royalties breached the leases, EQT argues, the breach occurred when these deductions were first taken more than 20 years ago.

In support of its argument, EQT cites the Virginia Supreme Court's 1989 decision in *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 379 S.E.2d 316 (Va. 1989). In *Westminster,* the Virginia Supreme Court rejected a "continuous breach" exception to Virginia's five-year period of limitations on suing for a breach of a written contract.  *See* 379 S.E.2d at 319. The plaintiff-lessee, Lamps Unlimited, sued the defendant-lessor, Westminster, to recover damages resulting from Westminster's alleged breach of a written lease agreement. Lamps Unlimited had entered into the lease on July 27, 1976, leasing retail space at a Northern Virginia shopping center from Westminster for a period of 10 years. The term of the lease began on October 1, 1976. During negotiations, a representative of Westminster represented that it intended to begin enforcing uniform business hours for all of the shopping centers tenants. This representation induced Lamps Unlimited to enter into

the lease. Shortly after entering into the lease, Lamps Unlimited learned that Westminster was not enforcing uniform business hours on the shopping center's tenants. Over the years, Lamps Unlimited lodged numerous complaints over Westminster's failure to enforce uniform business hours. In June 1983, three years before the expiration of its lease, Lamps Unlimited vacated its store.  On October 28, 1985, Lamps Unlimited sued Westminster based on breach of contract. *See Westminster*, 379 S.E.2d at 316-17.

Westminster argued that Lamp Unlimited's claim accrued in 1976 when it first learned that Westminster was not enforcing uniform business hours, and, therefore, Lamps Unlimited's claim was barred by Virginia's five-year period of limitations on claims based on written contracts. *See* VA. CODE ANN. § 8.01-246(2). Lamps Unlimited argued that Westminster's continuous failure to enforce uniform business hours constituted a breach that continued until the day that it vacated the premises in 1983. While Lamps Unlimited agreed that the five-year limitations period applied to its claim, it argued that the limitations period's only effect was to restrict its claim for damages to the five-year period prior to the date it filed suit. *See Westminster*, 379 S.E.2d at 317.

With little explanation, the Virginia Supreme Court rejected the "continuous breach" theory. *See Westminster*, 379 S.E.2d at 319.  The court stated:

> Statutes of limitation "serve an important and salutary purpose."
> ... Indeed, without limitations on actions,
>> defendants could find themselves at the mercy of unscrupulous plaintiffs who hoard evidence that supports their position while waiting for their prospective opponents

to discard evidence that would help make a defense. In light of the policy that surrounds statutes of limitation, the bar of such statutes should not be lifted unless the legislature makes unmistakably clear that such is to occur in a given case. Where there exists any doubt, it should be resolved in favor of the operation of the statute of limitations.

...

Thus, courts are obligated to enforce statutes of limitations strictly and to construe any exception thereto narrowly.

*Westminster*, 379 S.E.2d at 318 (citations omitted).

The court recognized that, where an injury, even though slight, occurred as a result of the wrongful or negligent act of another, and the law provided a remedy, the right of action had accrued and that the statute of limitations began to run. *See Westminster*, 379 S.E.2d at 317-18. The court stated that it was "immaterial" that all damages resulting from a breach had not been sustained. *See Westminster*, 379 S.E.2d at 319. Thus, the court held that Lamps Unlimited's claim accrued in 1976, and its suit filed in 1985 was barred by the statute of limitations. *See Westminster*, 379 S.E.2d at 319.

Oddly, the Virginia Supreme Court in its 1989 opinion in *Westminster* did not even mention its 1988 opinion in *Heirs of Roberts v. Coal Processing Corp*, 369 S.E.2d 188 (Va. 1988), the opinion the plaintiffs cite for support of their argument that the statute of limitations has not expired on their claims. In *Roberts*, the court held that the then-applicable 10-year statute of limitations on breach of written contract claims did not bar lessors' claims filed in 1980 based on an 1874 mineral rights lease. The lease at issue in *Roberts* gave the lessees the right to enter, remove minerals and build

roads and railways on a 1,000-acre tract of land lying in Wise and Russell Counties for a period of 99 years.  Under the terms of the lease, lessees were "to pay the lessor 'ten cents per ton arising from the sale of any Coal or other mineral that may be mined or obtained from the land ... after the same is sold and the receipts are in the hands of the [lessees].'" *Roberts*, 369 S.E.2d at 188.  No minerals were mined from the property until 1945, when coal mining operations began, and those mining operations continued through the date of the court's 1988 opinion.  The plaintiffs, heirs of the lessor, alleged that the lessees had extracted coal at a rate of 30,000 tons per month and continued to do so, even though the term of the lease expired in 1973.  It was undisputed that the lessees had paid no royalties under the lease.

The Virginia Supreme Court's decision in *Roberts* appears to turn on the fact that the lease at issue contained no fixed time or schedule of times for performance. The court reasoned:

> ... The contract contains no fixed time or schedule of times for performance.  Payment was due from lessees to lessors only when (1) coal was sold to lessees' customers and (2) the proceeds of such sales were "in the hands" of the lessees. The timing of those events was entirely within the lessees' control.  They might, if they so elected, wait until the end of the 99-year lease period before becoming obligated to pay the lessors the first royalty payment by arranging to postpone the actual arrival of proceeds into their hands.

> The contract provides for no periodic reports or statements to the lessors concerning lessees' receipts, nor does it provide any other means whereby the lessors could know when, or if, the lessees had become indebted to them. The record is devoid of any allegations of notice to the lessors that the lessees had become indebted to them or of any facts from which constructive notice could be inferred.

*Roberts*, 369 S.E.2d at 190.

The court's opinion recognized a distinction under Virginia law between divisible and indivisible contracts. *See Roberts*, 369 S.E.2d at 190; *see also Jackson v. Quantrex Integrated Tech. Group, Inc.*, 2002 WL 220340, at \*5 (Southampton County Circuit Court Feb. 12, 2002). The court held that the lease at issue, unlike those providing for payments in installments due at specific times, was not a "divisible undertaking." *Roberts*, 369 S.E.2d at 190. The court held:

> In the case of an indivisible or entire contract, a party seeking to recover for a breach committed while the contract remained executory, or for an anticipatory breach committed before expiration of the time agreed upon for full and final performance, has the election of pursuing his remedy when the breach occurs, or of awaiting the time fixed by the contract for full and final performance. If he elects the latter course, the statute of limitations does not begin to run against his right of action until the time for final performance fixed by the contract has passed.

*Roberts*, 369 S.E.2d at 190 (citations omitted). The court further held that, since the lease at issue did not fix any particular time for full and final performance, "the rights of action of the lessors did not arise, and the statute of limitations did not begin to run against them, until the end of the contract's 99-year term, in 1973." *Roberts*, 369 S.E.2d at 190. Thus, the court found that the claims filed in 1980 were not barred by the statute of limitations. *See Roberts*, 369 S.E.2d at 191.

The court, however, stated that the result it reached in *Roberts* might have been different had the lessors treated the lessees' failure to pay royalties as an anticipatory

breach and had demanded payment. *See Roberts*, 369 S.E.2d at 190. In support of this point, the court cited *Riverview Land Co. v. Dance*, 35 S.E. 720, 722 (Va. 1900). In *Riverview*, the Virginia Supreme Court held that the limitations period does not begin to run until a right of action accrues and, further, that there can be no right of action until a person has a right to demand payment. The court reasoned:

> As a general proposition, where there is an undertaking or agency which requires a continuation of services, the statute of limitations does not begin to run against advances lawfully made by the agent in the prosecution of the undertaking or agency, or against compensation for the services of the agent, until the termination of the undertaking or agency. The law looks upon the employment as an entire contract, and regards the claim for disbursements and compensation as an entire demand, to which the right does not accrue until the completion of the service or the termination of the employment or agency. But, although the employment or agency is a continuing one, yet if the agent had the right to require payment for advances or compensation for services prior to the termination of the agency, or if the advances were repudiated by the principal as unauthorized or not required to be made by the nature of the employment or agency, the statute begins to run from the time the agent had the right to demand payment for his services or for advances, or, if the advances were repudiated as unauthorized, from the time of such repudiation. The statute begins to run whenever the right of action accrues, and such right accrues whenever the agent has the right to demand payment of his principal.... So that, although the agency be a continuing one, if the agent has the right, prior to the termination of the agency, to demand payment of his compensation or for advances, the statute begins to run from the time he had the right to make such demand.

*Riverview*, 35 S.E. at 722. The court also noted that evidence was presented at trial from which the jury could have found that the agent had the right, and had exercised the right, to demand certain payments from the principal prior to the termination of

the agency. *See Riverview*, 35 S.E. at 722.

In a more recent case applying the *Roberts* decision, the Virginia Supreme Court has stated, "It is well-settled that the statute of limitations runs from the time of actual performance and not the time of the anticipatory repudiation.... The statute of limitations will not begin to run until the time for performance has passed." *High Knob Assocs. v. Douglas*, 457 S.E.2d 349, 354 (Va. 1995).

Under Virginia law, a contract which calls for payments or performance at specific intervals is a divisible "installment" contract. *See Am. Inn, L.P., v. Suntrust Banks, Inc.*, 28 F.App'x 316, 320 (4th Cir. Feb. 13, 2002). Under such contracts, the period of limitations begins to run as to each installment, when that installment is due. *See Am. Inn*, 28 F.App'x at 320-21 (citing *Williams v. Matthews*, 48 S.E. 861 (Va. 1904)(holding that statute of limitations on claim to recover five unpaid installments of stock subscriptions ran from dates on which unpaid installments were due)). The Virginia Supreme Court explained in *Hampton Roads Sanitation Dist. v. McDonnell*, 360 S.E.2d 841, 843-44 (Va. 1987), "...when wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action."

That does not mean, however, that every contract that calls for multiple payments is a divisible installment contract. In *Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420 (E.D.Va. 2009), the Eastern District of Virginia held that an employer's failure to pay an employee's monthly car allowance provided for by contract or to pay the employee's commission at the contract rate did not constitute

a new breach with every pay period.  Instead, the court held that the employer's actions were a continuation of the original breach that occurred when the employer first refused to pay the employee his car allowance or to honor the contract rate for his commission. *See Hunter*, 635 F. Supp. 2d at 433. The court found since the employer instituted these pay changes more than five years earlier, the employee's breach of contract claims based on the employer's actions were completely barred by the five-year Virginia statute of limitations. *See Hunter,* 635 F. Supp. 2d at 433.

It is against this backdrop that this court must decide whether the statute of limitations bars the plaintiffs' contract claims in this case. Like in *Roberts*, the leases at issue in this case contain no provision with regard to the timing of royalty payments. It is not disputed, however, that royalty payments have been made by EQT to the plaintiffs. The plaintiffs allege that EQT has underpaid royalties owed based on improper deduction of certain post-production costs, because it has sold gas for less than market value prices to its affiliate companies, because it has sold gas not in marketable condition and because it has underreported the volume of gas produced. EQT, through Crites's Declaration, asserts that it has paid monthly royalty payments to the plaintiffs or their predecessors-in-interest for more than 20 years and that these payments have been accompanied by statements showing the revenues earned and the deductions taken in calculating their royalties. As stated above, this court will not consider Crites's Declaration at this stage. Even if it were to consider it, however, the declaration and attachments, on their face, create an issue of fact that would preclude judgment in EQT's favor. In particular, while the copies of royalty statements attached to Crites's Declaration do show that deductions were taken, only one of these statements shows that deductions were taken for transportation and compression.  The

others simply note unspecified deductions. Furthermore, the leases show that certain deductions, such as for taxes, were specifically allowed to be taken from the royalties to be paid to the lessors.

Plea of the statute of limitations is an affirmative defense. Thus, EQT bears the burden of proving that the plaintiffs' claims are barred by the statute of limitations. *See Roberts*, 369 S.E.2d at 190. EQT argues that the facts of this case resemble those in *Westminster* and require a finding that the plaintiffs' claims, in their entirety, are barred by the statute of limitations. Plaintiffs argue that the facts of this case more closely resemble those in *Roberts* and require a finding that their claims are not barred by the statute of limitations. In the alternative, the plaintiffs argue that, if the court should find that the leases are divisible, then they should be allowed to pursue claims based on any payments made within the five years prior to the filing of this case.

Based on the facts before the court at this stage, I find that plaintiffs' contract claims should not be dismissed as barred by the statute of limitations. This result, however, is not based on the reasoning of *Roberts*. The facts alleged in this case differ from *Roberts* in one important aspect – the plaintiffs in this case have been receiving payments under the leases. Furthermore, the plaintiffs concede that EQT has routinely provided them with notice that some deductions were taken from their royalties. Therefore, if EQT can show that the plaintiffs knew that EQT had been deducting specific post-wellhead costs for more than five years, this case would more closely resemble *Westminster* or *Hunter*.

On the other hand, the Complaint alleges that EQT improperly deducted costs

such as for gathering, compression, dehydration, treating, separation, processing and transportation from royalty payments. The Complaint further alleges that EQT purposefully failed to disclose these deductions on plaintiffs' check stubs in an intentional effort to deceive them and prevent them from learning of the alleged improper deductions. As stated above, even the evidence offered by EQT – Crites's Declaration and attachments – shows that some check stubs listed these deductions and some did not, thus, establishing a question of fact to be determined. If the plaintiffs can prove the facts as alleged in their Complaint, they may be able to establish that EQT is estopped by fraudulent concealment from asserting a statute of limitations defense. *See Healy v. Chesapeake Appalachia, LLC, et al.,* No. 1:10cv00023 Report and Recommendation, slip opinion at 16-23 (W.D. Va. Jan. 5, 2011) (citing, e.g. *FDIC v. Cocke,* 7 F.3d 396, 402 (4th Cir. 1993) (intentional misrepresentations allow doctrine of equitable estoppel to be used to toll running of statute of limitations)).

Furthermore, the plaintiffs allege that EQT also has failed to pay royalties as required under the leases because it has sold the gas produced for less than fair market prices or in less than marketable condition or because it has underreported the volume of gas produced. If that is the case, these claims would more closely resemble those occurring at specific intervals. *See Hampton Roads Sanitation Dist.,* 360 S.E.2d at 843-44. The cause of action for these claims would accrue when these actions occurred, creating separate divisible claims for each such underpayment. Thus, at the very least, the plaintiffs would be allowed to pursue any of these claims which accrued within the five years prior to the date of filing of this case. For these reasons, I recommend that the court deny the Motion insofar as it seeks to dismiss the plaintiffs'

contract claims as barred by the statute of limitations.

EQT also moves the court to dismiss plaintiffs' claims based on the deduction of post-production costs because such costs are allowable as a matter of law under the terms of the leases. Each of the leases contains language stating that royalties are to be paid based on the proceeds received for or the market value of the coal bed methane, ("CBM"), gas "at the well." Unlike the other leases, the November 27, 1990, lease contains specific language, other than that which was stricken through, that allows the lessee to "make a reasonable charge for compressing and making merchantable coal bed methane." Thus, this lease expressly gives the lessee the right to deduct these expenses. EQT, nonetheless, argues that the "at the well" language in all the leases means that lessee and lessor share all post-production costs. The plaintiffs, to the contrary, argue that the language of the leases should be construed, as a matter of law, not to allow any post-production deductions from royalties. In the alternative, the plaintiffs argue that the language of the leases is ambiguous and, therefore, the meaning of the language would turn on the parties' intent, which would create a question of fact to be determined.

The parties have not cited, and I cannot find, any Virginia authority interpreting similar language in oil and gas leases. The courts of other states that have interpreted similar language have come down on both sides of the issue. *See Sufficiency of "At the Well" Language in Oil and Gas Leases to Allocate Costs,"* 99 A.L.R. 5th 415 (2002 & Cum. Supp. 2010). Thus, two lines of cases have developed: Those that follow the "at the well" rule and those that follow the "first marketable product" rule. *See Bice v. Petro-Hunt, L.L.C., et al.,* 768 N.W.2d 496, 500-02 (N.D. 2009).

Under the "at the well" rule, language such as that contained in these leases is interpreted as unambiguously meaning that the lessees' royalty payments are calculated based on the value of the gas at the wellhead. *See Bice,* 768 N.W.2d at 500. Under this rule, any costs incurred by the lessee after the gas reaches the wellhead, whether to improve the quality of the gas or to transport the gas to a market where it may be sold, may be deducted before the royalty is calculated. *See Bice,* 768 N.W.2d at 501. Several of these cases reason that, when there is no market at the well for gas, the market value at the well must be extrapolated backwards from the price paid once it reaches market minus the costs to bring it to market. *See Bice,* 768 N.W.2d at 501; *Schroeder v. Terra Energy, Ltd,* 565 N.W.2d 887, 892 (Mich. Ct. App. 1997); *Merritt v. Sw. Elec. Power Co.,* 499 So. 2d 210, 214 (La. Ct. App. 1986).

Under the "first marketable product" rule, courts have held that lessees are responsible for incurring any costs necessary to make the gas produced from a well marketable. *See Bice,* 768 N.W. 2d at 501. Any costs "incurred after a marketable product has been obtained, that either enhance the value of the product or cause the product to be transported to another location, are shared by the lessee and the lessor." *Rogers v. Westerman Farm Co.,* 29 P.3d 887, 900 (Colo. 2001). These cases rely on the imposition of either an express or implied duty to market on behalf of the lessee. *See Rogers,* 29 P.3d at 901. These cases turn on the issues of when the gas becomes marketable and whether a cost is incurred to make it marketable. *See Rogers,* 29 P.3d at 900; *Sternberger v. Marathon Oil Co.,* 894 P.2d 788, 799-800 (Kan. 1995); *Wood v. TXO Prod. Corp.,* 854 P.2d 880, 882-83 (Okla. 1992).

I recently have held that the Virginia courts would impose an implied duty to

market on lessees under oil and gas leases. *See Healy*, No. 1:10cv00023 slip op. at 29. Much of this analysis is repeated below. Also, four of the five leases at issue here specifically state that the lessees will operate for and produce gas and market the gas produced. (Docket Item No. 22, Atts. 1, 2, 3, 4 at 1.) The fifth lease makes no specific mention of the lessee's duty to market but does specifically state that the lessee "may make a reasonable charge for compressing and making merchantable coal bed methane." All that being the case, I hold that the lessee, EQT, has a duty to market the CBM from these leases. Furthermore, I hold that Virginia courts would construe this duty to market to include a duty to make the product marketable. In so holding, I am persuaded by the reasoning of the Oklahoma Supreme Court in *Wood,* 854 P.2d at 882-83:

> ...The lessor, who generally owns the minerals, grants an oil and gas lease, retaining a smaller interest, in exchange for the risk-bearing working interest receiving the larger share of proceeds for developing the minerals and bearing the costs thereof. Part of the mineral owner's decision whether to lease or to become a working interest owner is based upon the costs involved. We consider also that working interest owners who share costs under an operating agreement have input into the cost-bearing decisions. The royalty owners have no such input after they have leased.  In effect, royalty owners would be sharing the burdens of working interest ownership without the attendant rights. If a lessee wants royalty owners to share in [the costs of making the gas marketable], that can be spelled out in the oil and gas lease. Then, a royalty owner can make an informed economic decision whether to enter into the oil and gas lease or whether to participate as a working interest owner.

Furthermore, insofar as EQT attempts to argue that industry custom or practice allows the proportionate allocation of post-production costs, this would not require the dismissal of plaintiffs' claims at this stage. Before a party can be bound by industry

custom, the party must know of the custom or it must be so universal and well-established that the party is presumed to have knowledge of its existence. *See Garman v. Conoco, Inc.,* 886 P.2d 652, 660 (Colo. 1994). The facts alleged in the Complaint do not suggest that the plaintiffs have any exposure or contact with the oil and gas industry other than to execute the leases at issue. *See Garman,* 886 P.2d at 660.

Thus, I reject EQT's argument that the "at the well" language, as a matter of law, allows them to share all post-production costs with the royalty owners. Instead, I hold that Virginia courts would follow the "first marketable product" rule, and hold the lessee solely responsible for all costs making the gas produced from the well marketable, unless, as is the case in the November 27, 1990, lease, the parties specifically agree otherwise. Therefore, I recommend the court deny EQT's motion to dismiss on this ground.

EQT also argues that the plaintiffs' claims should be dismissed for failing to state a claim upon which relief can be granted. More specifically, EQT argues that the plaintiff's separate claim for breach of implied duties should be dismissed. For the following reasons, I agree. It does not appear that the Virginia Supreme Court has specifically addressed what, if any, implied duties arise on the part of the parties to a written contract under the common law. *See Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1151-52 (D.C. Cir. 1984) (unable to discover any Virginia authority on the existence of a generally applicable "duty to perform in good faith"); *see also L & E Corp. v. Days Inns of Am., Inc.*, 992 F.2d 55, 59 n.2 (4th Cir. 1993) (Virginia Supreme Court has yet to recognize implied covenant of good faith and fair dealing); *but see Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (citing only

-21-

federal cases for proposition that, under Virginia law, every contract contains an implied covenant of good faith and fair dealing and allowing independent claim for breach of implied covenant); VA. CODE ANN. § 8.1A-304 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement"). Whether or not any implied duties arise out of a written contract, Virginia courts have held that a party's breach of an implied duty does not give rise to an independent tort, but gives rise to a cause of action for breach of contract only. *See Charles E. Brauer Co., Inc. v. Nationsbank of Va.*, 466 S.E.2d 382, 385 (Va. 1996); *see also A&E Supply Co., Inc. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 676 (4th Cir. 1986) ("in a first-party Virginia insurance relationship, liability for bad faith conduct is a matter of contract rather than tort law"). The Virginia courts also have held that an implied duty cannot be used to override or modify any explicit contractual term or right. *See Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997); *see also Riggs Nat'l Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994).

The plaintiffs argue that it is well-established that oil and gas leases impose certain implied duties on an operator. Those include, they argue, a duty to market the gas produced and to operate diligently and prudently. While the Virginia Supreme Court has not specifically addressed this issue, it does appear that other courts have recognized these implied duties in the context of oil and gas leases. "Implied obligations are as much a part of an oil, gas, and mineral lease and are just as binding as though they were expressed." 38 AM. JUR. 2D *Gas And Oil* § 91 (2010) (citing *McCarter v. Ransom*, 473 S.W.2d 235, 238 (Tex. Civ. App. 1971)). However, no implied covenant is recognized if the oil and gas lease contains an express covenant

on the same subject matter.  *See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 701 (Tex. 2008).

Colorado courts have recognized four implied covenants in oil and gas leases. These include implied covenants "to conduct exploratory drilling; to develop after discovering resources that can be profitably developed; to operate diligently and prudently; and to protect the leased premises against drainage." *Whitham Farms, LLC v. City of Longmont*, 97 P.3d 135, 137 (Colo. App. 2003).  The Colorado courts have held that the implied duty to operate diligently and prudently includes an implied covenant to market.  *See Garman*, 886 P.2d at 659.  "[T]he covenant obligates the lessee to engage in marketing efforts which 'would be reasonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee.'" *Garman*, 886 P.2d at 659.  Kansas, Oklahoma, Ohio and West Virginia also have recognized this implied duty to market.  *See Gilmore v. Superior Oil Co.*, 388 P.2d 602, 606 (Kan. 1964); *Wood*, 854 P.2d at 882; *Am. Energy Servs., Inc. v. Lekan*, 598 N.E.2d 1315, 1321-22 (Ohio Ct. App. 1992); *Wellman v. Energy Res., Inc.*, 557 S.E.2d 254, 265 (W. Va. 2001); *see also* 58 CJS *Mines And Minerals* § 308 (2010) (under an oil and gas lease, lessee generally has an implied duty to market the product).  Furthermore, "[t]he reasonably prudent operator concept is an essential part of every implied covenant.  Every claim of improper operation by a lessor against a lessee should be tested against the general duty of the lessee to conduct operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease." *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex. 1981); *see Smith v. Amoco Prod. Co.*, 31 P.3d 255, 272 (Kan. 2001) (oil and gas lessee has "duty to act at all times as a reasonably prudent operator"); *Sw. Gas Producing Co. v. Seale*, 191

So. 2d 115, 119 (Miss. 1966) ("great majority of jurisdictions, including Mississippi, apply the 'prudent operator' standard").

The leases at issue in this case make no mention of a duty on behalf of lessees to act diligently and prudently or to market any oil or gas discovered.  The courts which have recognized these implied duties reason that the purpose of oil and gas leases is to "provide for the exploration, development, production and operation of the property for the mutual benefit of the lessor and lessee." *Garman*, 886 P.2d at 656 (quoting *Davis v. Cramer*, 808 P.2d 358, 360 (Colo. 1991)). The major consideration given to the lessors in oil and gas leases is a royalty interest, which pays only upon production.  Furthermore, royalty interests are usually nonrisk and noncost bearing interests. Therefore, royalty owners have no control over where and when to explore for and complete wells and establish production. *See Garman*, 886 P.2d at 657. Without recognizing an implied duty on the part of the operator to act diligently and prudently, royalty owners would have no assurance of ever receiving any benefit of their bargain.

Based on the above reasoning, I hold that Virginia courts would recognize an implied duty on the part of oil and gas lessees to operate diligently and prudently, including a duty to market the gas produced.  This does not mean, however, that the Virginia courts would recognize a separate cause of action for a breach of these implied duties.  As explained above, the Virginia courts have held that breach of an implied duty gives rise to a breach of contract action only. *See Charles E. Brauer Co., Inc.*, 466 S.E.2d at 385.  Therefore, I recommend that the court grant the Motion and dismiss Count II of the Complaint insofar as Count II attempts to state a separate

claim for breach of implied duties.  Any breach of these duties may be considered as evidence of the plaintiffs' breach of contract claim found in Count I of the Complaint.

In Count III of the Complaint, the plaintiffs allege that EQT breached fiduciary duties by failing to calculate and pay to the plaintiffs and the class members the correct royalties they were due, by failing to account for all of the gas EQT produced and by failing to fully and accurately report and disclose all material information relating to EQT's calculation of royalty payments. I find that the Complaint does not allege sufficient facts to establish that EQT owed the plaintiffs any fiduciary duty. The facts alleged in the Complaint, if true, establish that the plaintiffs have a business relationship with EQT, whereby EQT has the right to produce CBM gas from property in which the plaintiffs own the mineral rights in exchange for paying the plaintiffs a royalty on that gas.  The plaintiffs' business relationships were established by contract, and the leases do not impose any fiduciary duties upon EQT.  The plaintiffs argue that EQT's ongoing undertakings to handle properties and monies for the plaintiffs and others similarly situated and to provide continuing operational, accounting and reporting services to the plaintiffs and others puts EQT in a position of a fiduciary.

A fiduciary relationship exists where "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence."  *H-B Ltd. P'ship v. Wimmer*, 257 S.E.2d 770, 773 (Va. 1979).  Fiduciary duties can arise either from a contractual provision or through a common law duty. *See Foreign Mission Bd. of So. Baptist Convention v. Wade*, 409 S.E.2d 144, 148 (Va. 1991).  Virginia courts have

recognized fiduciary relationships between an attorney and client, an agent and principal, a trustee and beneficiary, a parent and child and a caretaker and invalid. *See Rossmann v. Lazarus*, 2008 WL 4642213, at *7 (E.D. Va. Oct. 15, 2008). When the parties' relationship is entirely defined by contract, and the contract imposes no fiduciary duty, none exists. *See Rossmann*, 2008 WL 4642213, at *7.

"A fiduciary owes total fidelity to the interests of his principal." *State Farm Mut. Auto. Ins. Co. v. Floyd*, 366 S.E.2d 93, 97 (Va. 1988). Simply put, a fiduciary must put the interests of his principal ahead of his own interests. While the relationship exists, the fiduciary may engage in no self-dealing which may have any adverse effect on the interests of his principal. *See State Farm Mut. Auto. Ins. Co.*, 366 S.E.2d at 97. If the alleged fiduciary has the right to protect his own interests pursuant to a contract, then no fiduciary relationship exists. *See State Farm Mut. Auto. Ins. Co.*, 366 S.E.2d at 97.

A fiduciary relationship does exist in an agency relationship. "'It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. . . ." *Byars v. Stone*, 42 S.E.2d 847, 853 (Va. 1947) (quoting 3 AM. JUR. 2D *Agency* § 252, p. 203.) There is no presumption of agency, however. *See Raney v. Barnes Lumber Corp.*, 81 S.E.2d 578, 584 (Va. 1954). If a party is not an agent, that party cannot be a fiduciary. *See Banks*

*v. Mario Indus. of Va., Inc.*, 650 S.E.2d 687, 695 (Va. 2007). The power of control, or its absence, is an important consideration in determining whether an agency relationship exists. *See Reistroffer v. Person*, 439 S.E.2d 376, 378 (Va. 1994).

There are no allegations in this case that EQT undertook to perform any functions as an agent of the plaintiffs. While the Complaint alleges that EQT, as an operator, *voluntarily* undertook to provide operational, accounting and reporting services for the plaintiffs, the leases show otherwise. From the language of the leases, it is clear that EQT performed these duties to fulfill its obligations to produce gas, account for it and pay the plaintiffs and others royalties for it. *See United States v. Bitter Root Dev. Co.*, 200 U.S. 451, 477-78 (1906) (it is doubtful that duty to report amount of timber cut creates a fiduciary relationship between licensee and property owner). The court should resist the request to turn a "garden variety, arm's length . . . transaction" into a fiduciary relationship. *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 695 (E.D. Va. 1990). Furthermore, the Complaint makes no allegation that the plaintiffs had the power to control EQT's actions. Therefore, I find that the plaintiffs have not alleged sufficient facts to show that EQT held a fiduciary duty toward them.

Next, I find that the plaintiffs have sufficiently pled a claim for conversion. This court has recognized that, under Virginia law, a claim for conversion may be pled in conjunction with a breach of contract claim. *See Combined Ins. Co. of Am. v. Wiest*, 578 F. Supp. 2d 822, 833 (W.D. Va. 2008). "'[T]he duty not to convert the property of another for one's own purposes' exists in the absence of any contract, and thus provides the basis for an 'independent tort from the contract claims' arising out of the parties' relationship." *Combined Ins. Co. of Am.*, 578 F. Supp. 2d at 833 (quoting

*Hewlette v. Hovis*, 318 F. Supp. 2d 332, 337 (E.D. Va. 2004)).  Virginia law defines conversion as any distinct act of dominion or control wrongfully exerted over the property of another, either inconsistent with, or in denial of, the owner's rights.  *See Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001); *Hairston Motor Co. v. Newsome*, 480 S.E.2d 741, 744 (Va. 1997).  In this case, the plaintiffs have alleged that EQT has wrongfully converted certain amounts of the CBM gas produced from the wells at issue for their own use without properly accounting for it or paying royalties on it. The plaintiffs also allege that EQT has wrongfully withheld for its own use monies owed to the plaintiffs and others similarly situated without properly accounting for it. I find that these facts are sufficient to allege an independent cause of action for conversion, and I recommend that the court deny the Motion as to Count IV.  *See PGI, Inc. v. Rathe Prods., Inc.*, 576 S.E.2d 438, 443 (Va. 2003) (any wrongful exercise over another's goods, including sums of money, in denial of the lawful owner's rights, states a claim for conversion).

In the Complaint, the plaintiffs seek an award of punitive damages.  EQT argues that the Complaint fails to state a claim for such damages because, in Virginia, punitive damages cannot be awarded for breach of contract.  For the following reasons, I find that the plaintiffs have sufficiently pled a claim for punitive damages, and I recommend that the court deny the Motion in this regard.

In *Giant of Va., Inc. v. Pigg*, 152 S.E.2d 271, 277 (Va. 1967), the Virginia Supreme Court explained the circumstances under which punitive damages may be awarded as follows:

> Punitive . . . damages are allowable only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others. They are allowed not so much as compensation for plaintiff's loss, as to warn others and to punish the wrongdoer, if he has acted wantonly, oppressively, or with such malice as to evince a spirit of (mischief) or criminal indifference to civil obligations. Wilful or wanton conduct imports knowledge and consciousness that injury will result from the act done.

(citations omitted). The Virginia Supreme Court has defined "willful and wanton negligence" as:

> acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

*Griffin v. Shively*, 315 S.E.2d 210, 213 (Va. 1984).

While EQT is correct that the general rule is that punitive damages are not allowed for breach of contract, *see Goodstein v. Weinberg*, 245 S.E.2d 140, 143 (Va. 1978), they may be allowed based on a "willful, independent tort in a count separate from that which alleges a breach of contract." *Kamlar Corp. v. Haley*, 299 S.E.2d 514, 518 (Va. 1983). In *Kamlar*, the Virginia Supreme Court noted that this "serves to notify the defendant of the precise allegations he must meet at trial to resist that part of the claim which supports punitive damages." 299 S.E.2d at 518. I find that the plaintiffs have met the Virginia Supreme Court's requirements by sufficiently pleading the independent tort of conversion, as set out above. Taking the plaintiffs' allegations contained in the Complaint as true, as I must, I note that the conversion by EQT was not based on mistake, but was intentional. I find that such allegations suffice to state a claim for punitive damages, at least at this stage of the proceedings,

and I recommend that the court deny the Motion on this ground.

Lastly, the plaintiffs seek an award of attorneys' fees. However, I find that under Virginia law, such attorneys' fees are not appropriate in this case, and I recommend that the court dismiss such a claim. Virginia follows the American Rule, which "forbids an award of attorney's fees absent a contractual, statutory, or equitable basis for it." *Arthur v. Warner*, 54 Va. Cir. 331, at *1 (Isle of Wight Co. Dec. 29, 2000). In *Russell Co. Dep't of Soc. Servs. v. O'Quinn*, 523 S.E.2d 492, 493 (Va. 2000) (quoting *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 300 (Va. 1999)), the Virginia Supreme Court made clear that "[w]e have repeatedly stated that the general rule in this Commonwealth is that in the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party." *See also Gilmore v. Basic Indus., Inc.*, 357 S.E.2d 514, 517 (Va. 1987). While several exceptions to the American Rule exist, I find that none of them applies to this case. Such exceptions exist for malicious prosecution and false imprisonment suits, cases against trustees defending the trust in good faith, cases alleging contract breaches that trigger third-party litigation, certain spousal support cases and in fraud suits, at the discretion of the chancellor. *See Bershader*, 515 S.E.2d at 301 (citations omitted). It is clear that none of the first five instances is the case here. However, the plaintiffs argue that because EQT engaged in intentional acts of self-dealing, made intentional omissions from its check stubs and intentionally failed to accurately report and disclose to the plaintiffs all material information relating to its calculation of royalty payments, such facts are sufficient to conclude that EQT's conduct constitutes actual or constructive fraud, thereby allowing the court, in its discretion, to award attorneys' fees to the plaintiffs. I disagree.

First, I note that there is no contractual or statutory basis for awarding the plaintiffs attorneys' fees in this case.  Next, I note that the *Bershader* exception for allowing attorneys' fees in fraud suits exists only in suits in equity, not at law.  In *Anand, L.L.C. v. Allison*, 55 Va. Cir. 261, at *6 (City of Va. Beach May 23, 2001), the court noted that it was doubtful that "the trial judge in a law action in which fraud had been proven, has the same power to award attorney's fees as does the chancellor." Here, the plaintiffs seek no equitable relief other than an accounting, and this equitable relief is sought for the sole purpose of determining the legal relief – the amount of monetary damages -- to award.  Thus, I find that this court should not award attorneys' fees in this case. Finally, under these facts, I find that even if this exception were allowable at law, the plaintiffs have not stated a claim for common law fraud in their Complaint.   Instead, the Complaint contains claims for breach of contract and conversion.  Although the plaintiffs ask the court to find that the allegations contained in the Complaint are sufficient to find that EQT's conduct constitutes actual or constructive fraud, I find that this is not sufficient under *Bershader*, which should be interpreted narrowly.  *See C.F. Trust, Inc. v. First Flight Ltd. P'ship.*, 359 F. Supp. 2d 497, 503 (E.D. Va. 2005).  It is well-settled that "[f]raud . . . must be clearly and expressly charged. . . ." *Sands v. Bankers' Fire Ins. Co.*, 192 S.E. 617, 621(Va. 1937). A "'litigant who prosecutes a cause of action for actual fraud must prove by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Davis v. Marshall Homes, Inc.*, 576 S.E.2d 504, 506 (Va. 2003) (quoting *Bryant v. Peckinpaugh*, 400 S.E.2d 201, 203 (Va. 1991)).  A review of the Complaint reveals that the plaintiffs simply have not alleged a claim for fraud.  It is for all of these reasons that I find that the plaintiffs

have failed to state a claim for attorneys' fees, and I recommend that the court grant EQT's Motion on this ground.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   The Complaint alleges sufficient facts to plead fraudulent concealment by which EQT may be estopped from asserting a statute of limitations defense to plaintiffs' breach of contract claims as barred by the statute of limitations;

2.   The Complaint alleges sufficient facts to plead a divisible contract with regard to plaintiffs' claims that EQT breached the leases for royalties paid within the past five years by selling gas at below-market rates to affiliated companies, by selling gas not in marketable condition and by underreporting the volume of gas produced;

3.   The Motion should be denied insofar as it seeks to dismiss plaintiffs' contract claims contained in Count I on statute of limitations grounds;

4.   Virginia courts would construe the lessee's duty to market to include the duty to make the gas marketable;

5.   Virginia courts would impose the "first marketable product" rule making producers solely liable for post-production costs incurred to make the gas marketable, unless the parties specifically agree otherwise;

6.   Virginia courts would recognize an implied duty on the part of oil and gas lessees to operate diligently and prudently, but they would not recognize a separate cause of action, other than breach of contract, for breach of this implied duty;

7.   Count II should be dismissed because the Complaint fails to state a separate claim for breach of the implied duty to operate diligently and

prudently;

8.  Count III should be dismissed because the Complaint fails to plead sufficient facts to show that EQT owed a fiduciary duty to plaintiffs;

9.  The Complaint sufficiently pleads a cause of action for conversion;

10.  The Complaint sufficiently pleads a claim for punitive damages;

11.  The Motion should be denied insofar as it seeks to dismiss plaintiffs' claims for conversion or punitive damages; and

12.  The court should not award attorneys' fees in a case such as this one.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motion in part and deny the Motion in part.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of

the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 11th day of January 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE