IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION


ROBERT ADAIR, on behalf of himself )
and all others similarly situated, )
         Plaintiff, )
          )
v. )   Case No. 1:10-cv-00037
          )
EQT PRODUCTION COMPANY, )
*et al.*, )
         Defendants. )


EVA MAE ADKINS, on behalf of )
herself and all others similarly situated, )
         Plaintiff, )
          )
v. )   Case No. 1:10-cv-00041
          )
EQT PRODUCTION COMPANY, )
         Defendant. )


EVA MAE ADKINS, on behalf of )
herself and all others similarly situated, )
         Plaintiff, )
          )
v. )   Case No. 1:11-cv-00031
          )
EQT PRODUCTION COMPANY, )
*et al.,* )
         Defendants. )

JEFFERY CARLOS HALE,       )
on behalf of himself and all others    )
similarly situated,            )
           Plaintiff,    )
                        )
v.                         )    Case No. 1:10-cv-00059
                        )
                        )
CNX GAS COMPANY, LLC, *et al*.   )
           Defendants.    )


DORIS BETTY ADDISON,       )
on behalf of herself and all others    )
similarly situated,            )
           Plaintiff,    )
                        )
v.                         )    Case No. 1:10-cv-00065
                        )
CNX GAS COMPANY, LLC, *et al*.   )
           Defendants.    )


## REPORT AND RECOMMENDATION

These matters are before the undersigned for decision on plaintiffs' pending motions to certify the cases as class actions and to appoint class representatives and class counsel.[1] Oral argument on the motions was heard on November 30, 2012. The Motions are before the undersigned magistrate judge by referral, pursuant to 28 U.S.C. § 636(b)(1)(B). Based on the arguments and representations presented, and for the reasons stated in this Report and Recommendation, the undersigned is

---

[1] The motions currently before the court, (collectively, "Motions"), are:
    Docket Item No. 190 in Case No. 1:10cv37;
    Docket Item No. 71 in Case No. 1:10cv41;
    Docket Item Nos. 76 and 173 in Case No. 1:10cv59;
    Docket Item No. 118 in Case No. 1:10cv65; and
    Docket Item No. 168 in Case No. 1:11cv31.

of the opinion that the Motions should be granted in part and denied in part as set out below.

## I. Facts

The plaintiffs in these five cases sue on behalf of themselves and others similarly situated, seeking payment of royalties and other relief as lessors of coal bed methane, ("CBM"), taken from CBM wells located throughout southwestern Virginia and operated by EQT Production Company, ("EQT"), or CNX Gas Company, LLC, ("CNX"). In the *Adair* and *Hale* cases, Case Nos. 1:10cv37 and 1:10cv59, the plaintiffs claim that they and the proposed class members are entitled to CBM royalty payments and other relief from the well operators as "deemed" lessors under forced-pooling orders of the Virginia Gas and Oil Board, ("Board"). In the *Legard*,[2] *Adkins* and *Addison* cases, Case Nos. 1:10cv41, 1:11cv31 and 1:10cv65, the plaintiffs claim that they and the proposed class members are entitled to royalty payments and other relief from the well operators as voluntary lessors of their CBM interests.

In four of these cases, the *Adair*, *Adkins*, *Hale* and *Addison* cases, the well operators have withheld royalty payments from the plaintiffs and proposed class members based on asserted conflicting claims of ownership of the CBM estate. In the "deemed" leased cases, *Adair* and *Hale*, these withheld royalty payments were required by Board orders to be placed into a Board-created escrow account, ("Escrow Account"), pending a final agreement or determination as to ownership

---

[2] Although Eva Mae Adkins has been substituted as the named plaintiff in Case No. 1:10cv41, the court will continue to refer to this case as the *Legard* case to avoid confusion with the other case in which Adkins is the named plaintiff.

of the CBM estate/interest. *See* VA. CODE ANN. §§ 45.1-361.21, 45.1-361.22 (2002 Repl. Vol. & Supp. 2012). In the voluntary lease cases, *Adkins* and *Addison*, the well operators have held the CBM royalty payments in "suspense" under the terms of the parties' leases or placed them in the escrow account pending final agreement or determination as to ownership of the CBM estate/interest. In these cases, the plaintiffs seek a determination that they and the proposed class members are the owners of the CBM estate, and, therefore, are entitled to payment of all withheld royalties. There is no dispute as to the ownership of the CBM estate in the *Legard* case.

In all five cases, the plaintiffs seek a full and accurate disclosure and accounting by the well operators of their handling and marketing of the CBM taken from the particular wells at issue, as well as an accounting of all CBM royalties owed to the plaintiffs and proposed class members. Also remaining in all five cases are claims for conversion. All of the cases except the *Legard* case have breach of fiduciary duty claims against the operators remaining. The deemed lease cases, *Adair* and *Hale*, also have trespass, failure to act as a reasonably prudent operator and unjust enrichment claims remaining against the operators. Two of the voluntary lease cases, *Legard* and *Adkins*, also have breach of contract claims remaining against the operators.

In *Adair*, the plaintiff seeks to certify the following class:

> Each person and entity who has been identified by EQT … or its predecessor(s)-in-interest as an "unleased" owner of the gas estate or gas interests in a tract included in a coalbed methane gas unit operated by EQT … in any of the Subject Virginia counties, and whose ownership of the coalbed methane gas attributable to that tract

has been further identified by EQT … as being in conflict with a person(s) or entity(ies) owning the coal estate or coal interests in the tract or coalbed methane interests allegedly derived from coal estate or coal interests in the tract, according to filings made by EQT … with the … Board and/or according to orders entered by the … Board pursuant to EQT['s] … filings.[3]

In *Adkins*, the plaintiff seeks to certify the following class:

Each person who has been identified by EQT as the owner and lessor of gas estate interests in a tract included in a coalbed methane gas unit operated by EQT in Buchanan, Dickenson, Lee, Russell, Scott, or Wise County, Virginia (and all other counties in which EQT operates or has operated CBM wells/units), and whose ownership of the coalbed methane gas attributable to that tract has been further identified by EQT as being in conflict with a person(s) identified by EQT as owning coal estate interests and not gas estate interests in the tract.

This proposed class excludes:

[E]ach gas estate owner who has entered a written agreement with a purported coal estate owner settling alleged conflicting claims of CBM ownership between them; provided, however, that this exclusion does not extend to those interests or rights of any such gas estate owner regarding lands, CBM units, and/or CBM royalties that are not expressly covered and settled by any such settlement agreement.

In *Legard*, the plaintiff seeks to certify the following class:

---

[3] Each of the proposed classes in these cases exclude "any person who serves as a judge" in these actions and his or her spouse. In *Adair*, the proposed class also excludes "all purportedly conflicting claims pertaining to those tracts/parcels that are comprised of railroads or public roads."

All individuals and entities to whom EQT has paid or is currently paying royalties under leases on gas produced by EQT in the Commonwealth of Virginia, according to business records maintained by EQT.[4]

In *Hale*, the plaintiff seeks to certify the following class:

Each person who has been identified by CNX as an "unleased" owner of gas estate interests in a tract included in a forced-pooled coalbed methane gas unit operated by CNX in Buchanan, Russell, and/or Tazewell County, Virginia, and whose ownership of the coalbed methane gas attributable to that tract has been further identified by CNX as being in conflict with a person(s) identified by CNX as owning coal estate interests and not gas estate interests in the tract, according to filings made by CNX with the … Board and/or according to orders entered by the … Board pursuant to CNX's filings.

This proposed class excludes the defendant and:

[E]ach gas estate owner who has entered a written agreement with a purported coal estate owners settling alleged conflicting claims of CBM ownership between them; provided, however, that this exclusion does not extend to those interests or rights of any such gas estate interest owner regarding lands, CBM units, CBM royalties and/or CBM proceeds that are not expressly covered and settled by any such settlement agreement.

In *Addison*, the plaintiff seeks to certify the following class:

Each person who has been identified by CNX as the owner and lessor of the gas estate or gas interests in a tract included in a coalbed methane gas unit operated by CNX in Buchanan, Russell, and/or

---

[4] In *Legard*, the proposed class also excludes the defendant and the federal government.

Tazewell County, Virginia, and whose ownership of the coalbed methane gas attributable to that tract has been further identified by CNX as being in conflict with a person(s) or entity(ies) owning the coal estate or coal interests in the tract.

This proposed class excludes the defendant and:

[E]ach gas estate owner who has entered into a written agreement with a purported coal estate owner settling the alleged conflicting claim of CBM ownership between [them]; provided, however, that this exclusion does not extend to those interests or rights of any such gas estate interest owner regarding lands, CBM units, and/or CBM royalties that are not expressly covered and settled by any such settlement agreement.

The parties have presented numerous affidavits and documents for the court's consideration on the Motions. A number of these affidavits are provided by plaintiffs' counsel and address counsel's qualifications to serve as class counsel. These affidavits are virtually identical and were filed in each of the five cases. These affidavits will not be addressed at length because no one contests plaintiffs' counsel's qualifications to serve as class counsel should these cases be certified as class actions.

The remaining evidence is addressed only insofar as I found it relevant on the Motions. Much of the evidence has been filed in more than one of these cases. In this Report and Recommendation, I cite to at least one record location for the evidence addressed. I do not necessarily provide every record location for each piece of evidence provided.

\*\*\*

Plaintiff Robert Adair owns land in Dickenson County which is referred to as the "N. K. Rasnick tract." Portions of the N. K. Rasnick tract are included in at least three of the Board's pooling orders. With regard to the Motions, plaintiffs have filed the Board files for two of these wells. (*Adair,* Docket Item No. 399-18, -19). In Board Docket No. 98-0818-0678, EQT filed an application to place a CBM gas well, VC-3756, on a 58.77-acre drilling unit. As required by the Gas Act, EQT gave notice of its application and hearing before the Board to "all unleased persons owning an interest in the oil, gas and coalbed methane, in and underlying the unit…" This notice stated that EQT was requesting the Board issue an order pooling "all the rights, interests, and estates of the unleased persons ... in regard to the drilling, development and production of oil, gas and coalbed methane" in the proposed drilling unit. This drilling unit is composed of six different tracts of land.

The notice for this drilling unit set out those EQT had found to have an interest in the CBM in Exhibit B. Exhibit B set out two lists of owners of the CBM for the six tracts contained in this drilling unit. One list is entitled "Gas Estate Only." The other is entitled "Coal Estate Only." The N. K. Rasnick Heirs are listed as the owners of the "Gas Estate Only" on two of the six tracts. On these tracts, the Lambert Coal Owners[5] are listed as the owners of the "Coal Estate Only."

Exhibit B also was attached to EQT's application for this drilling unit. The application stated: "Set forth in Exhibit B is the name and last-known address of each owner of record identified by [EQT] as having an interest in the oil, gas and

---

[5] The Lambert Coal Owners are Lambert Land, LLC; Arlie J. Lambert; Linda Lambert Loftin; G. Worth Pegram, Jr.; Bernice Lambert Pegram; Abbie Lambert Amos; Rose Lambert Short; Harris McGirt; Joan Lambert McGirt; Greg Lambert; C.W. Dotson; Mary Frances L. Dotson; Dennis Sutherland; Don Rainey; and Linda Carol Rainey.

coalbed methane underlying the unit..." The application further stated: "[EQT] has exercised due diligence to locate each of the oil, gas and coalbed methane interest owners named herein at Exhibit B...."

Following a hearing, the Board, by Report Of The Board Findings And Order approved on September 24, 1998, granted the application and approved the well and the pooling of all interests in the drilling unit. The order stated in part:

> ... [T]he Board ... finds that the Applicant has (1) exercised due diligence in conducting a meaningful search of reasonably available sources to determine the identity and whereabouts of each gas and oil owner, coal owner, or mineral owner and/or potential owner, i.e., person identified by [EQT] as having ("Owner") or claiming ("Claimant") the rights to Coalbed Methane ... in the Subject Drilling Unit... and (3) that the persons set forth in Exhibit B hereto have been identified by [EQT] as persons who may be Owners or Claimants of Coalbed Methane Gas interests ... in the Subject Drilling Unit....

> ... Set forth in Exhibit B is the name and last know[n] address of each person identified by [EQT] as having or claiming an interest in the Coalbed Methane Gas in the Subject Drilling Unit .... The Gas Owners or Claimants who have not reached a voluntary agreement to share in the operation of the well represent 76.920000 percent of the gas and oil estate and 0 percent of the coal estate in Subject Drilling Unit....

(*Adair,* Docket Item No. 399-18 at 4-5, 12).

This Board file also contains an affidavit regarding elections, escrow and escrow accounts made by EQT's counsel, James E. Kaiser. (*Adair,* Docket Item No. 399-18 at 30-41). This affidavit alleged that the interests and/or claims of the N. K. Rasnick Heirs were subject to escrow "due to <u>conflicting claims</u> as between the gas owner and the coal owner." By Supplemental Order dated December 8,

1998, the Board approved the establishment of the requested escrow account due to the conflicting claim set out in Kaiser's affidavit. (*Adair,* Docket Item No. 399-18 at 27-29).

Another portion of the N. K. Rasnick tract is included in the Board's pooling order in Docket No. 00-0418-0796. The plaintiffs have provided a certified copy of the Board's file of this case. (*Adair,* Docket Item No. 399-19). In this application, EQT sought to place a CBM gas well, VC-3614, on another 58.77-acre drilling unit. EQT also gave notice of its application and hearing before the Board to "all unleased persons owning an interest in the oil, gas and coalbed methane, in and underlying the unit." This notice stated that EQT was requesting the Board issue an order pooling "all the rights, interests, and estates of the unleased persons ... in regard to the drilling, development and production of oil, gas and coalbed methane" in the proposed drilling unit. This drilling unit is composed of four different tracts of land.

The notice for this drilling unit also set out those EQT had found to have an interest in the CBM in Exhibit B. Exhibit B set out two lists of owners of the CBM for the four tracts contained in this drilling unit. One list is entitled "Gas Estate Only." The other is entitled "Coal Estate Only." The N. K. Rasnick Heirs are listed as the owners of the "Gas Estate Only" on one of the four tracts. On this tract, the Lambert Coal Owners are listed as the owners of the "Coal Estate Only." On two of the tracts, Pittston Company is listed as both the owner of the "Gas Estate Only" and "Coal Estate Only." On the remaining tract, the Lambert Coal Owners are listed as both the owners of the "Gas Estate Only" and "Coal Estate Only."

Exhibit B also was attached to EQT's application for this drilling unit. The application stated: "Set forth in Exhibit B is the name and last-known address of each owner of record identified by [EQT] as having an interest in the oil, gas and coalbed methane underlying the unit..." The application further stated: "[EQT] has exercised due diligence to locate each of the oil, gas and coalbed methane interest owners named herein at Exhibit B...."

Following a hearing, the Board, by Report Of The Board Findings And Order approved on May 5, 2000, granted the application and approved the well and the pooling of all interests in the drilling unit. The order stated, in part:

> ... [T]he Board ... finds that the Applicant has (1) exercised due diligence in conducting a meaningful search of reasonably available sources to determine the identity and whereabouts of each gas and oil owner, coal owner, or mineral owner and/or potential owner, i.e., person identified by [EQT] as having ("Owner") or claiming ("Claimant") the rights to Coalbed Methane ... in the Subject Drilling Unit... and (3) that the persons set forth in Exhibit B hereto have been identified by [EQT] as persons who may be Owners or Claimants of Coalbed Methane Gas interests ... in the Subject Drilling Unit....

> ... Set forth in Exhibit B is the name and last know[n] address of each person identified by [EQT] as having or claiming an interest in the Coalbed Methane Gas in the Subject Drilling Unit .... The Gas Owners or Claimants … who have not reached a voluntary agreement to share in the operation of the well represent 2.94 percent of the gas and oil estate and 0.00 percent of the coal estate in Subject Drilling Unit....

(*Adair,* Docket Item No. 399-19 at 35-36, 43).

This Board file also contains an affidavit regarding elections, escrow and escrow accounts made by EQT's counsel, James E. Kaiser. This affidavit alleged

that the interests and/or claims of the N. K. Rasnick Heirs were subject to escrow. By Supplemental Order dated April 26, 2001, the Board approved the establishment of the escrow account requested in Kaiser's affidavit. (*Adair,* Docket Item No. 399-19 at 65-67).

Plaintiffs have provided a copy of a May 7, 1981, Oil And Gas Lease between Albert C. and Eva Mae Adkins and Philadelphia Oil Company, ("Philadelphia Oil"), for a 42.09-acre tract of land in the Kenady District of Dickenson County. (*Legard,* Docket Item No. 221-13). This lease granted Philadelphia Oil "the exclusive right of operating for, producing and marketing oil and gas…" The lease also provides for a royalty "for all gas … saved and marketed from the leased premises at the rate of one-eighth (1/8) of the proceeds received by the Lessee at the well." The lease further states: "Lessor shall pay a proportionate part of all excise, depletion, privilege and production taxes. … It is agreed … that gas produced from any well or wells may be taken by Lessee for fuel in its operation on and in the vicinity of said premises, free of charge…."

Plaintiffs also have provided a copy of a June 28, 1990, Oil And Gas Lease between Albert C. and Eva Mae Adkins and Equitable Resources Exploration, a division of Equitable Resource Energy, for a 35.13-acre tract in the Kenady District of Dickenson County. (*Legard*, Docket Item No. 221-13). This lease contains language identical to that listed above for the May 7, 1981, lease. Plaintiffs also have provided a copy of a May 19, 1992, Oil And Gas Lease between Albert C. and Eva Mae Adkins and Equitable Resources Exploration for a 58-acre tract of land in the Ervington District of Dickenson County. (*Legard*, Docket Item No. 221-13). This lease also contains language identical to that listed

above for the May 7, 1981, lease, except it also specifically grants the right to produce "coal bed methane."

Plaintiffs have provided a copy of a May 16, 2005, Oil And Gas Lease between Eva Mae Adkins and EQT for a 32.5-acre tract of land in the Caney Ridge Quad of Dickenson County. (*Legard*, Docket Item No. 221-13). This lease contains language identical to the May 19, 1992, lease listed above. Plaintiffs have provided a copy of a May 12, 2004, Ratification Of Oil And Gas Lease between Eva Adkins and EQT ratifying the May 7, 1981, lease and recognizing that Philadelphia Oil's rights under the lease had been assigned to EQT. (*Legard*, Docket Item No. 221-13).

CNX has provided a certified copy of a December 23, 1887, deed between Sparrel H. Hale and his wife, the Hale heirs' predecessor-in-interest, and William E. Perry, George W. Gillespie and H. Newberry. (*Hale*, Docket Item No. 207-1). This deed severs "[a]ll the coal, of every description, in, upon, or underlying a certain tract of land…." The deed further conveys the timber rights. The deed also conveys access "that may be necessary to use to successfully and conveniently mine said coal and other things above mentioned and granted" and the right to "erect on said tract of land such buildings as may be necessary for the mining of said coal and other things herein before enumerated."

CNX has provided a copy of a 1904 deed between Jacob Fuller and his wife and M.C. Clarke, B.J. Hyson and H.C. Stuart. (*Hale*, Docket Item No. 241-7; *Addison*, Docket Item No. 179-4). The deed conveys "all of the coal in, upon and underlying" a tract of land in the New Garden area of Russell County. The deed also grants "rights of way in, on and over said land, which may be necessary for

the purpose of mining and removing the said coal and minerals from said land, and from adjoining land, and with the right to enter on said land and dig upon and make openings thereon for the purpose of mining and removing said minerals and also the right to use all stone and water on said land necessary for mining purposes…."

The plaintiffs have filed copies of the Board's forced-pooling orders for each of the five CNX wells in which the plaintiff Hale is listed as a conflicting owner of the gas interests. (*Hale*, Docket Item No. 174-2; *Addison*, Docket Item No. 168-27). In Board Docket No. 99-0216-0709, Pocahontas Gas Partnership, ("Pocahontas"), a predecessor-in-interest to CNX, filed an application to place a CBM gas well, FF-23, on an approximately 80-acre drilling unit. At the time of its application, Pocahontas represented that it had CBM leases from 79.39502 percent of the fee owners for this tract. Following a hearing, the Board, by Report Of The Board Findings And Order, approved on September 30, 1999, granted the application and approved the well and the pooling of all interests in the drilling unit. The order stated, in part:

> Relief Granted: The Operator's requested relief in this cause be and hereby is granted: (1) Pursuant to Va. Code § 45.1-361.21.C.3, [Pocahontas] ... is designated as the Unit Operator authorized to drill and operate Coalbed Methane Gas well in the Subject Drilling Unit ..., and (2) all the interests and estates in and to the Gas in Subject Drilling Unit, including that of the Applicant and of the known and unknown persons listed on Exhibit B-3, attached hereto and made a part hereof, and their known and unknown heirs, executors, administrators, devisees, trustees, assigns and successors, both immediate and remote, be and hereby are pooled in the Subject Formation in the Subject Drilling Unit underlying and comprised of the Subject Lands.

The order further provided that any funds due any unknown or unlocatable persons should be placed in escrow along with any funds due for gas taken where there were "conflicting claims" of ownership of the gas estate. The order states: "Such funds shall be held for the exclusive use of, and sole benefit of the person entitled thereto until such funds can be paid to such person(s) or until the Escrow Agent relinquishes such funds as required by law or pursuant to Order of the Board…." The order requires payments into escrow be made on a monthly basis.

Hale is specifically listed in Exhibits B-3 and E to this order as having an "Oil & Gas Fee Ownership" interest as opposed to Hugh McRae Land Trust's "Coal Fee Ownership" in one of the tracts of land covered by the order. Torch Operating Co. also is listed on Exhibit E under the "Coal Fee Ownership" list, but beside its name it states "(CBM Royalty Owner)."

Plaintiffs also have provided the transcript of the Board's February 2, 1999, meeting, at which the Board considered the application for force-pooling the above tract. (*Hale*, Docket Item No. 174-10). Consol employee, Leslie K. Arrington, appeared and testified that he prepared the notice of hearing, application and exhibits for the pooling of well FF-23 for Pocahontas. (*Hale*, Docket Item No. 174-10 at 60). Arrington testified that the FF-23 well had been drilled in February of 1998, approximately a year before the hearing. (*Hale*, Docket Item No. 174-10 at 63-64). He also stated that gas was being pumped from the well. (*Hale*, Docket Item No. 174-10 at 68). He also testified that Pocahontas had CBM leases from 100 percent of the coal owners on the tracts at issue for this well. (*Hale*, Docket Item No. 174-10 at 62, 65). Arrington testified that Pocahontas was seeking to force pool the 20.0498 percent of "the oil and gas interest," including the 13.39435 percent interest owned by the Hale heirs. (*Hale*, Docket Item No. 174-10 at 65,

66). Arrington testified that the Hale heirs' oil and gas interest conflicted with the "coal owner," the Hugh MacRae Land Trust and Torch, requiring any royalties paid for the tract to be placed into escrow. (*Hale*, Docket Item No. 174-10 at 66-67). He admitted that no funds had been placed into escrow through the date of the hearing. (*Hale*, Docket Item No. 174-10 at 68).

Arrington also testified regarding another unrelated well for which Consol sought a pooling order before the Board on February 2, 1999. In that testimony, he stated that three wells already had been drilled on that unit. (*Hale*, Docket Item No. 174-10 at 95).

Plaintiffs have provided a Supplemental Order Regarding Docket Number VGOB-99-0216-0709 for Unit FF-23, approved by the Board on December 3, 1999. (*Hale*, Docket Item No. 232-28; *Addison*, Docket Item No. 168-28). The Supplemental Order stated that Hale had not made an election under the pooling order and, therefore, his interests in the CBM unit were "Deemed Leased." Plaintiffs also have provided DMME records for Well FF-23 showing monthly production starting in November 1998 through May 2012. (*Hale*, Docket Item No. 232-29; *Addison*, Docket Item No. 168-29).

Another portion of Hale's land is included in the Board's pooling order in Docket No. 00-1017-0830. In this application, Pocahontas sought to place a CBM gas well, FF-24, on an approximately 80-acre drilling unit. (*Hale*, Docket Item No. 174-3). At the time of its application, Pocahontas represented that it owned 14.99608 percent of the acreage of the unit in fee. Following a hearing, the Board, by Report Of The Board Findings And Order, approved on December 11, 2000, granted the application and approved the well and the pooling of all interests in the

drilling unit. The Board's order in this case contained the same language as outlined above. Hale is specifically listed in Exhibit E to this order as having an "Oil & Gas Fee Ownership" interest as opposed to the "Coal Fee Ownership" of Hugh MacRae and Torch's "(CBM Royalty Owner)" status in two of the tracts of land covered by the order.

Plaintiffs also have provided a partial transcript of the Board's October 17, 2000, meeting, which included testimony regarding the FF-24 unit discussed above. (*Hale*, Docket Item No. 174-11). At this hearing Arrington testified that the well on the tracts at issue already had been drilled. (*Hale*, Docket Item No. 174-11 at 5). Arrington testified that the application for pooling for this unit included an Exhibit E, which listed "all of the folks at this point that [he believed had] conflicting claims requiring [payment of royalties into] escrow." (*Hale*, Docket Item No. 174-11 at 5).

Another portion of Hale's land is included in the Board's pooling order in Docket No. 00-1017-0826. In this application, Pocahontas sought to place a CBM gas well, EE-24, on an approximately 80-acre drilling unit. (*Hale*, Docket Item No. 174-4). At the time of its application, Pocahontas represented that it had CBM leases from the fee owners of 20.4875 percent of the acreage of the unit. Following a hearing, the Board, by Report Of The Board Findings And Order, approved on December 11, 2000, granted the application and approved the well and the pooling of all interests in the drilling unit. The Board's order in this case contained the same language as outlined above. Hale is specifically listed in Exhibit E to this order as having an "Oil & Gas Fee Ownership" interest as opposed to the "Coal Fee Ownership" of Hugh MacRae and Torch's "(CBM Royalty Owner)" status in one of the tracts of land covered by the order.

Another portion of Hale's land is included in the Board's pooling order in Docket No. 00-1017-0831. In this application, Pocahontas sought to place a CBM gas well, FF-25, on an approximately 80-acre drilling unit. (*Hale*, Docket Item No. 174-5). At the time of its application, Pocahontas represented that it had CBM leases from the gas owners of 20.96720 percent of the acreage of the unit. Following a hearing, the Board, by Report Of The Board Findings And Order, approved on December 11, 2000, granted the application and approved the well and the pooling of all interests in the drilling unit. The Board's order in this case contained the same language as outlined above. Hale is specifically listed in Exhibit E to this order as having an "Oil & Gas Fee Ownership" interest as opposed to the "Coal Fee Ownership" of Hugh MacRae and Torch's "(CBM Royalty Owner)" status in one of the tracts of land covered by the order.

Another portion of Hale's land is included in the Board's pooling order in Docket No. 01-0116-0852. In this application, Pocahontas sought to place a CBM gas well, AV-111, on an approximately 80-acre drilling unit. (*Hale*, Docket Item No. 174-6). At the time of its application, Pocahontas represented that it owned in fee or had CBM leases from the gas owners for 97.6031 percent of the acreage of the unit. Following a hearing, the Board, by Report Of The Board Findings And Order, approved on March 2, 2001, granted the application and approved the well and the pooling of all interests in the drilling unit. The Board's order in this case contained the same language as outlined above. Hale is specifically listed in Exhibit E to this order as having an "Oil & Gas Fee Ownership" interest as opposed to the "Coal Fee Ownership" of Hugh MacRae in one of the tracts of land covered by the order.

Plaintiffs also have provided the transcript of the Board's January 16, 2001, meeting, at which the Board considered the application for force-pooling the above tract. (*Hale*, Docket Item No. 174-12 at 45-61). Arrington testified that well AV-111 would require the escrowing of royalties because of conflicting claims to the CBM. (*Hale*, Docket Item No. 174-12 at 56). Arrington testified that Pocahontas had 100 percent of the coal interest leased for well AV-111 and 97.60 percent of the "oil and gas interest." (*Hale*, Docket Item No. 174-12 at 58). Arrington stated that the permit for this well was issued on May 31, 2000, and the well was drilled on October 5, 2000. (*Hale*, Docket Item No. 174-12 at 58). During this meeting, there also was a discussion of problems with an old escrow agent not paying out the full amounts due under earlier disbursement orders. (*Hale*, Docket Item No. 174-12 at 35-42).

CNX has provided an August 9, 1887, deed from the Shorts to W.E. Peery, G.W. Gillespie and Jb. Quesenberry conveying "all the coal of every description in upon or underlying a certain tract of land and the timber and privileges hereinafter specified as appurtenant to said tract of land." (*Addison*, Docket Item No. 145-3). The deed conveyed other rights such as the right to erect buildings or railway lines "for the purpose of digging mining or otherwise securing the coal and other things … hereintofore specified…."

Plaintiffs provided copies of the Board's four pooling orders pertaining to Addison's interest. (*Addison*, Docket Item No. 119-2-119-5). In Board Docket No. 98-0324-0635, CNX's predecessor-in-interest, Pocahontas, filed an application to place a CBM gas well, AA-38, on an approximately 80-acre drilling unit. (*Addison,* Docket Item No. 13, Att. 2). Following a hearing, the Board, by Report Of The Board Findings And Order, approved on May 26, 1998, granted the

application and approved the well and the pooling of all interests in the drilling unit. The order states in part:

> Escrow Provisions For Conflicting Claimants: If any payment of bonus, royalty payment, proceeds in excess of ongoing operational expenses or other payment due and owing under this Order cannot be made because the person entitled thereto cannot be made certain due to conflicting claims of ownership and/or a defect or cloud on the title, then such cash bonus, royalty payment, proceeds in excess of ongoing operations expenses, or other payment, … shall … be deposited by the Operator into the Escrow Account within one hundred twenty (120) days of recording of this Order, and continuing thereafter on a monthly basis with each deposit to be made, … by a date which is no later than sixty (60) days after the last day of the month being reported and/or for which funds are subject to deposit. Such funds shall be held for the exclusive use of, and sole benefit of, the person entitled thereto until such funds can be paid to such person(s) or until the Escrow Agent relinquishes such funds as required by law or pursuant to Order of the Board.

Addison is specifically listed in this order as having an ownership interest in the gas interest in one of the tracts of land covered by the order. Commonwealth Coal Corporation, ("Commonwealth"), is also listed as having an ownership interest in only the coal interest for the same tract of land.

Addison also is listed as having an ownership interest in the gas interest in tracts of land covered by pooling orders issued by the Board on May 26, 1998, in Docket Nos. 98-0324-0637 for Drilling Unit No. Y-37, 98-0324-0631 for Drilling Unit No. Z-37 and 98-0324-0634 for Drilling Unit No. Z-38. (Docket Item No. 13, Atts. 3, 4 and 5). Commonwealth is also listed as having an ownership interest in the coal rights in each of these tracts of land. Each of these orders contains the

language set forth above regarding payments into escrow in cases involving conflicting claims. Each of these orders also contain attachments which show that CNX has CBM leases from Addison and Commonwealth for each of the tracts in which Addison claims that she holds the ownership of the gas estate.

Plaintiffs have filed numerous other Board documents in support of the Motions. These include three Board orders for forced-pooled drilling units for CBM wells operated by EQT. These orders are in Board Docket Nos. 94-0816-0467 and 94-0816-0468, entered September 19, 1994, (*Adair,* Docket Item No. 399-1), VGOB 07/04/17-1919, entered August 21, 2007, (*Adair,* Docket Item No. 399-2), and VGOB10/04/20-2693, entered July 30, 2010, (*Adair,* Docket Item No. 399-3), (collectively, "Sample Pooling Orders"). The Report Of The Board Findings And Order in VGOB 07/04/17-1919, entered August 21, 2007, states:

> ... [T]he Board ... finds that the Applicant has (1) exercised due diligence in conducting a meaningful search of reasonably available sources to determine the identity and whereabouts of each gas and oil owner, coal owner, or mineral owner and/or potential owner, i.e., person identified by [EQT] as having ("Owner") or claiming ("Claimant") the rights to Coalbed Methane Gas ... in the Subject Drilling Unit... and (3) that the persons set forth in Exhibit B-3 hereto have been identified by [EQT] as persons who may be Owners or Claimants of Coalbed Methane Gas interests ... in the Subject Drilling Unit....
>
> ... Set forth in Exhibit B-3 is the name and last known address of each Owner or Claimant identified by [EQT] as having or claiming an interest in the Coalbed Methane Gas … in Subject Drilling Unit .... who has not, in writing, leased to … [EQT] … or agreed to voluntarily pool his interests in [the] Subject Drilling Unit for its development. The interests of the Respondents listed in Exhibit B-3 comprise 17.168333% … of the oil and gas interests/claims in and to

Coalbed Methane Gas and 0.00% … of the coal interests/claims in and to Coalbed Methane Gas in Subject Drilling Unit….

While not identical, all three Sample Pooling Orders contain similar language. The Report Of Findings And Order in VGOB10/04/20-2693, entered July 30, 2010, also states that conflicting gas owners and claimants are listed on Exhibit E.

Each of the Sample Pooling Orders require all payments owed to interests with conflicting claims of ownership of the CBM to be deposited in the Board's Escrow Account. The Sample Pooling Orders require these deposits to be made within 60 days after the last day of the month for which the funds are subject to deposit. The Sample Pooling Orders also require that these payments "shall not be commingled with any funds of the Unit Operator."

Each of the Sample Pooling Orders makes a finding as to the portion of the oil and gas and CBM gas leasehold estate controlled by the applicant. Each of the Sample Pooling Orders has a Well Location Plat attached, which lists the owners of the surface, oil and gas and coal rights on each tract of land. Each Sample Pooling Order contains an exhibit which lists those who own the "Gas Estate Only" and those who own the "Coal Estate Only" in the tracts contained in the drilling unit.

The plaintiffs also have provided a number of more recent Board orders for units in which CNX is the operator to show that the language and content of the orders have not changed substantively over the relevant time period. (*Addison*, Docket Item No. 119-6-119-8).

CNX has provided a copy of a March 6, 1997, lease between Pocahontas, Consolidation Coal Company and Conoco Inc. and Addison, which allows placement of CBM gas wells, a compression station, access roads, pipelines and polelines on her property. (*Addison*, Docket Item No. 145-1). CNX also has provided a copy of a January 13, 2009, deed from Addison conveying two tracts of property in Buchanan County to her children. (*Addison*, Docket Item No. 145-2). Addison reserved a life estate for herself in these tracts and reserved the mineral rights previously conveyed.

Buckhorn Coal Company, ("Buckhorn"), Commonwealth and Harrison-Wyatt, LLC, ("Harrison-Wyatt"), have provided an excerpt of the transcript of the January 20, 2004, Board meeting, in which plaintiffs' counsel Peter Glubiak admits that many deeds in Southwest Virginia severed coal and minerals and not just coal. (*Addison*, Docket Item No. 143-2).

CNX has provided excerpts of the minutes of the Board's April 15, 2008, meeting. (*Hale*, Docket Item No. 241-3). These minutes show that the Board received a quarterly report from the then-current Escrow Agent, Wachovia Bank, which showed $19,386,777.61 in the Escrow Account as of March 31, 2008. These minutes also reflect that the Board received two examples regarding operators' post-production costs deducted from royalties. Deductions within these examples ranged from 95 percent to 10 percent of royalties. CNX also has provided excerpts of what appears to be minutes of the Board's June 17, 2008, hearings. (*Hale*, Docket Item No. 241-4). These minutes show that the Board formed a committee "charged with the task of making one or more recommendations regarding post-production, allowable deductions."

CNX has provided the minutes of the Board's March 17, 2009, hearings. (*Hale*, Docket Item No. 241-5). These minutes reflect that the Board continued to wrestle with the issue of deduction of post-production costs in forced-pooled units. The Board heard comments from Virginia state Senator Phillip P. Puckett and Delegate Bud Phillips, urging the Board to address the issue of what items should be allowed to be taken as post-production costs from CBM royalties. Puckett "challenged the board to restore confidence in its process on the basis of 'fair' and 'impartial' dealings in matters with the General Public." Board member Donald L. Ratliff made a motion that post-production costs be capped at $0.70 per MMBtu[6] for CBM gas wells. The motion failed on a roll call vote.

Plaintiffs have provided an October 18, 2010, letter from Robinson, Farmer, Cox Associates to Bradley C. Lambert, Chairman of the Board. (*Hale*, Docket Item No. 232-4; *Addison*, Docket Item No. 168-4). In this letter, the firm recites that it was engaged "to analyze computations associated with forty (40) escrow accounts held by the …Board's … Escrow Agent in accordance with pooling orders and disbursement orders issued by the Board." The letter stated:

> Our primary purpose was to compute royalty payments and trace such payments into the escrow account. Royalty payments were recomputed based on well production, gas selling prices, expense deductions (including tax payments), and pooling percentages. Our calculated royalty payments for each well were compared to actual royalty payments for the same production period and any variances were noted. We then traced actual royalty payments as provided from gas company records to deposits shown for each well at the escrow agent.

---

[6] Although these examples of post-production costs did not specify that the deductions were "per MMBtu," EQT has provided evidence that this is the appropriate measure, and the court has no reason to believe that any other measurement was intended by CNX.

Our sample of forty (40) wells included wells operated by four companies. We began our analysis by reviewing six wells, including at least one well from each of the companies selected in our test. We found errors in account balances for five (5) of the six (6) wells tested. Given the high error rate in our initial review of six wells, we determined that additional testing would not yield an acceptable error rate, even if no additional errors were noted in an analysis of the remaining thirty-four (34) wells.

The letter included the following findings and recommendations:

Finding 1:
A proper accounting of the escrow accounts held within the pooled bank account(s) is not taking place. Currently, there is no reconciliation of deposits applied to an individual account to records of same held at the gas companies. In addition, if a well account carries an incorrect balance, disbursements from such account (based on the balance) will be in error.

Recommendation 1a:
The Board should create an accounting function to reconcile individual well transactions with records maintained at the gas companies and disbursement orders issued by the Board. The Board should request that each gas company provide confirmations showing dates and amounts of deposits along with the pooling percentage used in calculating escrow payments for each well held in escrow for the period of January 1, 2000 forward. The Board's accountants should reconcile records for individual wells to these confirmations. The Board's accountants should compare disbursements from escrow accounts to Board orders for same taking into account the timing of those orders and account balances on the dates of those orders. Any disbursements found to be in error should be corrected with the claimants involved.

We recommend that the aforementioned accounting function be created internally and that the Board cease reliance on the escrow agent to maintain a proper accounting of funds held for each well. As such, this function should be established on a permanent basis to reconcile and account for historical and future well activity. Based on

the anticipated workload, we recommend that the Board hire no less than two accountants to perform these tasks. We anticipate that the Board will need assistance in developing procedures to reconcile the accounts and recommend the use of external accountants (on a limited basis) to assist in developing procedures that will be performed by the Board's accountants.

Recommendation 1b:
Once balances of individual well accounts are corrected, the accountants should reallocate interest earnings based on the corrected balances and recompute disbursements as necessary.

Finding 2:
Gas companies currently remit funds to the Board's Escrow Agent for each well subject to a pooling order. The timing and amount of these deposits are not compared to well production records. As a result, errors in deposits (including lost deposits; misapplied deposits; erroneous deposits and tardy deposits) are not identified.

Recommendation 2:
As part of our analysis, we determined that gas prices used in the calculation of escrow payments trended consistently with market prices published by the U.S. Energy Information Administration. In addition, gas companies are required to report production levels monthly for each well. The Board should develop a model (using multiple regression analysis) for each company to predict monthly revenue amounts for each well. Once developed, this model can predict escrow contributions by well, taking in to account pooling percentages shown in well pooling orders. By comparing actual contributions for each well against a predicted contribution (based on production levels, market price data and pooling percentages), staff can identify escrow payments that vary significantly from estimated amounts and follow-up with gas companies.

Finding 3:
In many cases, gas companies are not remitting funds in a timely manner. Some of these delays are procedural in nature as companies are permitted to drill and begin production prior to final approval of the pooling order by the Gas and Oil Board.

Delays in the remittance of funds complicate the reconciliation process and make it difficult to tie production records to deposit records of the Bank. In addition, untimely deposits in the escrow accounts may result in reduced interest earning that would otherwise be available to claimants.

Recommendation 3:
The Board should consider punitive damages for companies that do not remit funds within 60-90 days of the close of the related production month unless such delays are the result of the aforementioned approval process. In addition, the Board should require companies to remunerate escrow holders for lost earnings related to tardy deposits.

Finding 4:
The pooling orders allow companies to take deductions (expenses) against their contributions to the escrow account. These deductions are not well defined in the pooling orders approved by the Board. As a result, deductions charged against wells are not consistent from company to company.

Recommendation 4:
The Board should consider standardizing deductions in the pooling orders. This will remove variability from company to company and provide a consistent treatment of well-related expenses for claimants of the escrow accounts.

Plaintiffs also have provided the July 17, 2012, Report to the Virginia Gas and Oil Board Escrow Account Audit Update, (*Adair,* Docket Item No. 399-23) ("July 2012 Audit Report"), provided to the Board by Robinson, Farmer, Cox Associates. According to the July 2012 Audit Report, as of December 31, 2009, the Escrow Account with Wachovia Bank held approximately $25 million divided into approximately 770 subaccounts based on well/unit numbers assigned by the Board. The July 2012 Audit Report reflects that Robinson, Farmer, Cox Associates was hired to conduct an audit of the escrow and related subaccounts for the period of

January 1, 2000, to December 31, 2009. The audit was to include an audit of individual subaccounts against documentation in support of deposits, withdrawals, interest allocations and fee charges and a financial statement audit in accordance with applicable standards.

The July 2012 Audit Report reflects that neither of these audits were performed. The audit of individual subaccounts was halted after the accounting firm found errors in the account balances of five of the six subaccounts it first examined. According to the July 2012 Audit Report,

> [w]e began our analysis by reviewing six wells, including at least one well from each of the companies … [CNX, EQT, Range Resources and GeoMet]. We found errors in account balances for five (5) of the six (6) wells tested …. As noted…, errors were *generally* related to accounting for escrow deposits and not to the underlying calculations used to determine escrow payment amounts. Given the error rate in our initial review of six wells, we determined that additional testing would not yield an acceptable error rate, even if no additional errors were noted in any analysis of the remaining thirty-four [34 sample] wells. As such, the testing of individual accounts was halted….

(*Adair,* Docket Item No. 399-23 at 5).

Some of the problems noted were:

1. Escrow bank statement for much of the calendar year ending December 31, 2000, could not be located;

2. Deposits to subaccounts that could not be traced to gas company records;

3. Checks issued from gas companies for which no corresponding deposit into the escrow account could be located; and

4. Variances between gas company records and subaccount balances of as much as $200,000.

In all six test well/unit accounts analyzed, the accounting firm found delays between beginning production and deposits into escrow varying from at least six to as much as 27 months. In two of the wells, ongoing deposits were not made on a monthly basis. In two of the six wells, there were deposits missing; these missing deposits varied from a low of more than $18,000 to a high of more than $56,000. In at least one of these accounts, a disbursement was made without reconciliation of the missing royalties. In two of these six wells, royalties were underpaid. In one, royalties were underpaid by more than $860,000 over the life of the well.

Among the recommendations made in the report to the Board was that the Board "require each gas company to review the Board's subaccount financial data for each well/unit under the company's control. As part of this review, we recommend that the Board require a certification (from the company) as to the correctness of deposits applied to each subaccount for wells/units under the company's control." (*Adair,* Docket Item No. 399-22 at 6). The report also noted:

> In many cases, gas companies are not remitting funds in a timely manner. Some of these delays are procedural in nature as companies are permitted to drill and begin production prior to final approval of the pooling order by the … Board. These delays [of deposits into escrow] complicate the reconciliation process and make it difficult to tie production records to related deposits. In addition, these delays may lead to errors in the calculation of disbursement amounts, as all funds available for disbursement might not be in the escrow account on the date of disbursement. Finally, the delays have an impact on interest earnings that should accrue to royalty claimants.

> …We recommend that the Board require gas companies to remit funds within 60-90 days of the related drilling month. To the extent possible, we recommend that the Board consider assessing penalties and interest on late payments.

(*Adair,* Docket Item No. 399-22 at 7).

In 2010, the Virginia General Assembly enacted legislation requiring the Auditor of Public Accounts to perform an operational review of the Board's policies and procedures for the collection and disbursement of Escrow Account funds, including a determination of best practices and comparison of the Board's practices with these best practices. Plaintiffs have provided the court with a copy of the Auditor of Public Accounts report, (*Adair,* Docket Item No. 399-23 at 19-47) ("APA Report"). Among the recommendations the APA Report made were: 1) The Board should develop a policy that sets a timeframe for a deposit into an escrow account after the sale of gas and should periodically determine that gas companies are complying with this timeframe; and 2) The Board should develop and implement policies and procedures for a periodic review of the escrow accounts to ensure accuracy and completeness.

The plaintiffs also have provided a partial transcript of the Board's May 17, 2011, meeting. (*Hale*, Docket Item No. 174-16; *Addison,* Docket Item No. 119-13). This transcript reflects that three contract workers had been hired to audit the escrow account. During this meeting, Sharon Pigeon, an Assistant Attorney General, advised the Board that it could not use interest on the Escrow Account to pay to hire contract employees to perform tasks other than audit the Escrow Account.

CNX has provided excerpts of the transcript of the June 19, 2012, Board hearings. (*Hale*, Docket Item No. 241-6; *Addison*, Docket Item No. 179-3). According to the transcript, 45 petitions for disbursements from the Escrow Account were granted in April and May of 2012, with $185,000.00 being disbursed in April and $600,000.00 disbursed in May. CNX also provided the minutes of the June 19, 2012, July 17, 2012, August 21, 2012, and September 18, 2012, Board hearings. (*Hale*, Docket Item No. 241-10; *Addison*, Docket Item No. 179-7). These minutes show that the Board approved a number of petitions for disbursements from the Escrow Account, including a number of petitions for disbursement filed by CNX. These minutes do not state whether these petitions for disbursement were made after the parties received a court ruling as to ownership of the CBM or whether the parties had entered into agreements to split royalties, ("Split Agreements").

***

The parties have provided the court with various information and numerous documents produced in discovery in these cases. In discovery responses, EQT has stated that its CBM wells in Virginia are divided into two districts, the Big Stone Gap District and the Brenton District. (*Adair,* Docket Item No. 399-21). EQT has two fields, the Nora Field and the Roaring Fork Field, in the Big Stone Gap District. EQT has only one field in the Brenton District, the Pilgrims Knob Field.

In discovery responses, (*Adair,* Docket Item No. 399-21), EQT has admitted that, since January 1, 2005, EQT has sold all of the CBM it produces in Virginia to an affiliate company, EQT Energy, LLC, formerly Equitable Energy, LLC, ("EQT Energy"). According to EQT, the CBM is delivered to EQT Energy at the wells

and is then transported to interstate pipelines where it is sold to unrelated third parties.

According to EQT, from January 1, 2005, to May 17, 2007, in the Big Stone Gap District, the Nora Field, the contract price paid by EQT Energy to EQT was:

Applicable First of the Month Index Price applicable to the interstate pipeline(s) into which the Gas is delivered, less prevailing gathering related charges and retainage applicable to such point(s) less any other agreed applicable fees or charges.

Beginning May 17, 2007, the contract price paid by EQT Energy to EQT in this field was changed to:

[T]he actual weighted average sales price received, per MMBtu, for gas sold by Buyer at any point on the pipeline of East Tennessee Natural Gas Company ("East Tennessee"), or at any other Designated Points (as hereinafter defined) (collectively with East Tennessee, the "Downstream Systems"), less:

(i) the gathering rate(s) incurred by Buyer in delivering Seller's gas to the Downstream Systems as provided in that certain Gas Gathering Agreement of even date herewith between Nora Gathering, LLC ("Nora") and Buyer (the "Gas Gathering Agreement"), excluding any penalties or fees that are incurred by Buyer on account of Buyer's non-compliance under such agreement (other than on account of gas failing to meet quality specification); and,

(ii) if applicable and attributable to the gas purchased hereunder, (a) the one hundred percent (100%) load factor reservation charges, (b) the usage charges and (c) all surcharges, applicable to transportation service on the Downstream Systems, as such charges and surcharges may change for time-to-time; and,

(iii) five cents ($0.05) per MMBtu.

From January 1, 2005, to present in the Big Stone Gap District, the Roaring Fork Field, and in the Brenton District, the contract price paid by EQT Energy to EQT has been:

> Applicable First of the Month Index Price applicable to the interstate pipeline(s) into which the Gas is delivered, less prevailing gathering related charges and retainage applicable to such point(s) less any other agreed applicable fees or charges.

From January 1, 2005, to May 17, 2007, in the Big Stone Gap District, the Nora Field, royalties were based on the Index Price described above, before the deductions that are part of the contract price. Gathering and compression, property taxes and "selling, general and administrative" costs were generally deducted from this price. From May 17, 2007, to the present, in the Nora Field, EQT has paid royalties based on sales price described above, before deductions that are part of the contract price. In calculating royalties, gathering, compression, selling, general and administrative costs and depreciation are deducted.

From January 1, 2005, to the present in the Roaring Fork Field and the Brenton District, EQT calculated the royalties based on the Index Price described above, before any deductions that are part of the contract price. In the Brenton District, gathering, compression, selling, general and administrative costs are generally deducted from this price. In the Big Stone Gap Roaring Fork Field, no deductions are taken from this price.

Some of EQT's CBM leases in Virginia expressly limit deductions, and, in calculating royalties, EQT states that it follows these limitations. EQT does deduct severance taxes from royalties. EQT Energy also pays "capacity charges" for the

right to move gas in the interstate pipeline. For all gas produced in Virginia, these pipeline capacity charges are deducted before royalties are calculated.

According to EQT's discovery responses, the gas EQT produces in the Nora Field is gathered by Nora Gathering, LLC. (*Legard*, Docket Item No. 221-10). The members of Nora Gathering are Range Resources-Pine Mountain, Inc., and EQT Gathering Equity, LLC. All other gas produced by EQT in Virginia is gathered by EQT Gathering Equity, LLC. EQT Gathering Equity, LLC, is a subsidiary of EQT Gathering, Inc. EQT also admits in its discovery responses that the amount of gas produced at the well is greater than the amount of gas sold because some of the gas is used for compression and some is lost during transportation. According to EQT, EQT Gathering Equity uses standard industry practices or better to maintain its pipes, gathering and compression facilities to reduce the loss of gas. EQT states that these practices include reviewing field data, tracking variances in volumes over time and repairing facilities causing losses. EQT also states: "All gas pipeline transportation systems lose some gas."

Plaintiffs have provided the court with a February 1, 1991, letter from A. George Mason Jr., General Counsel with Equitable Resources Exploration, ("EREX"), a division of Equitable Resources Energy Company, to Richard A. Counts, a Kingsport, Tennessee, attorney. (*Adair,* Docket Item No. 399-5) ("2/1/91 Mason Letter"). According to plaintiffs' counsel, the 2/1/91 Mason Letter was produced by EQT in discovery in this litigation. The 2/1/91 Mason Letter requested Counts to perform a title examination and prepare a preliminary title opinion to EREX regarding five tracts of land being considered by EREX "as a potential drill site." The letter states: "The title opinions should certify ownership of the oil and gas underlying all of the subject tracts and should identify for

notification purposes the owner of the surface estate and the owner and lessee, if any, of the coal estate. The identification of the surface and coal owners and lessees should be limited to the drill site."

Plaintiffs have provided the court with an April 7, 2000, letter from Rita McGlothlin-Barrett, then Landman II with EQT, to James E. Kaiser, a Kingsport, Tennessee, attorney. (*Adair,* Docket Item No. 399-6) ("4/7/00 McGlothlin-Barrett Letter"). According to plaintiffs' counsel, the 4/7/00 McGlothlin-Barrett Letter was produced by EQT in discovery in this litigation. The 4/7/00 McGlothlin-Barrett Letter requested Kaiser to perform a title examination and prepare a preliminary title opinion to EQT regarding a tract of land. The letter states: "The title opinion should certify ownership of the oil and gas estate and the coal estate underlying the subject tract. Also, you should identify, for notification purposes, the owner of the surface estate of the drillsite."

Plaintiffs have provided the court with an April 24, 2003, letter from Samuel K. Smallwood, Landman, Title Curative with EQT, to Kaiser. (*Adair,* Docket Item No. 399-7) ("4/24/03 Smallwood Letter"). According to plaintiffs' counsel, the 4/24/03 Smallwood Letter was produced by EQT in discovery in this litigation. The 4/24/03 Smallwood Letter requested Kaiser to perform a title examination and prepare a preliminary title opinion to EQT regarding a tract of land. The letter states: "The title opinion should certify ownership of the oil and gas estate underlying all of the subject tracts. For drillsite and target tract, please identify the owner of the surface estate and the owner and lessee, if any, of the coal estate for notification purposes."

Plaintiffs have provided the court with an August 31, 2005, letter from Smallwood to Kaiser. (*Adair,* Docket Item No. 399-8) ("8/31/05 Smallwood Letter"). According to plaintiffs' counsel, the 8/31/05 Smallwood Letter was produced by EQT in discovery in this litigation. The 8/31/05 Smallwood Letter requested Kaiser to perform a title examination and prepare a preliminary title opinion to EQT regarding a tract of land. The letter states: "The title opinion should certify ownership of the coal, oil and gas estate underlying all of the subject tracts. For the drillsite and target tract, please identify the owner of the surface estate and the owner and lessee, if any, of the coal estate for notification purposes."

Plaintiffs have provided a January 8, 2010, email from David A. Bradley with EQT to Jerry Grantham with Range Resources, stating that the deduction from royalties for "gathering" includes gathering, processing, compression, transportation and marketing. (*Legard*, Docket Item No. 221-11).

Plaintiffs have filed CNX's discovery responses, in which it admits "that it has never participated or been a party or witness in an arbitration proceeding pursuant to Section 45.1-361.22 of the Virginia Gas Act." (*Hale*, Docket Item No. 232-2 at 6; *Addison*, Docket Item Nos. 168-2, 168-32). In these responses, CNX also states that "it does not believe" that any lawsuit has ever been brought against it by the Director of the Virginia Gas and Oil Board pursuant to § 45.1-361.27.

Plaintiffs have provided a February 16, 2006, email from McGlothlin-Barrett stating that "Consol's AFE's reflect a very high cost compared to EQT's cost estimates in the same area of operation." (*Hale*, Docket Item No. 232-18; *Addison*, Docket Item No. 168-18). McGlothlin-Barrett continued, "The theory has long

been that they 'inflate' their AFE's in an effort to discourage parties from participating in their wells."

Plaintiffs have provided the court with a number of emails to and from Virginia Assistant Attorney General Sharon Pigeon, who regularly advises the Board. (*Hale*, Docket Item Nos. 232-5-232-12; *Addison*, Docket Item Nos. 168-5-168-12). Shockingly, these emails show that the Board, or at least Pigeon, has been actively involved in assisting EQT and CNX with the defense of these cases, including offering advice on and providing information for use on the Motions currently before the court.

Plaintiffs have provided a May 15, 2008, letter from attorney Scott Sexton to Board Chairman Benny Wampler. (*Hale*, Docket Item No. 232-15; *Addison*, Docket Item No. 168-15). In this letter, Sexton argues that CNX has deducted "vastly higher" post-production expenses than any other producer. According to Sexton, these deductions, at times, were greater than the amount of royalties to be paid.

Plaintiffs also have provided a May 15, 2008, letter from attorney Mark A. Swartz on behalf of CNX to Wampler and David Asbury, Acting Director, Division of Gas and Oil. (*Hale*, Docket Item No. 232-16; *Addison*, Docket Item No. 168-16). Swartz argued that the Board's pooling orders allowed producers to deduct post-production costs before calculating royalties owed. Swartz argued that this gave the royalty owners in forced-pooled units "a sum reasonably comparable to the value they would receive in the marketplace." Swartz further argued that the Board had no power to determine whether the deductions taken were reasonable,

and, if the royalty owners wished to challenge the reasonableness of the post-production costs, they would be required to file suit in court against the operators.

Plaintiffs also have provided a June 30, 2008, email from Pigeon to DMME's Public Relations Manager, Michael Abbott, Wampler and Asbury. (*Hale*, Docket Item No. 232-17; *Addison*, Docket Item No. 168-17). This email states that the deductions taken from royalty owners is controlled by the language of the then-current Board pooling orders, which stated that the operator may deduct "post-production costs incurred downstream of the wellhead, including, but not limited to, gathering, compression, treating, transportation and marketing costs, whether performed by Unit Operator or a third person…." Pigeon stated that the Act did not allow operators to deduct "production" costs from forced-pooled royalty owners. Pigeon further stated that any costs deducted must be "actual and reasonable."

Plaintiffs have provided a January 9, 2009, letter from Scott Hodges, CNX District Land Manager, to Bruce Prather, Chairman of the Work Committee on Post Production Cost Allowances of the Board, in response to a request for details on CNX's post-production costs for "force pooled" units. (*Hale*, Docket Item No. 232-13, *Addison*, Docket Item No. 168-13). This letter reflects that CNX had several sales points for its gas, including sales points that required transportation through third-party facilities and sales points that did not. Hodges stated that the deductions charged were lower for units that did not require third-party transportation. Hodges's letter does not include the actual costs requested but, rather, provides the total deductions taken. Hodges stated that the deductions taken were "significantly less than our actual costs – which [were] approximately $1.86 per MMBtu." The spreadsheet attached to Hodges's letter simply lists total dollar amounts for deductions taken from certain wells for July 2008 production.

Plaintiffs have provided a February 10, 2009, email with a spreadsheet attached from Jerry Grantham with Range Resources. (*Hale*, Docket Item No. 232-14; *Addison*, Docket Item No. 168-14). The spreadsheet showed post-production costs for various gas operators, including $1.36 for CNX and $.064 per MMBtu for EQT. This spreadsheet also stated that CNX was responsible for 56.4 percent and EQT was responsible for 35.3 percent of Virginia's production.

Plaintiffs have provided CNX's supplemental responses to plaintiffs' Second Set Of Interrogatories, in which CNX stated that it was engaged in gas swap transactions and/or financial cash flow hedges as of January 1, 2004. (*Hale*, Docket Item 232-23; *Addison*, Docket Item No. 168-23). CNX further stated that it never had any direct communications with the Board about any gas swap transactions or its use of financial cash flow hedges. CNX stated that "it engages in financial cash flow hedges and/or gas swap transactions to meet certain cash flow expectations, for price certainty and to reduce price volatility while staying within its Risk Management guidelines and Hedge Accounting treatment under Statements of Financial Accounting Standards (FAS) No. 133." CNX stated that it began deducting severance and license taxes when calculating CBM royalties' payments on January 1, 2004. CNX said that to determine the amount of funds to be deducted for severance or license taxes, "it takes the production volume multiplied by the price of the gas minus a post-production deduction and then multiplies that total figure by the state tax rate of three percent (3%)."

Plaintiffs provided a series of emails between David Asbury, the Director of the Division of Gas and Oil, and Diane Davis, Anita Duty and Judy Boothe. (*Hale*, Docket Item No. 232-26; *Addison*, Docket Item No. 168-26). These emails show a

number of CNX wells which had been producing for which no or very little monies had been placed into escrow.

The plaintiffs have produced emails from McGlothlin-Barrett showing that EQT personnel were actively involved in trying to acquire royalty split agreements between coal and gas owners in an attempt to cut its costs. (*Adkins,* Docket Item Nos. 194-7, -8, -9).

\*\*\*

The parties also have provided affidavits and partial deposition transcripts from a number of witnesses.

EQT has provided three affidavits from McGlothlin-Barrett, a former Land Manager for EQT, who currently works for EQT on a contract basis. (*Adair*, Docket Item No. 243-1; *Legard,* Docket Item Nos. 105-1, 227-6). According to McGlothlin-Barrett, EQT operates approximately 3,355 wells in Virginia, 1,368 being conventional gas wells, 1,977 being CBM wells, and 10 being wells that produce both conventional gas and CBM. McGlothlin-Barrett stated that EQT has obtained forced-pooling orders for approximately 289 CBM wells in Virginia; of these, 29 were not drilled.

McGlothlin-Barrett stated that EQT holds "several thousand" leases for gas in Virginia. Some of these leases were obtained by EQT and some obtained by other producers and later assigned to EQT. She stated that no one form of lease, but rather many different forms, were used by EQT in Virginia. McGlothlin-

Barrett stated that these leases vary as to the language as to the payment of royalties and post-production deductions.

McGlothlin-Barrett also stated that there is no one form of severance deed in Virginia. According to McGlothlin-Barrett, the deeds vary in their descriptions of what is granted or reserved. She stated that there would be hundreds of different severance deeds for all of the conflicting claimants to CBM produced by EQT.

As of August 2011, there was approximately $6,069,266.49 in the Board's Escrow Account on EQT's forced-pooled CBM wells, according to McGlothlin-Barrett. Each of EQT's CBM drilling units with funds in escrow consists of approximately 58.77 acres. On average, McGlothlin-Barrett stated, each well unit has four to six different mineral tracts. She said that there are hundreds of gas owners and hundreds of coal owners with conflicting claims to the royalties that EQT has paid into the Board's Escrow Account.

The parties have provided excerpts of McGlothlin-Barrett's May 31, 2012, deposition testimony. (*Adair,* Docket Item Nos. 399-9, 404-1; *Adkins,* Docket Item No. 194-65) ("McGlothlin-Barrett Deposition"). McGlothlin-Barrett testified that, as of the date of her deposition, she worked as a contract land agent for EQT. McGlothlin-Barrett stated that although EQT no longer was drilling either CBM or conventional gas wells, EQT continued to operate 1,977 CBM wells, 1,368 conventional gas wells and 10 "dual producers," wells operated as both CBM wells and conventional gas wells, in Virginia. Of the CBM wells, McGlothlin-Barrett stated approximately 355 were forced-pooled units, and the other approximately 1,600 were voluntarily leased units.

McGlothlin-Barrett testified that she and EQT employees prepared the ownership schedules attached to EQT's applications for CBM pooling orders filed with the Board. McGlothlin-Barrett stated that EQT's employees relied on title opinions submitted to EQT by outside legal counsel and their own title research in drafting these ownership schedules. She stated that all of EQT's forced-pooling applications were submitted to the Board under oath and that she believes them all to have been truthful.

McGlothlin-Barrett testified that EQT typically applied for a permit to drill a well either before or at the same time that it filed to create a forced-pooled unit. She stated that, while she recalled that EQT had been granted permits to drill in some forced-pooled units before the Board entered orders for force-pooling the unit, EQT did not drill wells prior to have its pooling order in place because that would have violated the terms of the well permit.

McGlothlin-Barrett also testified that, while most of EQT's leases with coal owners included consent to stimulate the coal seam, the Division of Gas and Oil required each producer to provide a letter from each coal owner allowing it to stimulate the coal seam for that particular well. McGlothlin-Barrett stated that producers are required to get consent to stimulate from all coal owners within 750 feet of a well bore.

McGlothlin-Barrett testified that the 2/1/91 Mason Letter, the 4/7/00 McGlothlin-Barrett Letter, the 4/24/03 Smallwood Letter and the 8/31/05 Smallwood Letter were representative of the requests that EQT made to attorneys to request title opinions on tracts of land. McGlothlin-Barrett stated that EQT requested these title opinions in order to know who owned the gas and oil rights so

that it could contact the owners regarding leasing those rights and so it could notify each owner in the case of a forced-pooled unit. McGlothlin-Barrett also testified that the pooling orders submitted to the court by plaintiffs in support of the Motions are representative samples of the orders entered by the Board in EQT's forced-pooled drilling units.

McGlothlin-Barrett testified that, if a title examination for a tract showed that different persons owned the gas and coal estates, EQT always reported this to the Board as a conflicting claim of ownership of the CBM.

The parties have provided excerpts of the June 29, 2012, Rule 30(b)(6) deposition testimony of John Bergonzi. (*Adair,* Docket Item No. 399-20; *Adkins,* Docket Item No. 185-6) ("Bergonzi Deposition"). Bergonzi was controller and assistant treasurer of EQT Corporation from November 1993 to December 2002. From January 2003 to June 2009, Bergonzi was vice president and controller of EQT Corporation. His last position with EQT Corporation was vice president of finance from 2009 to 2010. Bergonzi testified that EQT was the biggest subsidiary of EQT Corporation and that revenue accounting was a material piece of EQT Corporation's business. Bergonzi stated that, in his roles at EQT Corporation, he gained some personal knowledge of how the revenue accounting system worked insofar as EQT's calculation and payment of royalties on gas production in Virginia.

According to Bergonzi, EQT calculated all royalty payments using the same methodology. Bergonzi stated that royalties were calculated based on net proceeds or value minus post-wellhead costs minus taxes equals net value. Bergonzi testified that the same net proceeds calculation is used in the voluntarily leased cases,

except that what deductions are taken might vary from lease to lease. Bergonzi testified that EQT deducts severance taxes before calculating royalty payments to all deemed lessors. Bengonzi also stated that any payments held in "suspense" because of conflicting claims of ownership of the CBM were just carried on EQT's books as a liability.

Bergonzi further stated that all of the CBM EQT currently produces in Virginia is sold to EQT Energy. He stated that the point of sale was "at the wellhead." Bergonzi said that the price paid by EQT Energy to EQT for the CBM was based on the index price for the interstate transmission pipeline that the gas was going into. He also stated, however, that any time gas is sold in the field, it is sold at a substantial discount to the index prices.

Bergonzi stated that, in Virginia, most of the gas is usable at the wellhead or it is "pipeline quality." He said that the discount to index prices for gas sold in the field was based more on the availability and liquidity in the market. Bergonzi said that the price EQT pays EQT Energy for "gathering" is set annually and is based on discussion between the business leaders of the affiliated entities. Bergonzi said that this is true for all of EQT's Virginia wells, except for those in the Nora Field. He explained that EQT's Nora Field wells are a joint venture between Range Resources and EQT and that Range Resources' gathering charges are not set the same way. Instead, these rates are adjusted quarterly based on a 12-month rolling average of actual costs. Bergonzi said this is true for both working interests and royalty interest gathering charges in the Nora Field, although the royalty owner pays a significantly lower rate than a working interest owner. Bergonzi said that a working interest owner's "gathering" costs were higher because the calculation of post-production costs for a working interest owner included amounts for rate of

return on investment and depreciation, which are not included in the calculation for royalty owners. Bergonzi also said that gathering in the Nora Field is performed by Nora Gathering, LLC, which is owned 50 percent by Range Resources – Pine Mountain, Inc., and 50 percent by EQT Gathering Equity, LLC. In its other Virginia fields, EQT's gathering is performed by EQT Gathering Equity, LLC, which is a subsidiary of EQT Gathering.

Bergonzi testified that "gathering charges" for royalty interest owners include property taxes, the direct gathering and compression costs of the gathering system, selling, general and administrative costs and electricity costs. Bergonzi stated that in the Roaring Fork Field there is no deduction for "gathering and compression charges;" the only deduction to royalties in the Roaring Fork Field is for severance taxes. Bergonzi stated that he did not know why royalty owners in the Roaring Fork Field did not pay gathering and compression charges.

EQT has provided excerpts of the June 28, 2012, Rule 30(b)(6) deposition of Kenneth C. Kirk, the executive vice president of production at EQT. (*Legard*, Docket Item No. 227-7) ("Kirk Deposition"). Kirk testified that none of the gas produced by EQT in Virginia flows straight from the well into an interstate or intrastate pipeline. Instead, Kirk stated that the gas from these wells moved through a gathering system and subsequently into an interstate or intrastate pipeline. Kirk stated that all of EQT's gas, except for gas from 55-60 wells in Buchanan County, flows into East Tennessee Natural Gas's interstate transmission pipeline. The gas from the wells in Buchanan County flows into the Dominion interstate transmission pipeline.

EQT also has provided excerpts of the May 2, 2012, deposition of Elizabeth Anne Cox. (*Adkins*, Docket Item No. 185-7; *Legard*, Docket Item No. 227-9) ("Cox Deposition"). Cox admitted that she complained to EQT about the deductions taken from CBM royalties as early as the late 1980s or early 1990s. These excerpts include a November 13, 1990, letter from Cox to Charles Bartlett. (Cox Deposition, Exhibit 3, *Legard,* Docket Item No. 227-9 at 41). In this letter, Cox authorizes Bartlett to represent her, her husband and her aunts, Pauline B. Legard and Emily P. Baker, in resolving a dispute with Equitable Resources Energy Co. regarding the transportation and compression deductions from their CBM royalties. This letter states: "My aunts, my husband, and I would like to pursue the legality of … deducting transportation and compression expenses from the royalties we receive…. This appears to be in clear violation of the terms of our lease."

These excerpts also include an April 15, 1991, letter from Cox to Glen L. Keller with Equitable Resources Exploration regarding wells P-75 & P-76, Lease 241574L. (Cox Deposition, Exhibit 4, *Adkins,* Docket Item No. 185-7 at 18). In this letter, Cox wrote:

> …[T]here are two items which are being deducted from [royalty payments]. These are labeled "transportation" and "compression – gas". I have consulted with my husband, who is a lawyer licensed to practice in Virginia as well as Connecticut, and with Dr. Charles Bartlett, who has acted as our agent for these properties, and we are of the opinion that these deductions are in violation of our lease. The lease states: "… and the Lessee agrees to pay a royalty for all gas except stored gas and gas produced from the storage horizon or horizons produced, saved and marketed from the leased premises at the rate of one-eighth (1/8) of the proceeds received by the Lessee at the well." "At the well" indicates that we are being charged for

compression and transportation costs which occur after our percentage is determined.

The excerpts also include an April 19, 1991, letter from Keller to Cox regarding Lease 241574L. (Cox Deposition, Exhibit 5, *Adkins,* Docket Item No. 185-7 at 19-20). This letter states:

> I am in receipt of your letter dated April 15, 1991 wherein you had a concern as to the charges deducted from your royalty check for transportation and compression.
>
> … Your interpretation of the [royalty] clause is correct in that your percentage is determined at the well. You are also correct in that you are charged for transportation and compression after your percentage is determined. This clause states, in part, that the lessee agrees to pay a royalty of 1/8 of all gas saved and marketed, the exception being stored gas. When the gas comes out of the ground at the well head it is metered to determine the amount of gas captured and saved. Of that amount, you are allotted 1/8 which determines your royalty. At this point, you have 1/8 of an amount of gas saved and the lessee has 7/8. The royalty clause further states that the gas is to be marketed by the lessee. In order to get your gas and the lessee[']s gas to market, it must be transported through pipelines owned and operated by other companies. To propel this gas (move it through the pipeline) it must be compressed. The lessee is charged for this transportation and compression by the pipeline company. You in turn are charged for your proportional amount, being 1/8 of the total cost for the transportation and compression for that well. All lessors and lessees share proportion[a]lly in this cost.
>
> You further stated in your letter that a September 1985 payment statement did not show any such deduction. This is true. It was not until 1987 or 1988, not sure of the date, that these deductions were spelled out on the royalty statements. Prior to that time, you were charged for theses cost[s], however, it did not show. To my knowledge, there has always been a charge for transportation and compression and all parties involved in each well has paid a proportional amount of that cost.

These excerpts also include an April 29, 1991, letter from Cox to Bartlett, forwarding Keller's April 19, 1991, letter and asking Bartlett if there was anything further that could be done. (Cox Deposition, Exhibit 6, *Adkins,* Docket Item No. 185-7 at 21). These excerpts also include a number of royalty statements for Lease 241574L, which all show deductions from royalty payments for transportation and compression. (Cox Deposition, Exhibit 8, *Adkins,* Docket Item No. 185-7 at 22-34).

EQT also has provided excerpts of a deposition of Adkins. (*Adkins*, Docket Item No. 185-8; *Legard*, Docket Item No. 227-3) ("Adkins Deposition"). Adkins testified that over the years she has received some royalty checks from EQT. She further testified that she really did not understand the royalty statements attached to these checks. Adkins stated that she had never contacted anyone from EQT in an attempt to understand the statements.

EQT also has provided excerpts of a May 3, 2012, deposition of Charles S. Bartlett Jr. (*Adkins*, Docket Item No. 185-10; *Legard*, Docket Item No. 227-10). ("Bartlett Deposition"). Bartlett, a former Emory & Henry College geology professor, owns and operates Bartlett Geological Consultants in Abingdon. Bartlett stated that, through this consulting business, he has helped manage the mineral interests of various landowners in Virginia, including the Baker family.

Bartlett stated that the Baker lands that he helped manage included two tracts in Dickenson County, one with approximately 565 acres and another with 101 acres, and three tracts in Buchanan County, totaling approximately 600 acres. Bartlett said that, when he started working for the Bakers, all of these lands were

leased for gas production. Bartlett admitted that he has an overriding royalty interest in the gas production on the 101-acre tract in Buchanan County.

Bartlett stated that EQT royalty statements which he received from the Baker family beginning in January 2000 showed that deductions were being taken for transportation and compression.

The parties have provided excerpts of the June 28, 2012, Rule 30(b)(6) deposition testimony of Nicole Atkison, EQT's Supervisor of Division Order. (*Adair,* Docket Item No. 399-22, 404-3; *Adkins,* Docket Item No. 194-2) ("Atkison Deposition"). Atkison testified that EQT's escrowed and nonescrowed royalty payments are two months behind its gas production. Atkison said that all EQT royalty payments, whether placed into escrow or not, are accompanied by a "royalty remittance statement," or "check stub." According to Atkison, since at least 2002, these statements provide the royalty owner with the production date, the well unit number, the production amount, the price obtained for the gas produced from the well, the payee's percentage share of the ownership of the CBM interests, the amount of deductions and amount of royalty payment.

Atkison stated that the deductions are simply listed on the statement as "Gross Deductions (Gathering)," but includes deductions for "taking the gas to market for the gathering and compression." Atkison testified that she was not sure what is included by EQT in the gathering and compression charges. According to Atkison, if a CBM lease was silent as to whether EQT could deduct gathering costs from royalties, it was EQT's policy to take those deductions.

Atkison stated that she was not aware of EQT ever sending out any explanation to royalty owners of the royalty statements or of the deductions taken into account in calculating their royalty payments. Atkison also testified that the amount listed on the royalty statements as "the gross volume" from a well is not the entire volume of gas produced from the well for that reporting period. Atkison stated that the difference is attributable to a volume of gas that is either lost, used or unaccounted for between the well site and the downstream sales point.

A November 20, 1998, EQT Check Attachment to plaintiff Adkins for well 2346730 was admitted as an exhibit at Atkison's deposition. (*Adkins*, Docket Item No. 185-2 at 11, 22). Also admitted as an exhibit was a May 2007 EQT Remittance Statement to Adkins for several wells. (*Adkins*, Docket Item No. 185-2 at 11, 23).

According to Atkison, EQT sometimes did not pay royalties as required into escrow. Atkison stated that this was most likely due to not receiving supplemental escrow orders from the Board or, if the supplemental orders were received, they might have been misfiled. Atkison testified that, while EQT made sure that supplemental orders were prepared and tendered to the Board, they had no system to ensure that those orders were promptly entered and returned. Atkison testified that EQT now has adopted a policy that it pays monies into escrow starting 120 days after the entry of the Board's pooling order regardless of whether EQT has received the supplemental escrow order from the Board.

Buckhorn, Commonwealth Coal and Harrison-Wyatt have provided excerpts of the August 30, 2012, deposition testimony of Doris Betty Addison. (*Hale*, Docket Item No. 204-1; *Addison*, Docket Item No. 143-1). In these excerpts, Addison testifies that she has worked as a grocery store clerk since 1959. Addison

testified that she knows that the coal rights to her land were previously sold, but that she has not undertaken any research herself to ascertain what, if any, rights were severed with the coal.

Plaintiffs have provided additional excerpts of Addison's August 30, 2012, deposition testimony. (*Hale*, Docket Item No. 232-33; *Addison*, Docket Item No. 168-33). Addison testified that one of the reasons she filed suit is because there is no accountability by CNX for the money owed for CBM royalties for wells with conflicting claims of ownership. Addison testified, "you just feel like they are hiding things from you, and they are hiding money from you. … We don't know how much gas is being drawn or anything else. We don't know anything. … [Y]ou just don't know what's coming off of your property…."

CNX has provided a copy of a March 6, 1997, Release And Grant between Addison and its successors-in-interests. (*Addison,* Docket Item No. 145-1) ("Release"). This Release purports to "forever discharge Operator from any and all claims, demands and cause of actions, including but not limited to claims for waste, damage, trespass, nuisance, inconvenience, implied contract o[r] other causes, known or unknown, anticipated or unanticipated, of every nature and description whatsoever, arising out of the location, construction, drilling, operating, use and maintenance of 1 coalbed methane gas wells, 1 compressor station site, and future coalbed methane gas wells as allowed…." CNX asserts that this Release applies to one of the tracts at issue in Addison's case.

Plaintiffs have provided excerpts of the November 5-6, 2012, deposition testimony of Anita Duty. (*Hale*, Docket Item Nos. 232-21, 232-22; *Addison*, Docket Item Nos. 168-21, 168-22). Duty testified that CNX has title opinions from

attorneys before it files its applications for forced-pooled CBM drilling units. She stated that these title opinions identify the owner of the different estates for the tracts of land contained in the unit. Duty stated that she was not aware of any conflicting claimants using arbitration to settle their claims to escrowed royalties. Duty testified that when CNX gave unleased owners notice of their elections options in a forced-pooled unit, they were not advised as to whether the well already had been drilled, completed and was producing. (*Hale*, Docket Item No. 232-22; *Addison*, Docket Item No. 168-22). Duty stated that CNX had uniform practices and procedures that it followed in preparing and submitting petitions for pooling orders and supplemental orders to the Board. Duty further testified that the Act required, as part of the forced-pooled application process, that CNX provide the Board with a list of all of the owners and potential owners of the CBM in that proposed unit.

CNX also provided additional excerpts of Duty's deposition testimony. (*Hale*, Docket Item No. 241-8; *Addison*, Docket Item No. 179-5). Duty testified that CNX would have no way of knowing if any of the listed interest owners had changed in a unit after the Board entered a Supplemental Order for a forced-pooled unit unless someone notified it of the changes. Duty stated that CNX would not look at the ownership of the interests again until there was a reason to disburse monies from the Escrow Account.

Plaintiffs provided excerpts of the November 6, 2012, deposition testimony of Jamie Cox-Kidd. (*Hale*, Docket Item No. 232-24; *Addison*, Docket Item No. 168-24). Cox-Kidd testified that CNX receives title opinions from attorneys to determine the ownership of the tracts of land within a proposed drilling unit. Cox-

Kidd stated that CNX had uniform procedures in place to follow in requesting, obtaining and processing title opinions in Virginia.

Plaintiffs provided excerpts of the November 6, 2012, deposition testimony of Sherri Scott. (*Hale*, Docket Item No. 232-25; *Addison*, Docket Item No. 168-25). Scott testified that CNX uses a form CBM lease, and any changes had to be approved by management.

Plaintiffs provided excerpts of the November 8, 2012, deposition testimony of Jason Mumford. (*Hale*, Docket Item No. 232-31). Mumford testified that CNX had in place uniform policies and procedures which governed its calculation of CBM revenues. Mumford testified that deemed lessors like Hale were subject to the $1.35 and 97 cent per MMBtu deduct rate. Mumford also testified that voluntary lessors like Addison, with no special deductions provisions, were subject to the $1.35 and 90 cent deduct rate. Mumford testified that CNX deducted amounts for severance and license taxes before calculating royalties unless there was some specific lease provision that prohibited deducting taxes.

CNX provided additional excerpts from Mumford's deposition testimony. (*Hale*, Docket Item No. 241-2; *Addison*, Docket Item No. 179-2). Mumford testified that CNX continued to deduct only $1.35 even though its actual costs increased above that amount for "administrative ease." Mumford testified that part of the transportation costs deducted included amounts paid to reserve capacity on interstate transmission pipelines.

CNX provided excerpts of William M. Hauck's November 9, 2012, deposition testimony. (*Hale*, Docket Item No. 241-9; *Addison*, Docket Item No.

179-6). Hauck testified that CNX was engaged in gas swap transactions and/or financial cash flow hedges as of January 1, 2004. Hauck testified that the first financial swap transaction CNX did was in 2002.

\*\*\*

Plaintiffs have provided the court with the May 5, 2012, letter opinion of Buchanan County Circuit Judge Keary R. Williams in *E.L.E., LLC v. Bull Creek Coal Company, LLLP*, Case No. 753-09. (*Hale*, Docket Item No. 232-1, *Addison*, Docket Item No. 168-1). In this letter opinion, Judge Williams states:

> …[T]he Plaintiff seeks a determination of CBM ownership where there appears to be a real conflict.
>
> The Court has had the opportunity to hear this issue on several occasions. The conflict in this type of case consistently involves the following scenario with some variation: The property owner conveys the coal estate through the execution of a severance deed. The severance deed typically utilized fails to specifically address ownership of the CBM. In recent years, the value of CBM ownership has become increasingly appreciated. In situations where there are conflicting claims of ownership to CBM, the gas royalties are held in escrow until a court resolves the issue of ownership. This has led to a conflict between the surface owner (or the owner of the residual estate) and the coal owner as to ownership of the CBM. These conflicts are typically resolved through the mechanism of a declaratory judgment action.
>
> The Supreme Court of Virginia handled an aspect of this conflict in the case *Harrison-Wyatt v. Ratliff*, …. In that case, the *Harrison-Wyatt* Court affirmed the trial court's ruling that "the grant of coal rights does not include rights to CBM absent an express grant of coalbed methane, natural gases, or minerals in general." …

Judge Williams continued to address a demurrer filed to a counterclaim alleging that the plaintiff had failed to allege that it had a right to enter the coal seam where the CBM was located and, therefore, the defendant coal owner was entitled to the gas royalties because it was the owner of the coal seams from which the CBM was produced.

> This Court adopts the position taken by the Russell County Circuit Court in *Belcher v. Swords Creek Land Partnership*, Case No. CL11-283 and *Richardson v. Swords Creek Land Partnership*, Case No. CL11-321. In addressing a similar counterclaim in a case analogous to the instant action, Judge Michael L. Moore stated in his letter opinion:
>
>> The defendant's counterclaim fails to state a cause of action. In its counterclaim, the defendant seeks the same royalties that the plaintiffs seek as CBM owners. The defendant bases this claim on its ownership of the coal seam from which the CBM was extracted. The right to access CBM by invasion of the defendant's coal seam, however, is irrelevant to the plaintiff's rights to royalties as owners of the CBM. Even if the defendant were entitled to some form of damages resulting from a trespass on its coal seam, these damages would be separate from the royalties due to the CBM owner.
>>
>> Accordingly, the Russell County Circuit Court found that the counterclaim failed to allege facts leading to an actionable claim and sustained the plaintiff's demurrer to the defendant's counterclaim…. This is not to say definitively that the Defendant is not the owner of the CBM; the owner of the CBM will be ascertained through an interpretation of the relevant deeds.

Plaintiffs also have provided the court with the October 4, 2012, letter opinion of Judge Moore in *Belcher v. Swords Creek Land Partnership*, Case No. CL11-283, on the plaintiffs' demurrer to the defendant's amended counterclaim.

(*Hale*, Docket Item No. 232-3; *Addison*, Docket Item No. 168-3). In this letter opinion, Judge Moore states:

> In Count I of the Amended Counterclaim, the Defendant alleges that the language in the original coal severance deed which contains the phrase "and other things" conveys to the coal owner all substances within the coal seam including CBM. The specific language is:
>
> > "all of the coal, in upon or underlying a certain tract of land and the timber and privileges hereinafter specified as appurtenant to said tract below described.... to enter on, over, upon and through said tract of land for the purpose of digging, mining, or otherwise securing the coal and other things in and on said tract of land hereinbefore specified, and removing same from off said land…"
>
> The Defendant has alleged … that this language in the … 1887 deed conveyed coal to the grantee and also CBM and requests the Court to declare that the Defendant owns the CBM. …
>
> The plain language of the 1887 severance deed conveys coal and also conveys "all the timber….that may be necessary to use successfully and conveniently mine said coal." The term "and other things" relates back to the timber included as an appurtenant to the coal and in no way can be interpreted to include CBM. As the Virginia Supreme Court stated in *Harrison-Wyatt v. Ratliff*, … the term "coal" is not ambiguous, and CBM is a distinct mineral estate that is not conveyed absent an express grant.

Judge Moore also addressed the coal owner's trespass arguments.

> The Defendant states that the law does not authorize "a surface owner who claims the title to CBM to enter the coal seam owned by … [another] to drill wells for the purpose of developing the coal seam to recover CBM, or to authorize anyone to do so on its behalf." … In this case the Defendant has not alleged any facts that would constitute a physical entry onto its property, the coal estate. While Defendant contends that it is the rightful owner of the CBM, this contention is

irrelevant to the determination if the plaintiffs did not physically invade the coal seam. The only invasion to the Defendant's coal seam was the result of the Defendant's lease of coal seam gas to Pocahontas Gas Partnership in 1991. "It is axiomatic that a party cannot collect damages based on theories of …trespass when the party consented to the very actions alleged to constitute trespass[.]" *Vicars v. First Virginia Bank-Mountain Empire*, … 458 S.E.2d 293, 296 (1995).

Judge Moore also rejected the coal owner's argument that, by voluntarily entering into a gas lease with the gas producer, it had waived substantial rights afforded to it by the Act, and, therefore, it was entitled to damages from plaintiffs. Judge Moore stated, "If in fact the Defendant has waived any actual vested rights, no facts have been submitted that the actions constituting this waiver are in any way attributable to the Plaintiffs." Judge Moore also rejected the coal owner's unjust enrichment claim, finding that the defendant had not alleged sufficient facts to show that the plaintiffs should have expected to pay the coal owner for any benefit conferred.

## II.    Analysis

Class certification is governed by Federal Rule of Civil Procedure 23. Under Rule 23(a), a party seeking certification must demonstrate, first, that:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). These are referred to as the numerosity, commonality, typicality and adequate representation requirements. A plaintiff seeking class certification bears the burden of proving the proposed class complies with each of these requirements. *See Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 n.6 (4th Cir. 1977) (en banc). As the Supreme Court held in its recent opinion in *Wal-Mart Stores, Inc. v. Dukes*:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," … and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."

___ U.S. ____, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)).

While not explicitly mentioned in Rule 23, there is an implicit requirement that the class definition is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1760. Thus, as a preliminary matter, the court must consider the definition of the class when determining the appropriateness of class certification. *See Melton v. Carolina Power & Light Co.,* 283 F.R.D. 280, 286 (D.S.C. 2012); *Kirkman v. N. C. R.R. Co.,* 220 F.R.D. 49, 53 (M.D. N.C. 2004). "[A] proposed class definition must be precise, objective and presently ascertainable." *Rozema v. Marshfield Clinic,* 174 F.R.D. 425, 431 (W.D. Wis.

1997) (citing MANUAL FOR COMPLEX LITIGATION § 30.14 (3d ed. 1995)). "The proposed class definitions must not depend on subjective criteria or the merits of the case or require extensive factual inquiry to determine who is a class member." *Rozema,* 174 F.R.D. at 432 (abrogated on other grounds). "A precise definition allows the [c]ourt to determine who would be entitled to relief, who would be bound by a judgment, and who is entitled to notice of the action." *Garrish v. UAW,* 149 F. Supp. 2d 326, 331 (E.D. Mich. 2001). Furthermore, an identifiable class exists if its members can be ascertained by reference to objective criteria. *See* MANUEL FOR COMPLEX LITIGATION § 21.222 (4th Ed. (2004).

The proposed class also must satisfy at least one of the three requirements listed in Rule 23(b). Rule 23(b)(1) allows a class to be maintained where "prosecuting separate actions by or against individual class members would create a risk of" either "(A) inconsistent or varying adjudications," or "(B) adjudications … that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1). Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Rule 23(b)(3) states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

The Supreme Court in *Dukes*, ___ U.S. ____, 131 S. Ct. at 2550, stated:

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-701 … (1979). In order to justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 … (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 …. (1974)). Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – "effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156, … (1982) (quoting *General Telephone Co. of Northwest v. EEOC*, 446 U.S. 318, 330 … (1980)).

District courts have "wide discretion in deciding whether or not to certify a proposed class," and a court's decision "may be reversed only for abuse of discretion." *Cent. Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir. 1993) (quoting *In re A.H. Robins Co., Inc.,* 880 F.2d 709, 728-29 (4th Cir. 1989)); *see also In re Catawba Indian Tribe*, 973 F.2d 1133, 1136 (4th Cir. 1992). The Fourth Circuit has held that "federal courts should 'give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and … promote judicial efficiency.'" *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (quoting *In re A.H. Robins*, 880 F.2d at 740). If a lawsuit meets the requirements of Rule 23, "certification as a class action serves important public purposes. In addition to promoting judicial economy and efficiency, class actions also 'afford aggrieved persons a remedy if it is not

economically feasible to obtain relief through the traditional framework of multiple individual damage actions.'" *Gunnells,* 348 F.3d at 424 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.02 (3d ed. 1999)). Also, likelihood of plaintiffs' success on the merits is not relevant to the issue of whether class certification is proper.

The court must first decide if the proposed classes are sufficiently definite. The classes sought to be certified are set out above at pages 4-7, *supra.* CNX argues that the members of the proposed classes in the *Hale* and *Addison* cases are not currently ascertainable without conducting extensive factual inquiries.[7] EQT does not raise this argument, but it appears to apply equally to the proposed classes in the *Adair* and *Adkins* cases.

Each of these four cases seek to certify a class made up of persons identified by the operator or its predecessor-in-interest as owners of the gas estates in CBM gas unit tracts for which the operator has identified their ownership to the CBM as being in conflict with persons owning the coal estate on the tract. CNX argues that this class definition depends on ownership determinations made as many as 23 years ago, after the enactment of the Act. CNX asserts that those listed as owners of the gas estate before the entry of a pooling order may no longer have any ownership rights. The plaintiffs in these four cases seek to certify classes by issue under both Rule 23(b)(2) and 23(b)(3). While not all Rule 23(b)(2) classes require a class definition that permits identification of the individual class members, Rule 23(b)(3) classes do require such, because individual class members must receive

---

[7] The coal owner defendants also assert this argument in the *Hale* and *Addison* cases. The coal owner defendants in the *Hale* case are Torch Oil & Gas Co., Buckhorn Coal Co., Commonwealth Coal Corp. and Harrison-Wyatt, LLC. The coal owner defendants in the *Addison* case are the same, with the exception of Torch Oil & Gas Co.

notice and an opportunity to opt out of the class. *See* FED. R. CIV. P. 23(c)(2). Furthermore, since the plaintiffs in these four actions seek an award of CBM royalties and damages based on ownership of CBM royalties, the class definition necessarily must be modified to include only the current owners. Such a modification could be achieved by simply redefining the classes to include the current owners of the gas estates in tracts which the operator identified the current owners' or their predecessors'-in-interest rights as being in conflict with the owners of the coal estate. Once the class definition is modified, the members of the classes would be ascertainable by reference to objective criteria, i.e. local land records. *See Garrish,* 149 F. Supp. 2d at 331.

CNX also asserts that the class definitions in its cases are overly broad in that they do not exclude those gas estate owners who have gone to court and gotten determinations as to the ownership of the CBM for a particular tract. This argument also has merit. The class definitions in each of the conflicting claims cases with the exception of *Adair,* excludes any gas owners who entered into Split Agreements resolving the ownership to the CBM royalties. It would appear that the class definitions should be modified to further exclude those who previously have gone to court and resolved the CBM ownership issue. It also would appear that the class definition in *Adair* should be modified to exclude any gas owners who have entered into Split Agreements.

With regard to the *Legard* case, it appears that the members of the proposed class are readily identifiable based on EQT's records. Therefore, I find that class definition sufficiently definite.

The court next must decide whether the proposed class in each case meets the requirements of Rule 23(a). Defendants do not raise any serious challenge to the plaintiffs' assertions that the proposed class in each case is so numerous that joinder of all members is impracticable under Rule 23(a)(1). Defendants, however, do challenge whether there is sufficient commonality or typicality between the named plaintiffs' claims and those of the proposed classes. In the *Adkins* and *Legard* cases, EQT also challenges whether the named plaintiff, Eva Mae Adkins, can fairly and adequately protect the interests of the members of the proposed class. Likewise, CNX challenges whether Hale and Addison can adequately represent the interests of the proposed class in each of their cases.

The evidence before the court confirms that the proposed class in each of these cases is so numerous that joinder of all members is impracticable. "Impracticable … does not mean impossible…. A party seeking certification need show only that it is extremely difficult or inconvenient to join all the members of a class." *Olvera-Morales v. Int'l Labor Mgmt. Corp.*, 246 F.R.D. 250, 255 (M.D. N.C. 2007) (internal citations and quotations omitted). The exact number of class members need not be known for certification to be proper. *See Mitchell-Tracey v. United Gen. Title Ins. Co*., 237 F.R.D. 551, 556 (D. Md. 2006). "The court may certify a class based on a common sense estimation of the class size if the precise number of class members is unknown." *Talbott v. GC Servs. Ltd. P'ship,* 191 F.R.D. 99, 102 (W.D. Va. 2000).

Evidence before the court shows that, in 2009, CNX was responsible for 56.4 percent and EQT was responsible for 35.3 percent of Virginia's CBM production. The evidence also shows that EQT operates 1,977 CBM wells in Virginia. On average, each EQT well tract has four to six different mineral tracts.

EQT has obtained forced-pooling orders for approximately 355 CBM wells in Virginia and holds "several thousand" leases for gas. There are "hundreds" of gas owners and "hundreds" of coal owners with conflicting claims to the CBM produced in Virginia by EQT.

According to the latest information from the Division of Mines, Minerals, and Energy, ("DMME"), CNX operates 498 CBM units with royalties in escrow. Each of these units are the subject of a Board pooling order because they contain at least one claimant whose interest in the CBM was forced pooled and deemed leased. While plaintiffs have not produced any specific number of voluntarily leased units in which CBM royalties are held in suspense, it is reasonable to infer from the evidence before the court that these units are numerous.

Based on the above, I find that plaintiffs in these cases have shown that the members of the proposed class in each case are so numerous that joinder of all members is impracticable. *See Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir. 1967) (class of 18 members sufficiently numerous).

\*\*\*

The crux of the matter in these cases, as in the *Dukes* case, is "commonality – the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.'" 131 S. Ct. at 2550-51.

Class certification under Rule 23 requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ.

P. 23(a). Before turning to this requirement, the Court notes that "[i]n a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 147 (4th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609, … (1997)). This Court, however, will first address whether commonality exists under Rule 23(a) in light of the recent precedent from the Supreme Court in *Wal-Mart Stores*, recognizing that if Plaintiffs cannot establish commonality under Rule 23(a), then, a fortiori, they cannot satisfy the more stringent requirements of Rule 23(b)."

*Valerino v. Holder*, 283 F.R.D. 302, 310 (E.D. Va. 2012).

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'." *Dukes,* 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157). "Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S. Ct. at 2551. The issue is not common questions, but whether there are "common *answers* apt to drive the resolution of the litigation." *Dukes,* 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev. 97, 131-32 (2009)).

The threshold requirements for commonality "are not high." *Brown v. Nucor Corp.,* 576 F.3d 149, 153 (4th Cir. 2009) (reversing denial of class certification). Rule 23(a)(2) "does not require that all, or even most issues be in common." *Tatum v. R.J. Reynolds Tobacco Co.,* 254 F.R.D. 59, 64 (M.D. N.C. 2008) (quotation and

citation omitted). A single common question will satisfy Rule 23(a)(2)'s commonality requirement. *See Dukes,* 131 S. Ct. at 2551. Further, "claims of individual class members do not have to match precisely." *D'Alauro v. GC Servs. Ltd. P'ship,* 168 F.R.D. 451, 456 (E.D. N.Y. 1996). In these cases, the named plaintiffs have shown that they have at least one common question with each of the proposed class members in each of these cases, thus, meeting the requirement of Rule 23(a)(2).

In four of these cases – *Adair*, *Adkins*, *Hale* and *Addison*, the plaintiffs seek declaratory judgments that all CBM royalties held in escrow or suspense due to alleged conflicting claims of CBM ownership with persons identified by the operators as owning coal estate interests must be paid over to plaintiffs and the proposed class members. (*Adair*, Docket Item No. 330 at 39; *Adkins*, Docket Item No. 139 at 31; *Hale*, Docket Item No 169 at 40; and *Addison*, Docket Item No. 116 at 31-32). The plaintiffs in these cases assert that the Virginia Supreme Court in its March 2004 opinion in *Harrison-Wyatt LLC v. Ratliff*, 593 S.E.2d 234, held that, under Virginia law, CBM is a distinct mineral estate and that a conveyance of the coal or coal estate on a property did not convey an interest in the CBM.

The defendants have spent great time and effort, again, at this stage of the proceedings in an attempt to convince the court that the Virginia Supreme Court's ruling in *Harrison-Wyatt* was dependent on the specific language of the deed in front of it. Thus, the defendants argue CBM ownership must be determined on a case-by-case, tract-by-tract, deed-by-deed basis. Nonetheless, the Supreme Court's opinion in *Harrison-Wyatt* squarely affirmed the ruling of Circuit Judge Keary Williams that a conveyance of coal does not include rights to the CBM. Furthermore, the Virginia circuit courts continue to interpret the *Harrison-Wyatt*

opinion as clearly deciding that a conveyance of coal rights does not convey the rights to the CBM. *See E.L.E., LLC v. Bull Creek Coal Company, LLP,* and *Belcher v. Swords Creek Land Partnership, supra.*

In each of these four cases, the plaintiff seeks to certify a class composed of gas estate owners whose ownership of CBM has been identified by the well operator as being in conflict with persons who own the coal estate. The plaintiffs seek a declaratory judgment that, based on the *Harrison-Wyatt* opinion, a conveyance, reservation or exception of coal does not include CBM as a matter of law, and, therefore, no CBM ownership conflict exists as a matter of law between a person owning the gas estate interest in a CBM tract and a different person owning the coal estate interests in the tract. Quite frankly, I am of the opinion that the Virginia Supreme Court has decided this issue.

The plaintiffs, however, further seek judgment that they, as gas owners, are entitled to the CBM royalties withheld. Whether such relief may be granted by this court based on the *Harrison-Wyatt* opinion – or not – is a question held in common by each of the named plaintiffs and the proposed class members in these four cases and is subject to a common resolution.

All five cases also include a claim for an accounting of all CBM produced, as well as of the royalties owed to plaintiffs and the proposed class members. Also remaining in all five cases are claims for conversion. All of the cases except the *Legard* case have breach of fiduciary duty claims against the operators remaining. The deemed lease cases, *Adair* and *Hale*, also have trespass, failure to act as a reasonably prudent operator and unjust enrichment claims remaining against the

operators. Two of the voluntary lease cases, *Legard* and *Adkins*, also have breach of contract claims remaining against the operators.

Each of these remaining claims revolve around the issues of whether the CBM well operators have paid the full royalties owed from the CBM produced. In particular, the plaintiffs claim that the operators have either underreported the volume of CBM sold, have sold the CBM for less than the market price or have taken deductions to which they were not entitled under the relevant pooling orders or leases. The evidence before the court shows that the price received by these operators does not vary by well, but rather is consistent across particular wellfields. Therefore, while there may be a need to break the proposed classes into sub-classes by wellfield, it appears the issue of receipt of market price may be resolved on a classwide basis. The same appears true for the propriety of the deductions taken. The evidence shows that the deductions taken by the operators are applied consistently based on wellfield. It appears the only variance comes when a voluntary lease specifically prohibits a particular deduction.

The more difficult question is whether the common issues rise to the level in each of these cases to meet the requirements of Rule 23(b). The plaintiffs seek to certify these class actions under both 23(b)(2) and 23(b)(3).

In four of these cases – *Adair, Adkins, Hale* and *Addison* – the plaintiffs seek to certify the class under Rule 23(b)(2) for purposes of obtaining a declaratory judgment as to the ownership of the rights to the CBM royalties. Rule 23(b)(2) does not require a showing of predominance of common questions of law or fact over individualized ones. Instead, it requires that the plaintiffs show that the CBM operators have "acted or refused to act on grounds generally applicable to the class,

thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). I find that the plaintiffs in these four cases have made that showing. In particular, the evidence before the court shows that EQT and CNX have withheld royalty payments based on "conflicting claims of ownership" to the CBM for any tract for which the coal rights were severed from the gas rights. The evidence also shows that this occurred in each of the named plaintiff's individual cases.

In the *Adair* case, EQT's application to the Board for a forced pooling order contained an exhibit that asserted that there were conflicting claims to the CBM between the owners of the gas estate and the coal estate. EQT also filed an affidavit from its counsel asserting that, based on its due diligence to determine the ownership of the CBM, it had determined that there were "conflicting claims as between the gas owner and coal owner." (*Adair,* Docket Item No. 399-18 at 27-30). Based on this assertion, the Board found a conflict and ordered the royalties from Adair's tract to be escrowed.

In *Adkins*, Adkins alleges that all CBM royalties from the subject tracts have either been held in suspense or the Board's escrow account based on EQT's assertion of conflicting claims to ownership of the CBM.

The evidence shows that, regarding the Hale lands, a Consol employee appeared at the hearing before the Board regarding the forced pooling application and testified that there were conflicting claims to the CBM between the Hale heirs' oil and gas interests and the interests of the coal owners, which required the royalties from these tracts to be paid into escrow. (*Hale*, Docket Item No. 174-10 at 66; Docket Item No. 174-11 at 65; Docket Item No. 174-12 at 56).

In the *Addison* case, the pooling orders entered by the Board also show that the well operator asserted conflicting claims to the CBM between gas owners and coal owners. (*Addison*, Docket Item No. 119-2-119-5).

Also, there is evidence before the court that both EQT and CNX had attorneys perform title searches on each tract of land contained in a CBM drilling unit to determine who owned the CBM estate. The evidence before the court is that EQT always reported conflicting claims of ownership to the CBM for any tract for which the title examination showed different persons owned the gas and the coal estates.

The defendants argue, and have produced evidence, that there was no one form of severance deed which was used in Virginia to sever the coal estate. Therefore, they argue, the ownership of CBM must be determined on a tract-by-tract basis. As stated above, however, this argument ignores the relief sought and the class definitions of the classes sought to be certified.

Again, the relief sought is for a declaratory judgment that all CBM royalties held in escrow or suspense due to alleged conflicting claims of CBM ownership between persons who operators identified as owning the gas estate and persons they identified as owning the coal estate and ***not*** the gas estate, be paid to the persons identified as owning the gas estate. In each case, the named plaintiff seeks to apply this ruling to a class composed of persons identified by the operators as the owners of the gas estate whose royalties have been withheld because the

operators allege there are conflicting claims to ownership of the CBM from persons identified as owning the coal estate but not the gas estate.[8]

The plaintiffs do not seek relief in any case in which the coal estate owner has any gas interest. Further, the plaintiffs do not seek to apply the relief to any person whose ownership claim is in conflict with a coal estate owner who has any gas interest. Thus, it appears the declaratory relief may appropriately be granted or denied to the class as a whole.

The plaintiffs seek to certify the remaining claims under Rule 23(b)(3). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Each of the other remaining claims in these cases revolve around the price of the CBM as sold by the operators, the volume of CBM and the amount of post-production deductions taken from the sale proceeds before calculating royalties. I find that the plaintiffs, at this stage, have provided sufficient evidence to meet the requirements of Rule 23(b)(3).

In discovery, EQT has admitted that, since January 1, 2005, it has sold all of the CBM it produces in Virginia to an affiliate company, EQT Energy. EQT also has admitted that all royalty owners within the same field have been paid royalties based on the same sales price for the CBM. EQT Corporation's former vice president of finance has testified that EQT calculated all royalties based on the same methodology. This former vice president of finance has testified that the

---

[8] This is the language contained in the current complaints in *Adkins* and *Hale,* but not *Adair*. *(Adair,* Docket Item No. 330; *Adkins*, Docket Item No. 139; *Hale*, Docket Item No. 166).

price paid by EQT Energy for the CBM was based on the "index price" for the interstate pipeline into which the CBM was going. The only difference between deemed leased and voluntarily leased cases might be the deductions that are allowed under the terms of voluntary leases.

EQT has stated that it takes deductions from the sales price for gathering, compression, selling, general and administrative costs and depreciation before calculating royalties for CBM wells in the Big Stone Gap Nora Field and in the Brenton District. The deduction for "gathering" actually includes expenses for gathering, processing, compression, transportation, marketing, general and administrative costs and property taxes. EQT does not deduct any amount for "gathering and compression" in the Roaring Fork Field. The price EQT pays EQT Energy for "gathering" is set annually and is based on discussions among the business leaders of the affiliated entities for all fields except the Nora Field. In the Nora Field, the gathering costs are adjusted quarterly based on a 12-month rolling average of actual costs. EQT also has stated that it deducts severance taxes and pipeline "capacity charges" before calculating royalties from all Virginia wells. EQT also takes deductions for "gathering and compression" in voluntary lease cases where the lease is silent as to whether the deductions can be taken.

All CBM produced by EQT, with the exception of 55-60 wells in Buchanan County, flows into East Tennessee Natural Gas's interstate transmission pipeline. The CBM from these Buchanan County wells flows into the Dominion interstate transmission pipeline.

Evidence also has been produced showing that the amount that CNX deducts from royalties for post-production costs is not the actual costs it incurs. CNX

argues that the amount deducted is less than the costs it incurs. The plaintiffs, however, have produced evidence that the amount CNX deducts for post-production costs is much higher than other producers. (*Hale*, Docket Item No. 232-14; *Addison*, Docket Item No. 168-14). CNX has admitted that it has deducted severance and license taxes when calculating royalties since January 1, 2004. CNX also has admitted that part of the transportation costs deducted include amounts paid to reserve capacity on the interstate transmission pipelines. CNX has admitted that it has used one form lease to lease CBM rights and that any changes to this form had to be approved by CNX's management. CNX has testified that its standard CBM royalty rate is 12.5 percent and that it has uniform policies and procedures which governed its calculation of CBM revenues.

In the *Legard* case, EQT argues that issues common to the class do not predominate over individual issues. It is important to note that the *Legard* case is the only one of the five CBM cases before the court in which CBM royalties have been paid to the plaintiffs. In particular, EQT has asserted a statute of limitations defense to each of the claims raised in *Legard*. The court has refused to grant EQT's motion to dismiss on this basis based on its finding that the plaintiffs had alleged sufficient facts to plead fraudulent concealment by which EQT may be estopped from asserting this defense. (*Legard*, Docket Item No. 60). EQT argues that its statute of limitations defense, and whether it may be estopped from asserting this defense, will require individualized factual analysis of the facts of each class member's claim and that these individual issues will dominate this case. In support of its argument, EQT cites a number of cases where courts have held class certification inappropriate when the defendants rely on a statute of limitations defense and individualized decisions must be made as to when each class member's right of action accrued. *See Thorn v. Jefferson-Pilot Life Ins. Co.,* 445

F.3d 311, 319-22 (4th Cir. 2006); *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 341-43 (4th Cir. 1998); *see also Gunnells*, 348 F.3d at 434-36 (common issues did not predominate on claims of fraud, which required proof of reliance).

This argument, however, ignores the fact that the doctrine of fraudulent concealment does not focus on the actions or knowledge of the plaintiffs, but on the actions of the defendant. *See F.D.I.C. v. Cocke*, 7 F.3d 396, 402 (4th Cir. 1993) (citing *Sadler v. Marsden,* 168 S.E. 357, 360-61 (Va. 1933)); *City of Bedford v. James Leffel & Co.,* 558 F.2d 216, 217-18 (4th Cir. 1977). As stated above, the evidence produced thus far shows EQT's actions were consistent with regard to calculation and payment of CBM royalties. Insofar as plaintiffs' reliance must be proven, that matter could be taken up in any subsequent proceedings to determine individual damages. *See Seiden v. Nicholson,* 69 F.R.D. 681, 686 (N.D. Ill. (1976); *see also Abramovitz v. Ahern,* 96 F.R.D. 208, 218 (D.C. Conn. 1982) (existence of individual statute of limitations problems does not effect propriety of class action determination). Thus, I find that questions of law or fact common to class members predominate over any questions affecting only individual members.

Defendants argue that certifying these cases as class actions is not superior to other methods of resolving these matters. In particular, the defendants point out that the Act now allows for parties to seek resolution of CBM ownership through arbitration rather than by filing suit in court. *See* VA. CODE ANN. § 45.1-361.22:1 (2012 Supp.). The operators also argue that those with withheld royalties may file individual suits to establish ownership and recover any monies they are owed. These arguments ignore that the plaintiffs seek to certify the CBM royalty ownership issue in four of these cases under Rule 23(b)(2), which does not require

a finding of superiority. With regard to the plaintiffs' claims for which they are seeking certification under Rule 23(b)(3), the evidence before the court shows that many CBM royalty claimants own only a fractional interest in a 12.5 percent royalty. This fact, no doubt, has resulted in the sparse number of individual cases filed to date over the propriety of reported well volumes, the calculation of royalties owed or the deductions taken. *See* FED. R. CIV. P. 23(b)(3)(B). In particular, despite the continuing publicity given these five CBM cases, no potential class members have come forward to argue that they have any interest in individually controlling the prosecution of separate actions. *See* FED. R. CIV. P. 23(b)(3)(A). The common sense inference to be drawn from these facts is that many potential CBM royalty owners simply cannot afford to pursue individual actions. "'[A]djudication of [a] matter through a class action … [is] superior to no adjudication of the matter at all.'" *Gunnells,* 348 F.3d at 426 (citing 5 Moore's Federal Practice § 23.48[1] (1997)). Furthermore, it would appear desirable from a judicial economy standpoint to consolidate these cases in one forum. "Efficiency is the primary focus to determine if a class action is the superior method to resolve a controversy, … and the court looks to judicial integrity, convenience, and economy." *Talbott,* 191 F.R.D. at 106. Since Virginia does not allow class action claims, *see Casey v. Merck & Co., Inc.,* 722 S.E.2d 842, 846 (Va. 2012), the Western District is the only forum in which these claims, which involve tracts of land located in at least three different Virginia judicial circuits, can be consolidated. "Furthermore, class certification 'provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects *the defendant* from inconsistent adjudications.' 5 MOORE'S FEDERAL PRACTICE § 23.02 (1999) (emphasis added)." *Gunnells,* 348 F.3d at 427.

The court recognizes a number of likely difficulties in managing these claims as class actions. Perhaps the most difficult task will be identifying the members of the Rule 23(b)(3) classes to provide the notice required under Rule 23(c)(2)(B). This task would appear to be easily manageable in the *Legard* case, where EQT's own records should identify the CBM royalty owners. In the four cases where ownership of the current CBM is an issue, the operators' records should establish ownership of the conflicting claims as of the Board's approval of the pooling unit. Certainly, there will have been changes in ownership since that time. Nonetheless, changes in ownership tied to the land are generally recorded and trackable.

The manageability of these cases as class actions is increased by the fact that only Virginia law need be applied to the classes' claims, and each case involves only one CBM well operator. *See Cent. Wesleyan Coll.,* 6 F.3d at 189.

\*\*\*

Typicality "goes to the heart of a representative['s] ability to represent a class…." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Thus, a named plaintiff's "interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Deiter,* 436 F.3d at 466. Typicality "tend[s] to merge" with commonality, insofar as both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13. "A claim is typical if it arises from the same course of conduct that gives rise

to the claims of the class members and if the claims are based on the same legal theories. H. NEWBERG, NEWBERG ON CLASS ACTIONS § 3.13 n.202 (1985) (cases collected)." *Cent. Wesleyan Coll.*, 143 F.R.D. at 637 (D.S.C. 1992). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter*, 436 F.3d at 466 (quoting *Broussard,* 155 F.3d at 340).

To determine if the named plaintiffs in these cases have shown typicality, the court should compare their claims and the defendants' defenses to those claims with those of the purported class members by reviewing the elements of the claims and the facts supporting those claims and examining "the extent" to which those facts "would also prove the claims of the absent class members." *Deiter*, 436 F.3d at 467. There is no typicality where the claims of the named plaintiff and the class members depend on individual circumstances. *See Broussard,* 155 F.3d at 340-44. However, "[t]ypicality does not require that the claims be identical." *Talbott,* 191 F.R.D. at 104.

EQT argues that Adair's claims are not typical of the class members' because Adair's CBM ownership claim is not in conflict with every coal owner who has been listed by EQT as a conflicting claimant in a deemed-leased case. This argument is based on the defendants' assertion that all coal owners must be added as party defendants because ownership must be determined on a deed-by-deed basis. Again, this argument ignores the relief requested and is not persuasive.

CNX argues that Hale's claims are not typical of the proposed class members in his case because Hale also owns the coal interest in some tracts. The fact that Hale owns tracts on which there is no conflicting claim of ownership does

not mean that his claims based on tracts where there are conflicting claims are not typical of the other class members.

The defendants argue that Adkins's and Addison's claims are not typical of the proposed class members' claims in the *Legard, Adkins* and *Addison* cases because of the varying language among the voluntary leases used. While this may be true on the breach of contract claims, additional claims remain in these voluntarily leased cases. As stated above, the *Adkins* and *Addison* cases have claims remaining for a declaratory judgment as to the ownership of CBM. In the *Adkins* case, however, the conflicting claimant has relinquished its claim to the CBM. That being the case, Adkins's ownership of the CBM is no longer at issue. Thus, her claim is no longer typical of the proposed class members' claims. Each of these cases also have conversion claims remaining. These claims are based upon allegations of the defendants' underreporting the volume of CBM sold and on allegations of selling the CBM for less than the market price. *Adkins* and *Addison* also have breach of fiduciary duty claims remaining. None of these claims will turn on the varying language in the leases.

Two of these cases, *Legard* and *Adkins* do have breach of contract claims remaining. Such claims may turn on the language of the individual contracts, the CMB leases, at issue. For instance, some leases may allow certain deductions while others do not. The class definitions in both these cases, however, draw no distinctions between the CBM lessors included based on the language of their CBM leases.

The evidence before the court shows that EQT and its predecessors-in-interest did not use one form lease but, rather, used many different form leases.

Further, the evidence before the court is that these leases vary as to the language as to the payment of royalties and post-production deductions. "[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts." *Broussard,* 155 F.3d at 340.

Based on the above, I find that the plaintiffs have shown that their claims are typical of the proposed class members' claims with the exception of Adkins in the *Adkins* case and the breach of contract claims filed in the *Legard* and *Adkins* cases. It is anticipated that plaintiffs' counsel will move to substitute a named plaintiff in *Adkins* whose claim to the CBM at issue remains contested and, therefore, typical. A decision on class certification in that case must await such action, however.

\*\*\*

The court next must consider whether the named plaintiffs will fairly and adequately protect the interests of the class.

> Rule 23(a)(4) embodies the due process element of a class action…. Specifically, it works to protect the interest of class members by requiring that the named representative adequately represent the class. This means that the class representative has no conflicting claims with other class members and has a sufficient interest in the case's result….

*Talbott,* 191 F.R.D. at 105.

Insofar as EQT and CNX attack the adequacy of any of the named plaintiffs based on their lack of knowledge, that argument has been specifically rejected by the Fourth Circuit. *See Gunnells,* 348 F.3d at 430. "It is hornbook law … that '[i]n a complex lawsuit, such as one in which the defendant's liability can be established

only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.'" *Gunnells,* 348 F.3d at 430. *See Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363 (1966) (court disapproved of attacks on the adequacy of a class representative based on the representative's ignorance). Insofar as EQT attacks Adkins's ability in *Legard* and *Adkins,* and CNX attacks Addison's ability in *Addison,* to adequately represent the proposed class members on this basis, the court rejects that argument.

The adequacy requirement is met when the named representative possesses the same interests and suffers the same injury as the proposed class members. *See Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 625-26 (1997). EQT in *Adair,* and CNX in *Hale* and *Addison,* argue that these plaintiffs cannot adequately represent their respective proposed class members because they each have interests which conflict with at least some of the other class members' interests. A conflict of interest must be "fundamental" to prevent a named plaintiff from meeting the adequacy requirement of Rule 23(a). "'It must go to the heart of the litigation.'" *Gunnells,* 348 F.3d at 431 (citations omitted).

In *Adair*, EQT argues, again, that Adair cannot adequately represent the proposed class because he has not provided evidence that he and the proposed class members share the same ownership interest. Based on the evidence before the court, I find this argument unpersuasive. The evidence currently before the court shows that EQT, itself, considered that Adair, or at least his predecessors-in-interest, owned the gas estate in the tracts at issue and that placed the ownership of the CBM rights in conflict with others who owned the coal estate in these tracts.

The class Adair seeks to certify is of gas estate owners whom EQT has identified as possessing claims to CBM which are in conflict with the coal estate owners. Therefore, it appears that Adair possesses the same ownership interests and has suffered the same injury as the proposed class members.

In *Hale,* CNX argues that Hale cannot adequately represent the class he proposes because he owns both the gas and coal interests to one particular tract and has received CBM royalties for that tract. The fact that Hale owns land upon which there is no conflicting claims to the CBM does not mean that he cannot represent himself and others who also own tracts upon which there are conflicting claims to the CBM between the gas owners and the coal owners. I do not find that these facts present a fundamental conflict.

In *Addison,* CNX argues that Addison cannot adequately represent the proposed class because the pooling orders for her tracts of land were entered before the *Harrison-Wyatt* decision in 2004, and the proposed class, as defined, would include members whose tracts had pooling orders entered both before and after the *Harrison-Wyatt* decision. This distinction, however, has little impact on the remaining claims in the *Addison* case and does not prevent Addison from adequately representing the class.

CNX, nonetheless, has alleged several facts that may substantially affect Addison's ability to adequately represent the proposed class in her case. CNX alleges that Addison released all claims against CNX's predecessors-in-interest. While the language of the Release tendered by CNX is broad, the court cannot, at this stage, determine whether the Release bars Addison's claims. CNX also notes that the royalties for Addison's tracts have been placed in escrow pursuant to a

Board pooling order because they involve a deemed-lessor. The proposed class in Addison's case, however, makes no distinctions between lessors with claims to royalties held in escrow versus those with claims to royalties held in "suspense" by CNX.

It is difficult for the court to determine at this stage of the proceedings what, if any, effect these distinctions in fact will have on the claims remaining and Addison's ability to adequately represent the proposed class. While at this point, I find that Addison can adequately represent the proposed class in her case, the court should be diligent to ensure that this is true throughout the litigation.

*** 

Based on the above analysis, I recommend that the court conditionally certify these matters as class actions as requested by the plaintiffs, with the exception of the *Adkins* case and the breach of contract claims in the *Legard* and *Adkins* cases.

> As this litigation proceeds, the district court must make certain that manageability and other types of problems do not overwhelm the advantages of conditional certification. Should such concerns render the class mechanism ineffective, the district court must be prepared to use its considerable discretion to decertify the class….

*Cent. Wesleyan Coll.,* 6 F.3d at 189. "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Falcon,* 457 U.S. at 160. A court "is duty bound to monitor [the] class decision and, where certification proves improvident, to decertify, subclassify,

alter, or otherwise amend its class certification." *Chisolm v. TranSouth Fin. Corp.,* 194 F.R.D. 538, 544 (E.D. Va. 2000).


## PROPOSED FINDINGS OF
## FACT AND CONCLUSIONS OF LAW


As supplemented by the above summary and analysis, the undersigned now submits the following findings, conclusions and recommendations:


1.      The class definition in *Legard* is sufficiently definite;

2.      The class definition in *Adkins, Hale* and *Addison* would be sufficiently definite if modified to include current gas estate owners and to exclude gas estate owners who previously have received a judicial determination of the ownership of CBM;

3.      The class definition in *Adair* would be sufficiently definite if modified to include current gas estate owners and to exclude gas estate owners who previously have received a judicial determination of the ownership of CBM or entered into Split Agreements;

4.      The plaintiffs have shown that the members of the proposed class in each of the five cases are so numerous that joinder of all members is impracticable;

5.      The plaintiffs have shown that there are questions of law or fact common to each class;

6.      For purposes of obtaining a declaratory judgment as to ownership of the rights to the CBM royalties in *Adair, Adkins, Hale* and *Addison,* the plaintiffs have shown that the CBM operators have acted or refused to act on grounds generally applicable to the class, making appropriate final declaratory relief with respect to the class as a whole;

7.      For purposes of the remaining claims, the plaintiffs have shown that common questions of law or fact predominate;

8.      The plaintiffs have shown that class actions are superior

to other available methods for fairly and efficiently adjudicating this controversy;

9. The plaintiffs have shown that their claims are typical of the proposed class members' claims, with the exception of the *Adkins* case and the breach of contract claims in *Legard* and *Adkins*;

10. The plaintiffs have shown that they will fairly and adequately protect the interests of the classes; and

11. Plaintiffs' counsel have shown that they will adequately represent the interests of the classes.

## RECOMMENDED DISPOSITION

Based upon the above-stated reasons, the undersigned recommends the court allow the plaintiffs in the *Adair, Adkins, Hale* and *Addison* cases to modify the class definitions as set forth above, grant the Motions and conditionally certify these matters as class actions as requested, with the exception of the *Adkins* case and the breach of contract claim in the *Legard* and *Adkins* cases. The undersigned further recommends that plaintiffs' counsel be appointed as class counsel.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in the matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

ENTERED: this 5th day of June, 2013.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE